# EXHIBIT 1

**STATE OF RHODE ISLAND**                                       **SUPERIOR COURT**
**PROVIDENCE, SC**

---------------------------------------------------------------------X

**STATE OF RHODE ISLAND**,

              Plaintiff,                          C.A. No. _____

vs.

                                             **JURY TRIAL DEMANDED**

**Atlantic Richfield Company** (formerly known as
      Atlantic Richfield Delaware Corporation),
      individually, as successor-by-merger to
      Atlantic Richfield Company (a Pennsylvania
      corporation), and doing business as ARCO
      Products Company,
**BP Products North America Inc.** (f/k/a Amoco Oil
      Company and The American Oil Company),
      individually, as successor-by-merger to BP
      Exploration and Oil, Inc., and as successor-
      in-interest to BP North America Inc.,
**Chevron U.S.A. Inc.** (f/k/a Gulf Oil Corporation,
      and d/b/a Chevron Products Company and
      Chevron Chemical Company),
**CITGO Petroleum Corporation** (f/k/a Cities
      Service RMT Corporation),
**CITGO Refining and Chemicals Company L.P.**
      individually, and as successor-by-merger to
      Citgo Refining and Chemicals Company,
      Inc.,
**Coastal Eagle Point Oil Company**,
**ConocoPhillips Company** (f/k/a Phillips Petroleum
      Company and d/b/a Phillips 66 Company,
      Phillips Chemical Company, and Phillips Oil
      Company), individually, as successor-by-
      merger to Conoco, Inc., and Tosco
      Corporation,
**El Paso Merchant Energy-Petroleum Company,**
      (f/k/a Coastal Refining & Marketing, Inc.,
      Coastal Derby Refining Company, Derby
      Refining Company, and as Colorado Oil and
      Gas Corporation),

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2017 2:56:42 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 3 of 83 PageID #: 8

**Equilon Enterprises LLC** (d/b/a Shell Oil Products US) individually, and as successor-by-merger to Equiva Services LLC,

**Exxon Mobil Corporation** (f/k/a Exxon Corporation, and d/b/a ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., and ExxonMobil Chemical Corporation),

**ExxonMobil Oil Corporation** (f/k/a Mobil Oil Corporation, Socony Mobil Oil Company, Inc., and Socony Vacuum Oil Company, Incorporated),

**Hess Corporation,** (f/k/a Amerada Hess Corporation),

**Highlands Fuel Delivery, LLC** (f/k/a Irving Oil Corporation),

**Irving Oil Limited**,

**Marathon Oil Company** (f/k/a/ USS Holdings Company),

**Marathon Petroleum Company LP** (f/k/a Marathon Petroleum Company LLC; successor to Marathon Ashland Petroleum LLC),

**Mobil Corporation**,

**Motiva Enterprises LLC** (f/k/a Star Enterprises LLC),

**Paulsboro Refining Company, LLC**,

**PDV Midwest Refining, L.L.C.**,

**The Premcor Refining Group Inc.**,

**Shell Oil Company**,

**Shell Oil Products Company LLC,** (d/b/a Shell Oil Products Company),

**Shell Petroleum, Inc.**,

**Shell Trading (US) Company** (individually, f/k/a Equiva Trading Company and d/b/a Stusco),

**Sunoco, Inc. (R&M),** (f/k/a Sun Company, Inc. (R&M), Sun Refining and Marketing Company, and Sun Oil Company of Pennsylvania),

**TMR Company** (f/k/a Texaco Refining and Marketing, Inc.), individually, and as successor-by-merger to TRME Company (f/k/a Texaco Refining and Marketing (East), Inc.),

**TRMI-H LLC** (f/k/a TRMI Holdings Inc., Texaco Refining and Marketing Inc., Getty Refining

2

> and Marketing Company, and Getty Oil
> Company (Eastern Operations), Inc.),
> **Total Petrochemicals & Refining USA, Inc.** (f/k/a
> TOTAL Petrochemicals USA, Inc., Atofina
> Petrochemicals, Inc., Fina Oil and Chemical
> Company, and American Petrofina Company
> of Texas),
> **Ultramar Energy, Inc.**,
> **Valero Energy Corporation**,
> **Valero Marketing and Supply Company**,
> **Valero Refining-Texas, L.P.** (f/k/a Valero Refining
> Company and Valero Refining Company-
> Texas),

> Defendants.

---------------------------------------------------------------X

## PLAINTIFF'S COMPLAINT

Plaintiff **STATE OF RHODE ISLAND** makes the following allegations against the

Defendants listed above.

## I.     SUMMARY OF THE CASE

1.      The State of Rhode Island, by and through the Attorney General, brings this action to

protect and remedy important and vital State interests affected by widespread contamination of

groundwater and drinking water wells throughout the State with methyl tertiary butyl ether

("MTBE"), a chemical used in some gasoline, and tert butyl alcohol ("TBA"), a degradation

product of MTBE (together, "MTBE").

2.      The waters of the State, whether located above or below ground, constitute limited,

precious, and invaluable public resources which the State has the authority and responsibility to

protect, conserve, and manage in the interest of present and future generations.  The State has a

significant property interest in the waters of the State and a quasi-sovereign interest in protecting

the quality of such waters.  The MTBE contamination of groundwater and drinking water wells

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2017 9:56:32 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS    Document 1-1    Filed 05/11/17    Page 5 of 83 PageID #: 10

throughout the State constitutes injury for which the State seeks damages in its *parens patriae* capacity.  The State also acts to protect its own exclusive possessory interest in property.

3.      In Rhode Island, the public is entitled, by right, to the protection, preservation, and enhancement of the waters of the state, including groundwater.

4.      In Rhode Island, there is a public right to clean, safe and drinkable groundwater.

5.      Defendants' decision to use MTBE in gasoline, and their promotion, marketing, distribution, supply, and sale of such gasoline has created an unprecedented widespread degradation of, and future imminent threat to, both the surface and ground waters of the State, including many public and private drinking water supplies and wells (collectively, "waters of the State").  Unlike other gasoline constituents, MTBE contaminates and spreads in groundwater quickly and resists removal and treatment, thereby presenting a serious ongoing present injury and ongoing imminent threat to waters of the State and other properties.  MTBE and TBA have already contaminated numerous drinking water sources in the State and imminently threaten to contaminate many more, as a result of normal and foreseen storage, purchase, and use of gasoline in the State.

6.      The source of the MTBE contamination in Rhode Island's groundwater is gasoline.

7.      MTBE can cause significant adverse health effects and, even at very low concentrations, can render drinking water foul and unfit for human consumption.

8.      The defendants are major oil and chemical companies that have refined gasoline, manufactured MTBE, blended MTBE into gasoline, and/or supplied gasoline containing MTBE to the State.  The defendants include MTBE manufacturers and refiners and major brand marketers of gasoline containing MTBE that was sold and supplied in the State.  Gasoline

containing MTBE has damaged and continues to damage the waters of the State and other

property, both those owned by the State and those owned by citizens of the State.

9.      In addition to manufacturing and/or supplying MTBE or gasoline containing MTBE for

sale within the State, the defendants knowingly and willfully promoted, marketed, distributed,

supplied, and sold MTBE, gasoline, and other petroleum products (collectively referred to as

"gasoline") containing MTBE, when they knew or reasonably should have known that MTBE

would be released into the environment and cause contamination of property, water, water

supplies, and wells throughout the State in violation of federal and state law; would interfere

with the State's interest in protecting and preserving both surface and ground waters as well as

both public and private drinking water supplies; and would threaten public health and welfare

and the environment, as has occurred and is continuing to occur within the State.

10.     The defendants are:  liable for polluting groundwater as prohibited by R.I. Gen. Laws §§

46-12-5 and 46-12-21; liable for reimbursing the State's expenditures related to MTBE

contamination, per 42 U.S.C. § 6991b, R.I. Gen. Laws § 46-12.9-5, and any other applicable

provisions; strictly liable for manufacturing and supplying a defective product; strictly liable for

failing to provide adequate warnings in connection with that product; liable for negligently

causing damage to the property and waters of the State and to the property of citizens of the

State; liable for creating a public nuisance; liable for creating a private nuisance; liable for

trespass upon the waters of the State and upon property of citizens of the State; liable for

unreasonably interfering with the use and enjoyment of public trust resources; liable as co-

conspirators with other defendants; and liable for all resulting damages.

11.     Plaintiff brings this action to recover compensatory damages and all other remedies,

including all costs to investigate, monitor, abate, contain, prevent, treat, and remove MTBE and

TBA from the State's property and waters, property of the citizens of the State, and public and

private drinking water supplies, and to ensure that the responsible parties bear such expense,

rather than the State or its citizens and taxpayers. The State also seeks punitive damages to

reflect the aggravating circumstances caused by the defendants' willful, wanton, malicious,

oppressive, fraudulent, and/or outrageously reprehensible conduct, and harms caused to public

resources by defendants' intentional business choices.

## II.    PLAINTIFF

12.    Plaintiff is the State of Rhode Island, as represented by and through the Attorney General

of the State of Rhode Island (the "State").

13.    The State brings this action as an exercise of its authority to protect state waters including

groundwater and its police power, which includes, but is not limited to, its power to prevent

pollution of the State's property and waters, to prevent and abate nuisances, and to prevent and

abate hazards to public health, safety, welfare, and the environment.

14.    The State also brings this action in its *parens patriae* capacity for the benefit of the

citizens of the State, whose private property, groundwater, and/or water supplies have been

contaminated with MTBE; for the benefit of public water providers, whose property and/or water

supplies have been contaminated with MTBE; for the benefit of governmental subdivisions,

whose property and/or water supplies have been contaminated with MTBE and/or who have

spent funds associated with MTBE contamination; and for the benefit of all citizens of the State

who rely on public and private drinking water wells at their residences, schools, churches,

workplaces, recreational sites, and elsewhere.

15.    By bringing this suit, the State intends to occupy the field of litigation arising from

MTBE contamination in the State of Rhode Island and to recover damages arising from any and

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2017 9:56:52 AM
Envelope: 1018765
Reviewer: Alexa G.

all MTBE contamination in the State, except for any proceeds recovered in previous lawsuits for

MTBE contamination of water supplies and wells in the State.  The State intends specifically to

preempt any similar or related action filed after the date of filing of this Complaint except, for

example, private lawsuits alleging personal injury or diminution in property value associated

with MTBE.

16.     The contamination of the property and waters of the State by MTBE constitutes injury to

the environment and to property and waters of the State, for which the State seeks damages.  The

State has a quasi-sovereign interest in protecting the quality of waters of the State.

17.     The contamination of property and waters of the State by MTBE also constitutes injury to

property directly owned by the State for which the State seeks damages.  The State has an

interest in remediating the MTBE contamination of its exclusive property and in preventing

future MTBE contamination.

18.     In this Complaint, the term "property and waters of the State" will refer to all property for

which the State seeks damages including without limitation: public property, property directly

owned by the State, property owned by citizens, surface water and groundwater in the State,

drinking water supplies located throughout the State, and State-owned, public, and private

drinking water wells.

### III.     DEFENDANTS

19.     Defendants are petroleum industry corporations including the manufacturers and

promoters of MTBE and the refiners and marketers of MTBE and/or gasoline containing MTBE.

The following defendants, at all times relevant to this action, refined, marketed and/or otherwise

supplied (directly or indirectly) MTBE and/or gasoline containing MTBE such that each

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2017 10:56:52 AM
Envelope: 1018765
Reviewer: Alexa G.

defendant knew or should have known that it would be delivered into areas affecting the property and waters of the State:

a.  **Atlantic Richfield Company,** (formerly known as Atlantic Richfield Delaware Corporation), individually, and as successor-by-merger to Atlantic Richfield Company (a Pennsylvania corporation), and doing business as ARCO Products Company, is a Delaware corporation with its principal place of business at: 501 Westlake Park Boulevard, Houston, Texas 77079.  Atlantic Richfield Company may be served with process through its registered agent, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

b.  **BP Products North America Inc.,** (f/k/a Amoco Oil Company and The American Oil Company, individually, and as successor-by-merger to BP Exploration and Oil, Inc., and as successor-in-interest to BP North America Inc.), is a Maryland corporation with its principal place of business at: 501 Westlake Park Boulevard, Houston, Texas 77079.  BP Products North America Inc. may be served with process through its registered agent, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

c.  **Chevron U.S.A. Inc.,** (f/k/a Gulf Oil Corporation, and d/b/a Chevron Products Company and Chevron Chemical Company), is a Pennsylvania corporation with its principal place of business at:  6001 Bollinger Canyon Road, San Ramon, California 94583.  Chevron U.S.A. Inc. may be served with process through its registered agent, Prentice-Hall Corp. System, 222 Jefferson Boulevard, Suite 200, Warwick, RI 02888.

d.  **CITGO Petroleum Corporation,** (f/k/a Cities Service RMT Corporation), is a Delaware corporation with its principal place of business at:  1293 Eldridge Parkway, Houston, Texas

77077. Citgo Petroleum Corporation may be served with process through its registered agent, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

e. **CITGO Refining and Chemicals Company L.P.,** individually, and as successor-by-merger to Citgo Refining and Chemicals Company, Inc., is a Delaware limited partnership with its principal place of business at: 6100 South Yale Avenue, Tulsa, Oklahoma 74136. Citgo Refining and Chemicals Company, LP may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

f. **Coastal Eagle Point Oil Company** is a Delaware corporation with its principal place of business at: 1001 Louisiana Street, Suite 1000, Houston, Texas 77002. Coastal Eagle Point Oil Company may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

g. **ConocoPhillips Company,** (f/k/a Phillips Petroleum Company and d/b/a Phillips 66 Company, Phillips Chemical Company, and Phillips Oil Company), individually, and as successor-by-merger to Conoco, Inc. and Tosco Corporation, is a Delaware corporation with its principal place of business at: 600 North Dairy Ashford Road, Houston, Texas 77079. ConocoPhillips Company may be served with process through its registered agent, US Corporation Company, 222 Jefferson Boulevard, Suite 200, Warwick, RI 02888.

h. **El Paso Merchant Energy-Petroleum Company,** (f/k/a Coastal Refining & Marketing, Inc., Coastal Derby Refining Company, Derby Refining Company, and as Colorado Oil and Gas Corporation), is a Delaware corporation with its principal place of business at: 1001 Louisiana Street, Suite 1000, Houston, Texas 77002. El Paso Merchant Energy-Petroleum Company may be served with process through its registered agent, CT Corporation

Company, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

i.    **Equilon Enterprises LLC,** (d/b/a Shell Oil Products US) individually, and as successor-by-merger to Equiva Services LLC, is a Delaware limited liability company with its principal place of business at:  910 Louisiana, Houston, Texas 77002.  Equilon Enterprises LLC may be served with process through its registered agent, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

j.    **Exxon Mobil Corporation,** (f/k/a Exxon Corporation and d/b/a ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., and ExxonMobil Chemical Corporation), is a New Jersey corporation with its principal place of business at: 5959 Las Colinas Boulevard, Irving, Texas 75039.  Exxon Mobil Corporation may be served with process through its registered agent, Corporation Service Company, 222 Jefferson Boulevard, Suite 200, Warwick, RI 02888.

k.    **ExxonMobil Oil Corporation,** (f/k/a Mobil Oil Corporation, Socony Mobil Oil Company, Inc., and Socony Vacuum Oil Company, Incorporated), is a New York corporation with its principal place of business at: 5959 Las Colinas Boulevard, Irving, Texas 75039.  ExxonMobil Oil Corporation may be served with process through its registered agent, Prentice-Hall Corp. System, 222 Jefferson Boulevard, Suite 200, Warwick, RI 02888.

l.    **Hess Corporation** (f/k/a Amerada Hess Corporation), is a Delaware corporation with its principal place of business at: 1185 Avenue of the Americas, New York, New York 10036.  Hess Corporation may be served with process through its registered agent, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

m. **Highlands Fuel Delivery, LLC** (f/k/a Irving Oil Corporation), is a Maine corporation with its principal place of business at 190 Commerce Way, Portsmouth, New Hampshire 03801. Highlands Fuel Delivery may be served with process through CT Corporation System, 9 Capitol Street, Concord, NH 03301.

n. **Irving Oil Limited,** is a Canadian corporation with its principal place of business at 1 Germain Street, Saint John, E2L 4V1 NB Canada. Irving Oil Limited may be served with process through the Rhode Island Secretary of State.

o. **Marathon Oil Company** (f/k/a/ USS Holdings Company) is an Ohio corporation with its principal place of business at: 5555 San Felipe, Houston, TX 77056. Marathon Oil Company may be served with process through its registered agent: Bonnie L. Love as Senior Corporate Operations Specialist for Marathon Oil, Company, c/o Registered Agent, CT Corporation System, 120 South Central Avenue, Suite 400, Clayton, MO 63105.

p. **Marathon Petroleum Company LP** (f/k/a Marathon Petroleum Company LLC; successor to Marathon Ashland Petroleum LLC) is a limited partnership organized under the state of Delaware with its principal place of business at: 539 South Main Street, Findlay, Ohio 45840. Marathon Petroleum Company LP may be served with process through its registered agent, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

q. **Mobil Corporation,** is a Nevada corporation with its principal place of business at: 800 Bell Street, Suite 1503, Houston, Texas 77002. Mobil Corporation may be served with process through its registered agent, Prentice Hall Corp. System, 211 E. 7th Street, Suite 620, Austin, TX 78701.

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 3:46:52 AM
Envelope: 1018765
Reviewer: Alexa G.

CASE 1:17-CV-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 13 of 83 PageID #: 18

r.      **Motiva Enterprises LLC,** (f/k/a Star Enterprises LLC), is a Delaware limited liability company with its principal place of business at: OSP 25th Floor, 910 Louisiana Street, Houston, Texas 77002.  Motiva Enterprises LLC may be served with process through its registered agent, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

s.      **Paulsboro Refining Company, LLC,** (f/k/a Valero Refining Company-New Jersey) is a Delaware Corporation with its principal place of business at: 1 Sylvan Way, 2nd Floor, Parsippany, NJ 07054.  Paulsboro Refining Company, LLC may be served with process through its registered agent, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI, 02914.

t.      **PDV Midwest Refining, L.L.C.,** is a Delaware limited liability company with its principal place of business at: 1293 Eldridge Parkway, Houston Texas 77077.  PDV Midwest Refining, LLC may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

u.      **The Premcor Refining Group Inc.,** (f/k/a Clark Refining & Marketing, Inc.) is a Delaware corporation with its principal place of business at: One Valero Way, San Antonio, TX 78249.  The Premcor Refining Group Inc. may be served with process through its registered agent, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI, 02914.

v.      **Shell Oil Company** is a Delaware corporation with its principal place of business at: 910 Louisiana Street, Houston, Texas 77002.  Shell Oil Company may be served with process through its registered agent, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

12

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 9:46:52 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 14 of 83 PageID #: 19

w.   **Shell Oil Products Company LLC,** (d/b/a Shell Oil Products Company), is a Delaware limited liability company with its principal place of business at: 910 Louisiana Street, Houston, Texas 77002. Shell Oil Products Company LLC may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

x.   **Shell Petroleum, Inc.,** is a Delaware corporation with its principal place of business at: 910 Louisiana Street, Houston, Texas 77002.  Shell Petroleum, Inc. may be served with process through its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

y.   **Shell Trading (US) Company,** (individually, f/k/a Equiva Trading Company and d/b/a Stusco), is a Delaware corporation with its principal place of business at:  1000 Main, 12th Floor, Houston, Texas 77002.  Shell Trading (US) Company may be served with process through its registered agent, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

z.   **Sunoco, Inc. (R&M),** (f/k/a Sun Company, Inc. (R&M), Sun Refining and Marketing Company, and Sun Oil Company of Pennsylvania), is a Pennsylvania corporation with its principal place of business at: 1818 Market Street, Suite, 1500, Philadelphia, Pennsylvania 19103.  Sunoco, Inc. (R&M) may be served with process through its registered agent, Corporation Service Company, 222 Jefferson Boulevard, Suite 200, Warwick, RI 02888.

aa.  **TMR Company,** (f/k/a Texaco Refining and Marketing, Inc.), individually, and as successor-by-merger to TRME Company (f/k/a Texaco Refining and Marketing (East), Inc.), is a Delaware corporation with its principal place of business at: 910 Louisiana,

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2017 9:36:52 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-CV-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 15 of 83 PageID #: 20

Houston, Texas 77002.  TMR Company may be served with process through its registered

agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

bb.   **TRMI-H LLC** (f/k/a TRMI Holdings Inc., Texaco Refining and Marketing Inc., Getty

Refining and Marketing Company, and Getty Oil Company (Eastern Operations), Inc.) is a

Delaware corporation with its principal place of business at: 6001 Bollinger Canyon Road,

San Ramon, California 94583.  TRMI-H LLC may be served with process through its

registered agent, Corporation Service Company, 2338 West Royal Palm Road, Suite J,

Phoenix, AZ 85021.

cc.   **Total Petrochemicals & Refining USA, Inc.,** (f/k/a TOTAL Petrochemicals USA, Inc.,

Atofina Petrochemicals, Inc., Fina Oil and Chemical Company, and American Petrofina

Company of Texas), is a Delaware corporation with its principal place of business at: 1201

Louisiana Street, Suite 1800, Houston, Texas 77002.  Total Petrochemicals & Refining

USA, Inc. may be served with process through its registered agent, CT Corporation System,

450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

dd.   **Ultramar Energy, Inc.,** is a Delaware corporation with its principal place of business at:

One Valero Way, San Antonio, Texas 78249.  Ultramar Energy, Inc. may be served with

process through its registered agent, The Corporation Trust Company, Corporation Trust

Center 1209 Orange Street, Wilmington, DE 19801.

ee.   **Valero Energy Corporation,** is a Delaware corporation with its principal place of business

at:  One Valero Way, San Antonio, Texas 78429.  Valero Energy Corporation may be served

with process through its registered agent, Senior Process Specialist c/o CT Corporation

Company, 1999 Bryan Street, Suite 900, Dallas, TX  75201.

ff.  **Valero Marketing and Supply Company** is a Delaware corporation with its principal place of business at: One Valero Way, San Antonio, Texas 78429. Valero Marketing and Supply Company may be served with process through its registered agent, CT Corporation System, 450 Veterans Memorial Parkway, Suite 7A, East Providence, RI 02914.

gg.  **Valero Refining-Texas, L.P.,** (f/k/a Valero Refining Company and Valero Refining Company-Texas) is a Texas Limited Partnership with principal place of business at: One Valero Way, San Antonio, Texas 78429. Valero Refining-Texas, L.P. may be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.

20.  The entities identified above will be collectively referred to as "Defendants." Defendants, among other things: (a) designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed, sold, and/or otherwise supplied (directly or indirectly) MTBE and/or gasoline containing MTBE that was delivered into areas affecting the property and waters of the State, such that releases of MTBE contaminated and imminently threaten the property and waters of the State; (b) acted with actual or constructive knowledge that refiners would blend such MTBE into gasoline and such gasoline would, in turn, be delivered into areas affecting the property and waters of the State; (c) were legally responsible for and committed each of the multiple tortious and wrongful acts alleged in this Complaint; (d) participated in one or more joint enterprises to promote MTBE and/or gasoline containing MTBE, despite the availability of reasonable alternatives and their actual or constructive knowledge that the contamination alleged in this Complaint would be the inevitable result of their conduct; and (e) in doing the tortious and wrongful acts alleged in this Complaint, acted in the capacity of joint-venturer, partner, agent, principal, successor-in-interest, surviving

corporation, fraudulent transferee, fraudulent transferor, controller, alter-ego, co-conspirator,

licensee, licensor, patent holder, and/or indemnitor of other Defendants.

21.     To the extent any act or omission of any of the Defendants is alleged in this Complaint,

the officers, directors, agents, employees or representatives of each such Defendant committed or

authorized each such act or omission, or failed to adequately supervise or properly control or

direct their employees while engaged in the management, direction, operation or control of the

affairs of such Defendants, and did so while acting within the scope of their duties, employment

or agency.

22.     Any and all references to a Defendant or Defendants in this Complaint include any

predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

## IV.     JURISDICTION AND VENUE

23.     This Court has jurisdiction pursuant to R.I. Gen. Laws §§ 8-2-13, 8-2-14, and Rule 65 of

the Superior Court Rules of Civil Procedure.

24.     This Court may exercise personal jurisdiction over Defendants because they are either

authorized to do business in Rhode Island, registered with the Rhode Island Secretary of State,

do sufficient business with sufficient minimum contacts in Rhode Island, or otherwise

intentionally avail themselves of the Rhode Island market through the sale, manufacturing,

distribution, supply and/or processing of petroleum-related products in Rhode Island to render

the exercise of jurisdiction over Defendants by the Rhode Island courts consistent with

traditional notions of fair play and substantial justice.

25.     Venue is proper, pursuant to R.I. Gen. Laws §§ 9-4-2 and 9-4-4.

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 3:46:52 AM
Envelope: 1018765
Reviewer: Alexa G.

CASE 1:17-CV-00204-WES-PAS    Document 1-1    Filed 05/11/17    Page 18 of 83 PageID #: 23

## V.    LIABILITY SUMMARY

26.    Defendants knew, or reasonably should have known, that:  (a) the gasoline distribution

and retail system contained leaking gasoline storage and delivery systems; (b) MTBE is more

readily released from gasoline storage and delivery systems than the constituents of conventional

gasoline; (c) releases of MTBE into the environment would be an inevitable consequence of

placing MTBE into the stream of commerce in the absence of precautionary measures to prevent

or mitigate such releases; (d) when released into the environment, MTBE would easily travel

great distances, mix easily with groundwater, resist biodegradation, and render drinking water

unsafe and/or non-potable; and (e) removing such contamination from property, surface water,

groundwater, drinking water supplies, and water wells would require significant expense.

27.    At all times relevant to this litigation, Defendants were or should have been aware that

MTBE contamination of groundwater and drinking water was inevitable as a result of MTBE's

water-seeking properties, recalcitrance to biodegradation and bioremediation, and the long

history of nationwide gasoline spills, leaks, and other losses during supply, distribution, sale, and

use.

28.    Despite their knowledge that MTBE posed a devastating risk of groundwater and

drinking water contamination, and despite the availability of reasonable alternatives, Defendants

failed to warn customers, retailers, regulators, public officials, or the State, and failed to take any

other precautionary measures to prevent or mitigate such contamination.  Instead, Defendants

promoted MTBE, and gasoline containing MTBE, as environmentally sound products

appropriate for widespread use.  Moreover, certain Defendants engaged in separate and joint

activities to suppress, conceal, and/or discredit studies and other information regarding the

hazards of MTBE.  Defendants' intentional business choices harmed the State.

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 8:42 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 19 of 83 PageID #: 24

29.     In their Material Safety Data Sheets and other materials, Defendants provided
instructions regarding the use, handling, and storage of MTBE and affirmatively misrepresented
the risks involved in those activities.  Indeed, Defendants represented that gasoline containing
MTBE could be handled in the same fashion as conventional gasoline and required no special
measures to protect against, respond to, or mitigate suspected releases to the subsurface.

30.     Defendants made such representations although they had not conducted adequate testing
before they began adding MTBE to gasoline.  Defendants did not perform the standard
toxicological studies before placing MTBE into the stream of commerce, and they did not
conduct long-term cancer studies, although research showed that MTBE caused cancer in
animals.  Defendants misled the Environmental Protection Agency ("EPA") and convinced the
Agency not to test MTBE.  In 1986, the federal Interagency Testing Committee ("ITC"),
established pursuant to the Toxic Substances Control Act, recommended testing and review to
assess MTBE's health and environmental risks.  Recognizing its high water solubility and
persistence in groundwater, ITC recommended chemical fate monitoring of MTBE to determine
the risk MTBE poses to the environment as well as medical testing of MTBE.  The oil industry,
including Defendants, mobilized to convince the EPA that additional testing of MTBE was not
needed.  Defendants downplayed the risks of groundwater contamination with MTBE and
omitted material facts known to Defendants at the time, even when government officials
expressed concern over the need to assess the potential for groundwater contamination.

31.     Defendants also misled Congress when it was preparing to take action to address the
Nation's smog problem.  As a result of tremendous lobbying efforts by the industry, including
Defendants, Congress adopted the Reformulated Gasoline (RFG) Program as part of the 1990
Amendments to the Clean Air Act.  According to the EPA, "The concept of reformulated

18

gasoline (RFG) was originally generated, developed and promoted by industry, not the EPA or other parts of the federal government."

32.     At all times relevant to this action:

    a.  Defendants manufactured, promoted, marketed, supplied, and/or sold MTBE for use as a component of gasoline and/or refined, blended, promoted, marketed, supplied, and/or sold gasoline containing MTBE.

    b.  Gasoline containing MTBE was delivered to commercial and consumer users including retail gasoline stations and other gasoline delivery systems in the State (and areas affecting the property and waters of the State).

    c.  Gasoline containing MTBE was released to the subsurface from USTs, retail gasoline facilities, other commercial and consumer uses, and other sources at locations throughout the State and/or in areas affecting the property and waters of the State. Such releases of gasoline containing MTBE occurred over time in varying amounts at different locations.

    d.  MTBE, which takes time to migrate from release points through the subsurface to locations where it may be detected in groundwater, has migrated and continues to migrate from dispersed release points at or near the surface at retail gasoline facilities and other sources and facilities within or near the State's boundaries, causing and imminently threatening to cause pollution, contamination, and substantial and continuing damage to the property and waters of the State, including, without limitation, drinking water, and causing damage to the State.

33.     As a direct and proximate result of Defendants' negligent and intentional acts described above, MTBE was released into the environment, where it remains, causing and imminently

19

threatening to cause widespread contamination of the property and waters of the State and

endangering water supplies including, without limitation, drinking water supplies.

## VI.    FACTUAL ALLEGATIONS

### A.    The Contaminant at Issue - MTBE

34.    MTBE is a synthetic chemical blended into various gasolines by various refiners at times

since 1979.  As used in this Complaint, "MTBE" refers not only to methyl tertiary butyl ether,

but also to the contaminants in and degradation byproducts of MTBE, including TBA.

35.    One way that MTBE contaminates the environment is through releases, leaks, overfills,

and spills from gasoline delivery facilities --- including, but not limited to, gasoline stations,

gasoline storage, transfer, delivery, and dispensing systems ("gasoline delivery systems").

36.    Another way that MTBE contaminates the environment is through releases, leaks,

overfills, and spills of gasoline associated with or incident to certain consumer activities, such as

use of snowmobiles, motorized watercraft and lawnmowers, and operation of junkyards and

vehicle maintenance and repair facilities, which result in releases of MTBE into waters of the

State.

37.    A very small release of gasoline containing MTBE can cause significant environmental

contamination.  Exxon Research & Engineering Company prepared a report in 1999 explaining

that a one teaspoon leak "can translate into MTBE ground water concentrations above the taste

and odor detectable threshold levels."  Even worse, a UST's leak detection system allows leaks

of up to 0.01 gallons per hour to go undetected, which means 7.5 teaspoons per hour can leak

from a UST.  Assuming an average volume of 10% MTBE in gasoline, by Exxon's estimate,

0.75 teaspoons of MTBE per hour could leak undetected into the environment.

20

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 3:46:52 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 22 of 83 PageID #: 27

38.     A graphic in the same Exxon document shows that the one teaspoon leak would result in

an MTBE concentration of 413 ppb in 1000 liters (L) of groundwater.  At 10,000 L, the MTBE

concentration is 41 ppb.  Even at 100,000 L, the MTBE concentration is 4 ppb --- well above the

taste and odor threshold.

39.     As a result of its physical characteristics, MTBE finds pathways for release into the

environment from gasoline delivery systems and is more readily released from such systems than

conventional gasoline components.

40.     Once released to the environment, MTBE's unique characteristics cause extensive

environmental contamination and a corresponding imminent threat to the public health and

welfare beyond that caused by gasoline that does not contain MTBE.  In particular, the fate and

transport of MTBE in the subsurface differs significantly from that of conventional gasoline

constituents, specifically the "BTEX compounds" (benzene, toluene, ethylbenzene, and xylene).

41.     In groundwater, MTBE moves freely at approximately the rate of the water's movement,

unlike BTEX compounds, which tend to adhere to soil and float on the surface of water.  This

makes MTBE more difficult to remove than BTEX compounds.

42.     MTBE also is more persistent than BTEX compounds because it does not readily

biodegrade in groundwater.  Because of its recalcitrance, plumes of MTBE can persist in

underground aquifers for decades, far longer than other gasoline components.  Once an MTBE

plume reaches a well, it continues to contaminate the water drawn from that well.  As a result,

MTBE is more difficult and expensive to remove from groundwater than BTEX compounds.

43.     In sum, when MTBE is released into the environment, it migrates farther and faster

through soil and groundwater, penetrates deeply into aquifers, resists biodegradation and results

21

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 8:42 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 23 of 83 PageID #: 28

in persistent contamination that is costly to address.  As a result of these properties, MTBE has

contaminated, and continues to contaminate and imminently threaten, the waters of the State.

44.     Not all of the MTBE contamination of water resources in the State can be traced to a

specific source.

45.     MTBE is a fungible product:  MTBE made and/or used by one Defendant is chemically

identical to MTBE made and/or used by any other Defendant.  MTBE gasoline also is a fungible

product: MTBE gasoline made and/or used by one Defendant is chemically identical to MTBE

gasoline made and/or used by any other Defendant.  Once blended into gasoline, it is impossible,

based on physical characteristics, to identify the manufacturer of the MTBE.

46.     Once MTBE leaves the refinery and enters the stream of commerce, it is impossible,

based on physical characteristics, to identify the refiner of the gasoline containing it.  In addition,

gasoline containing MTBE from various refiners is commingled during transmission from

refineries to distribution centers such as gasoline terminals to retail gasoline stations.  The

gasoline at any particular service station is, therefore, an intentionally blended product made up

of gasoline from many different refiners.  Thus, a subsurface plume, even if released from a

single identifiable tank, pipeline, or vessel, is the product of mixed batches of gasoline

originating from different refiners.  It is impossible, based on any physical characteristics, to

identify what portions of commingled gasoline containing MTBE were refined and/or supplied

by any particular refiner/marketer defendant, or to identify the manufacturer of any of the MTBE

contained in such commingled gasoline.

47.     Once released into the environment, MTBE lacks characteristics or a chemical signature

that would enable identification of the refinery or company that manufactured the product, based

on any physical characteristics.  Even when it is possible to identify a source of a plume of

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 24 of 83 PageID #: 29

MTBE --- such as a leaking underground storage tank --- it is impossible, based on any physical

characteristics, to identify what portions of commingled gasoline containing MTBE were refined

and/or supplied by any particular refiner/marketer defendant, or to identify the manufacturer of

any of the MTBE contained in such commingled gasoline.  Identification is further complicated

by the Defendants' practice of trading, bartering, or otherwise exchanging gasoline products.

48.     Federal and other studies link MTBE to a variety of adverse health effects.  MTBE is a

known animal carcinogen, and the EPA considers it to be a possible human carcinogen.

49.     In addition to the health and environmental risks posed by MTBE in drinking water

supplies, MTBE imparts a turpentine odor and chemical taste onto previously potable water.

MTBE's taste and odor alone renders water unfit for human consumption.  Research has shown

that some people can detect the foul odor or taste of MTBE in water at concentrations of one part

per billion ("ppb") or lower.

50.     TBA also has contaminated and imminently threatens the waters of the State.

51.     TBA is a chemical used to produce MTBE and sometimes blended into gasoline.  In

addition, TBA is an intermediate product of MTBE biodegradation.  As a result, TBA may

appear wherever there is MTBE contamination.

52.     TBA has the same characteristics as MTBE that make it a persistent and pernicious

groundwater contaminant: high solubility in water (even higher than MTBE); resistance to

biodegradation, etc.  In addition, TBA is highly toxic when inhaled and is irritating to the skin,

eyes, and mucous membranes.  Some animal studies link TBA to cancer, and kidney and thyroid

tumors.

53.     TBA contamination is even more expensive to clean up than MTBE.  In fact, the

presence of TBA in water being treated for MTBE may generate additional compounds of health

and environmental concern, limiting the usefulness of these technologies and further increasing

costs.

54.     Defendants failed to warn the State, regulators, and the general public that Defendants

often added TBA to their gasoline and that MTBE breaks down into TBA.  Further, Defendants

failed to warn the State of the need to test its water supplies for contamination by TBA.

### B.     History of MTBE Use

55.     Oil companies began blending MTBE into gasoline in the late 1970's.  Initially used as

an octane enhancer, MTBE was used throughout the 1980s at low concentrations in some

gasoline by some refiners, primarily in high-octane grades.  MTBE was not the only viable

option to achieve higher octane in gasoline.  Rather, Defendants made an intentional business

decision to use MTBE in order to find a profitable use for a waste byproduct of the refining

process.

56.     Prior to 1990, Congress was preparing to take action to address the Nation's smog

problem.

57.     During this timeframe, the oil industry, including Defendants, became concerned that

Congress might consider requiring alternative non-petroleum based fuels.

58.     As a result of tremendous lobbying efforts by the industry, including Defendants,

Congress adopted the Reformulated Gasoline Program as part of the 1990 Amendments to the

Clean Air Act.  According to the EPA, "The concept of reformulated gasoline (RFG) was

originally generated, developed and promoted by industry, not the Environmental Protection

Agency (EPA) or other parts of the federal government."

59.     Congress mandated the use of RFG containing at least 2% oxygen by weight in those

areas of the country with the worst ozone or smog problems.  The 1990 Amendments authorized

the EPA to designate certain areas of the country to participate in RFG programs.

60.     In 1992, in conjunction with the Clean Air Act, EPA initiated the Oxygenated Fuel

Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline in

certain metropolitan areas to reduce carbon monoxide emissions during the fall and winter

months.

61.     The Clean Air Act required during the relevant timeframe the use of an oxygenate in

certain gasoline, but it did not require a specific oxygenate to be used.  MTBE became

Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce

and offered Defendants the highest profit margin of all the oxygenates available.  Defendants

could manufacture MTBE from their already available refinery by-products and therefore were

not forced to purchase a different oxygenate, such as ethanol, from a third-party.

62.     National annual production figures for MTBE reflect the oil industry's decision to make

MTBE its oxygenate of choice:  MTBE production increased from 1.5 million barrels in 1980 to

75 million barrels in 1998.

63.     Much of the gasoline sold in non-attainment areas under the RFG Program exceeded that

Program's minimum 2% or 2.7% oxygenate requirements, and MTBE composed up to 15% of

every gallon of gasoline used in those areas.  MTBE composed a significant amount of gasoline

even in areas that did not participate in the RFG Program.

64.     Defendants started supplying high MTBE-content gasoline for sale in certain

metropolitan areas in 1992 as part of the Oxyfuel Program.

65.     In or around January 1995, Defendants started manufacturing and supplying gasoline

25

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 3:36:57 AM
Envelope: 1018765
Reviewer: Alexa G.

1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 27 of 83 PageID #: 32

containing higher levels of MTBE into the stream of commerce when moved by market factors

and financial considerations to do so.  Gas station owners and pump operators, whom Defendants

never warned about the properties of MTBE or gasoline containing MTBE, started selling

Defendants' gasoline with greatly elevated concentrations of MTBE.

66.     At its peak, most if not all gasoline supplied to the RFG areas contained high

concentrations (11 to 15 percent) of MTBE.  In addition, gasoline containing elevated

concentrations of MTBE was often sold at other locations at the discretion of the oil industry,

including Defendants.

67.     In making MTBE their oxygenate of choice, Defendants decided to forgo safer

oxygenates, such as ethanol.  In fact, belatedly, some gasoline sellers publicly acknowledged that

MTBE is neither environmentally safe nor necessary.  Getty Marketing, for example, placed full

page ads in the *New York Times* on October 13, 1999 stating:

> Protecting our water supply means making a commitment to doing
> business in environmentally-friendly ways. That's what we're
> doing at Getty. We have replaced MTBE with **ethanol** in our
> gasoline because it helps clean the air without harming our
> drinking water.

68.     Safer, more environmentally sound alternatives were at all times available and known to

Defendants.

69.     Defendants, not the State, chose to use MTBE in gasoline in Rhode Island.

70.     As a result of Defendants' intentional business choices, MTBE was widely used

throughout the United States, including Rhode Island, and it now contaminates the property and

waters of the State and both public and private drinking water supply wells.

71.     It is now apparent that MTBE did not even deliver Defendants' promise of cleaner air.  A

detailed 1998 report commissioned by the State of California concluded that "there is no

significant air quality benefit to the use of oxygenates such as MTBE in reformulated gasoline"

when compared to alternative non-oxygenated formulations.[1]

72.     In May 1999, the National Research Council of the National Academy of Sciences

("NAS") issued a report concluding that MTBE does little to reduce ozone air pollution and

smog.[2]  NAS previously had concluded that reductions of carbon monoxide concentrations in the

nation's air actually took place before MTBE was added to gasoline as a purported "clean air"

oxygenate.[3]

73.     In fact, combustion of gasoline containing MTBE in car engines actually increases

exhaust emissions of formaldehyde, nitrous oxide and other toxic chemicals including MTBE

itself.

### C.     Defendants Were Well Aware of MTBE's Threat to Groundwater

74.     At all times relevant to this litigation, Defendants were aware that, on a nationwide level,

gasoline was leaking from multiple sources, including underground storage tanks ("USTs").

Industry reports, Congressional testimony, and EPA concerns reflect Defendants' knowledge that

the systems used for shipping, storing, pumping, and using gasoline involved leaks and spillages

at all links in the gasoline distribution chain.

75.     At all times relevant to this litigation, Defendants were or should have been aware that

thousands of gallons of gasoline entered the soil and groundwater annually from gasoline-

dispensing stations due to UST releases and leaks, consumer and jobber overfills, and

mishandling.

---

[1] "Health and Environmental Assessment of MTBE," Report to the Governor and Legislature of the State of California as sponsored by SB 521 (Nov. 12, 1998).
[2] "The Ozone-Forming Potential of Reformulated Gasoline," Nat'l Research Council, Nat'l Academy of Sciences (May 11, 1999).
[3] "Toxicological and Performance Aspects of Oxygenated Motor Vehicle Fuels," Nat'l Research Council, Nat'l Academy of Sciences (1996).

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2023 8:52 AM
Envelope: 1018765
Reviewer: Alexa G.
Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 29 of 83 PageID #: 34

76.     At all times relevant to this litigation, Defendants were or should have been aware that gasoline containing MTBE was leaking and/or being released from multiple sources, including USTs, and causing MTBE contamination of soil, groundwater and/or drinking water.

77.     The source of the MTBE contamination in Rhode Island's groundwater is gasoline.

78.     At all times relevant to this litigation, Defendants were or should have been aware that additional quantities of MTBE reached the soil and groundwater through vaporization from USTs, and that such vaporization and other small releases occurred even when a tank is considered to have tested tight, e.g., passed standard leak detection tests.

79.     Defendants also knew or should have known that releases, leaks, overfills, and spills of gasoline associated with or incident to certain consumer activities, such as use of snowmobiles, motorized watercraft and lawnmowers, and operation of junkyards and vehicle maintenance and repair facilities, would result in releases of MTBE into waters of the State.

80.     At all times relevant to this litigation, Defendants were or should have been aware that MTBE contamination of groundwater was inevitable.  MTBE's water-seeking properties, recalcitrance to biodegradation and bioremediation, and the long history of nationwide gasoline spills, leaks, and other losses during distribution, sale, and use guaranteed substantial and repeated releases of MTBE-containing gasoline into the environment.

81.     For example, the American Petroleum Institute ("API"), a trade association representing the domestic petroleum industry, including certain Defendants, in a broad range of topics, formed a Toxicology Committee in or around 1980.  The Toxicology Committee included representatives from Exxon, Mobil, Shell, Atlantic Richfield Company ("ARCO"), Tosco and Chevron Texaco, among others.

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 ... 8:43 AM
Envelope: 1018765
Reviewer: Alexa G.
CASE 1:17-CV-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 30 of 83 PageID #: 35

82.     API's Toxicology Committee meeting minutes make plain that committee members shared information and repeatedly discussed MTBE's propensity to contaminate groundwater. The Committee specifically acknowledged the need for certain toxicological information due to MTBE's propensity to contaminate groundwater and the resulting likelihood of extensive ingestion of MTBE through drinking water.

83.     Despite early knowledge and a shared recognition of the need to do long-term, low-level ingestion studies on the effects of MTBE, Defendants postponed for decades and never completed such a study.

84.     Defendants possess and have always possessed vastly superior knowledge, resources, experience and other advantages, in comparison to anyone or any agency, concerning the manufacture, distribution, nature, and properties of gasoline in general and MTBE in particular. By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as hydrogeologists, chemists, engineers, and toxicologists, Defendants have at all relevant times been in a position to know, identify, and confirm the threat that MTBE posed and continues to pose to groundwater.

85.     In addition, by virtue of this superior knowledge, and/or by virtue of the Defendants' partial and incorrect statements regarding the nature and impacts of MTBE, Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE.

86.     Defendants knew or should have known at least as early as 1980 of the impact of MTBE and its contamination of water.

87.     In or around October 1980, certain Defendants learned of a serious incident of MTBE groundwater contamination in Rockaway, New Jersey, which substantiated the threat that MTBE poses to drinking water supplies.  Approximately 4,000 residents of Rockaway tasted MTBE or

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 8:57 AM
Envelope: 1018765
Reviewer: Alexa G.

CASE 1:17-CV-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 31 of 83 PageID #: 36

DIPE (another ether) in water supplied from a municipal well. This evidence of contamination

prompted leading oil industry insiders to further investigate the groundwater threat posed by

MTBE.

88.　　In April 1983, a serious MTBE incident in Jacksonville, Maryland, came to public

attention. Spills or leaks that occurred at least two years earlier at two different gas stations, one

owned by what is now ExxonMobil, created a large underground reservoir of MTBE that fouled

the domestic wells of local residents and stalled a planned housing project.

89.　　Certain Defendants were also aware of two MTBE groundwater contamination events in

Liberty, New York, and East Patchogue, New York, both of which preceded, by several years,

the introduction of gasoline with higher concentrations of MTBE and presaged the now

widespread MTBE contamination.

90.　　At the East Patchogue site, spilled gasoline left over from the operation of a filling station

whose underground storage tanks had been dug up and removed in 1988 sent a plume of MTBE

into Long Island's sole source aquifer. The MTBE plume was detected when the water from a

private well 4,000 feet from the old filling station site was rendered undrinkable with 350 ppb of

MTBE. Although trace levels of BTEX were eventually found in neighboring wells, that did not

happen until the MTBE levels had reached the astounding level of 7,600 ppb.

91.　　A decade after the spill in East Patchogue, government officials were still tracking the

MTBE plume through the aquifer thousands of feet from the site. In contrast, BTEX compounds

were found concentrated in the soils and water much closer to the spill site, and the mass of these

compounds was observed to be steadily decreasing.

92.　　The Liberty incident started sometime before August 1990, when state health officials

detected MTBE in the public water supply.

30

93.      In December 1992, MTBE was again found in Liberty's water at concentrations

approximately three times higher than the New York State Department of Health drinking water

standard of 50 ppb at the time.

94.      In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental

Protection drafted a paper entitled "Methyl Tertiary Butyl Ether as a Ground Water

Contaminant" ("the Garrett Report").[4]  The paper described approximately 30 wells in Maine

that were contaminated with MTBE.  The authors explained that as a result of their experience

dealing with the contamination, they learned that: (a) groundwater contaminated with MTBE is

difficult to remediate; (b) MTBE is more soluble than the other constituents of gasoline and

therefore a plume of MTBE in groundwater will be more extensive than the plume of the other

gasoline components; and (c) MTBE has a distressing "terpene-like" odor in low concentrations.

95.      As a result of MTBE's characteristics, the Garrett Report's authors recommended that

MTBE be banned as a gasoline additive or at least be stored in double-contained facilities.  The

authors planned to present their paper and have it published in the proceedings of the "Petroleum

Hydrocarbons and Organic Chemicals in Ground Water Conference" sponsored by the National

Well Water Association and the API in November of 1986.

96.      As soon as the existence of the Garrett Report was known, even before it was published,

the draft was widely circulated throughout the oil industry.  Oil industry representatives,

including many of the Defendants, joined forces to pressure the authors to radically revise their

negative conclusions and recommendations about MTBE.  Even after succeeding in having the

report's language softened, Defendants continued to discredit the report.

---

[4] Peter Garrett, Marcel Moreau & J.D. Lowry, "MTBE as a Ground Water Contaminate," in NWWA/API Conference on Petroleum Hydrocarbons and Organic Chemicals in Ground Water - Prevention, Detection, and Restoration, Houston, TX, November 12-14, 1986 [Proceedings]: Dublin, OH, National Water Well Ass'n, pp. 227-238.

97.     ARCO Chemical, which was then a part of ARCO, aggressively challenged the initial

draft of the Garrett Report before its presentation.  ARCO Chemical provided "data that

indicated that many of their theories were incorrect" to the authors of the paper in an attempt to

change their opinions.  Despite ARCO Chemical's efforts, however, the authors concluded that

"MTBE presented an environmental hazard different to other gasoline components" and went

ahead with their presentation of the paper to the National Well Water Association in November

of 1986.

98.     On December 23, 1986, a staff member to API's Groundwater Technical Task Force

("GWTTF") forwarded the Garrett Report to members of the GWTTF, including representatives

of Shell and Exxon.  API asked these individuals to review the Garrett Report and provide

comments and critiques.  API asked for responses because the article was "of possible grave

concern to the oxygenate producers."

99.     The comments from the GWTTF members culminated in a letter from API to the

National Well Water Association, which was to present the paper.  The letter stated in part:

> The authors' "recommendations" that MTBE ... be either banned as
> gasoline additives or require double-lined storage is clearly a policy
> statement and not an objective credible scientific conclusion.  Further,
> data presented in this paper as well as those generated by ongoing API
> research indicate that such a policy is reactionary, unwarranted and
> counter-productive.

100.    But the API letter to the National Well Water Association in no way refuted the Garrett

Report's conclusions regarding MTBE's solubility, MTBE's low odor and taste threshold, the

fact that MTBE could travel faster in groundwater than the other gasoline constituents, or the

conclusion that MTBE was difficult to remediate.  These issues were not even addressed.

101.    BP Corporation (then known as "Amoco") publicly denounced the Garrett Report, stating

flatly that the report "isn't true."

102.    Privately, however, Defendants acknowledged that the major findings of the Garrett

Report were correct.  For instance, while the oil companies, via the GWTTF, attacked the

authors of the Garrett Report, saying the paper had a "general lack of technical data to support

the rather strong policy statements," Defendants admitted internally that the authors might in fact

be correct.  ARCO Chemical, in communications to others within the oil industry, admitted that

it had no data to refute the Garrett Report's conclusions.  For example, a letter dated February 4,

1987, stated, "we don't have any data to refute comments made in the paper that MTBE may

spread farther in a plume or may be more difficult to remove/clean up than other gasoline

constituents."

103.    On or around May 6, 1987, Mobil's laboratory prepared and circulated a memo based

upon a compilation of data on MTBE contamination of groundwater in New York State and

elsewhere in the region, including laboratory analyses verifying the presence of MTBE in water

samples from three wells in Harrison, New York, and four wells in Port Jefferson, New York.  In

its report, Mobil's laboratory stated: "We agree that MTBE in gasoline will dissolve in

groundwater at a faster rate than any gasoline hydrocarbon, including benzene."  The report

further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are

not found, we feel it is important for you to be aware of MTBE.  From an environmental and

engineering standpoint, you may need to be informed of its presence to assist you in responding

effectively to regulatory and remedial requirements."

104.    Similar communications circulated among officials at Chevron Texaco (Chevron).  A

1987 memo, widely circulated within the company, stated:

> Two considerations impact MTBE.  One is potential health risk, and
> the second is increased solubility over normally regulated constituents
> of interest, i.e. benzene, toluene and xylene (BTX).

33

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2017 3:36:42 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 35 of 83 PageID #: 40

MTBE is significantly more soluble in water than BTX.
Consequently, the dissolved "halo" from a leak containing MTBE can
be expected to extend farther and spread faster than a gasoline leak
that does not include MTBE as one of its constituents.

Further compounding the problem of increased solubility, MTBE is
more difficult to remove from groundwater using current technology
(air stripping or carbon adsorption). Because of its lower volatility,
MTBE requires more than double the air stripping capacity to reach a
95 percent reduction. Removal using carbon adsorption is even worse.
MTBE breaks through activated carbon four times faster than BTX.

105.     In 1992, Shell employees C. C. Stanley, W.G. Rixey, and C.Y. Chiang created a

document entitled "MTBE WHITE PAPER - The Impact of MTBE on Groundwater." They

intended to circulate among the employees of various Shell companies a report about the

movement of MTBE in groundwater.

106.     According to Shell's MTBE White Paper, MTBE is nearly 25 times more soluble than

benzene and, therefore, MTBE's plumes would move faster and farther than benzene plumes

emanating from a gasoline spill. Further, the White Paper indicated that MTBE would not

biodegrade in the subsurface environment. Finally, the document confirmed that MTBE has a

low odor and taste threshold and, further, that "at many locations odor and taste criteria may

determine clean-up levels."

107.     Shell's MTBE White Paper further stated:

MTBE has had an impact on groundwater management at only a few
Shell marketing terminals and service stations to date. However, as
the usage of this oxygenate begins to increase, a stringent clean-up
criteria for MTBE will become adopted in more states, we should
anticipate increased concerns over how its release to groundwater is
managed.

This paper was never published outside of Shell.

108.     A June 1997 Shell document entitled "Summary of Current MTBE Issues and Status"

stated:

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 36 of 83 PageID #: 41

> MTBE is relatively quite soluble in water (compared to other
> components in gasoline, like BTEX), and it moves essentially with the
> ground water, thus MTBE tends to "lead the plume" whenever there is
> a gasoline spill or leak. MTBE also has a very low biodegradation
> potential, which makes it more difficult to remove from ground water
> than other gasoline components such as BTEX.

**D.      Defendants Concealed the Risks Associated with MTBE**

109.    Defendants added MTBE to gasoline even though no long-term cancer studies had been

undertaken. Existing studies showed MTBE caused cancer in animals. Although it is common

practice to conduct toxicological tests before introducing a widely-used chemical like MTBE,

Defendants did not perform any such tests to determine the effects of MTBE before placing it into

the stream of commerce. Instead, Defendants attempted to convince the EPA that health testing

of MTBE was not needed. Thus, Defendants exposed millions of Americans to potential harm

without warning of the potential health risks associated with MTBE.

110.    Despite their superior knowledge of the groundwater threat posed by MTBE, certain

Defendants, beginning in the early 1980s, formed various formal and informal task-forces and

committees for the purpose of concealing the actual threat of MTBE, facilitating the Defendants'

use of MTBE without regard to its impact on the State and convincing the public and regulators

that increasing concentrations of MTBE in gasoline was desirable. Certain Defendants formed

these joint task-forces and committees under the auspices of trade organizations such as the API

and the Oxygenated Fuels Association ("OFA"). Defendants, as members of these joint task

forces and committees, conspired to conceal the risk of MTBE contamination of groundwater and

agreed to use MTBE, thereby placing corporate profits above known-but-concealed harm to the

environment and the State. Certain Defendants manufactured and distributed MTBE with actual

knowledge of MTBE's defects and with actual knowledge that MTBE would cause harm in

groundwater and drinking water wells and took affirmative steps to conceal those effects.

111.    In 1986, the federal Interagency Testing Committee ("ITC"), established pursuant to the

Toxic Substances Control Act, recommended testing and review to assess MTBE's health and

environmental risks.[5]  The ITC characterized MTBE as having relatively high water solubility,

and stated that MTBE's persistence in groundwater following spills was unknown but that it was

likely not to be readily biodegradable.  The ITC recommended chemical fate monitoring of

MTBE to determine the risk MTBE poses to the environment.  The ITC also recommended

additional medical testing of MTBE and invited written comments.  The 1986 Notice credited the

Dynamac Corporation for supplying the government with MTBE information.

112.    The oil industry, including Defendants, mobilized to convince the EPA that additional

testing of MTBE was not needed.

113.    On or about December 12, 1986, ARCO, speaking on behalf of and/or with the approval

of certain Defendants, responded to the 1986 Notice in an effort to derail further testing of

MTBE.  ARCO's comments included a critique of the Dynamac Corporation's information

review of MTBE, on which the ITC had relied.  ARCO stated that its "critique of the

CRCS/Dynamac report revealed that some erroneous assumptions had been made that cause the

hazards of MTBE to be seriously overestimated."  In further comments to the EPA, ARCO stated

the following:

> Characteristics - Moderate water solubility is reported.  However, an
> ARCO Technical Bulletin states that 'MTBE is only slightly soluble in
> water ...'
>
> ***
>
> The CRSC/Dynamac report states that potential environmental
> exposure is 'high.'  This conclusion is not supported by the available
> information.

---

[5] Nineteenth Report of the ITC to the Administrator, Receipt and Request for Comments Regarding Priority List of Chemicals, 51 Fed. Reg. 220 (1986) (the "1986 Notice").

\*\*\*

>Exposure from accidental spills of MTBE could occur, but should be regarded as a minimal possibility.  The closed nature of the manufacturing and transportation process reduces worker exposure and product loss.  Training and safety programs also lower the possibility of accidental spills.  Many current programs at EPA and industry are underway to monitor and reduce the possibility of gasoline loss from leaking underground storage tanks .... MTBE losses would be extremely small from this source.

\*\*\*

>Environmental Information

>As has been reportedly stated, environmental entry would not occur in every stage of the gasoline marketing chain .... Environmental entry of MTBE from this source would be considerably less than the report indicates.

>MTBE is only slightly soluble so environmental fate projections based on this assumption will not be correct.

ARCO's comments, made with certain other Defendants' explicit or implicit approval, were misleading when made.  The comments improperly downplayed the risks of MTBE contamination of groundwater and omitted material facts known to Defendants at the time.

114.    On or around December 17, 1986, EPA held a Public Focus Meeting to hear comments on the need for additional testing of MTBE.  The minutes of the meeting show that government officials expressed concern over the need to assess the potential for groundwater contamination.  The minutes show that ARCO and Exxon made a presentation to support the industry position that additional medical testing of MTBE was unnecessary.  Other Defendants assented to these representations either explicitly or by their silence.

115.    In or around early 1987, certain Defendants formed the "MTBE Committee," with the express and stated purpose, as set forth in a written agreement, of "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and

the producers and users of MTBE." The MTBE Committee included Defendants BP Corporation

(Amoco), ARCO, Chevron Texaco (Chevron), Citgo, ExxonMobil (Exxon), Shell, and Sunoco,

among others.

116.    The MTBE Committee lauded itself as "being a source of information to MTBE

producers, users, the government and the public" and stated that its goal was to "address

environmental health and safety issues relating to MTBE ... , provide technical data to appropriate

regulatory agencies and legislative bodies ... , conduct[] and fund[] testing of MTBE required

under a Toxic Substances Control Act Section 4 Consent Order or Test Rule ... , [and] make

available to interested parties and the general public technical and scientific information relating

to the use of MTBE in fuels."

117.    On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of the MTBE

Committee, had its first meeting. The meeting minutes, circulated February 2, 1987, indicate:

> [T]he plan of attack on the combined response to the EPA on the ITC
> report is as follows: Since each producer must respond to the EPA
> before February 12 on the SA and SD [sic] questions and many will
> respond individually to production and economic questions which
> were also sought by EPA, a letter will be sent by George Dominguez
> requesting that information requested by the EPA be sent to the MTBE
> Committee before February 9. A form will be included in George's
> letter... the Technical Committee will then meet on February 19 to
> combine the three reports from the working groups and draft a
> response to the EPA which will then be passed on to the Steering
> Committee for their approval on February 20 ... The combined
> response to the EPA will be submitted by February 27, to be followed
> shortly thereafter by a formal visit to EPA. Dominguez will meet with
> EPA and notify them that the MTBE Committee has been formed and
> will be submitting its overview.

118.    Although Defendants were keenly aware that the EPA was interested in obtaining more

information about MTBE in groundwater, Defendants were not forthcoming in their responses to

the EPA. On February 12, 1987, ARCO Chemical responded to the EPA's request for

information about "data gaps" concerning MTBE's environmental and health effects in a letter

stating:

> Item D requests more information on the presence and persistence of
> MTBE in groundwater. We are not aware of any incidents where
> MTBE contaminated groundwater at manufacturing facilities. Where
> gasoline containing MTBE is stored at refineries, terminals, or service
> stations, there is little information on MTBE in groundwater. We feel
> there are no unique handling problems when gasoline containing
> MTBE is compared to hydrocarbon-only gasoline.

119.    At the same time that ARCO Chemical was telling the EPA that MTBE posed no

significant environmental or health problems, ARCO Chemical admitted to other Defendants that

it "had no data to refute the claims made in the Garrett Report that MTBE posed a significant

threat of groundwater contamination."

120.    On or around February 27, 1987, the MTBE Committee submitted written comments

drafted to convince the EPA not to require additional health and environmental testing of MTBE.

The information provided by Defendants was misleading and false. For example, the Defendants

provided information to the EPA representing that MTBE is only slightly soluble in water, that

potential environmental exposure is not high, and that MTBE has excellent biodegradation

characteristics. The MTBE Committee's Statement added:

> [T]here is no evidence that MTBE poses any significant risk of harm
> to health or the environment, that human exposure to MTBE and
> release of MTBE to the environment is negligible, that sufficient data
> exists to reasonably determine or predict that manufacture, processing,
> distribution, use and disposal of MTBE will not have an adverse effect
> on health or the environment, and that testing is therefore not needed
> to develop such data. Furthermore, issuance of a test rule requiring
> long term chronic testing will have a significant adverse environmental
> impact.

121.    The MTBE Committee's agenda is reflected in the following excerpt from those

comments addressed to the issue of medical testing:

> If a test rule is issued requiring chronic testing that will take 3-4 years
> to complete, great uncertainty will be created as to whether MTBE is a
> safe fuel additive.  As a result, demand for MTBE and expansion of
> productive capacity is not likely to grow significantly.  Refiners will
> be likely to commit capital to more costly alternative methods of
> octane enhancement such as isomerization and reformate plants that do
> not have the environmental benefits of MTBE.  Thus, requiring long
> term testing of MTBE will have a significant adverse environmental
> and economic impact.

122.    The MTBE Committee acknowledged in its February 27, 1987, comments that MTBE

had not been the subject of long term chronic health testing, but claimed that such testing was

unnecessary.  Under the heading "MTBE in Groundwater," it stated that:

> the results of a number of acute and sub-chronic health effect studies
> are presented in the Health Effects Summary of this report.  These data
> suggest that the odor detection level of 700 ppb (approximately 0.7
> mg/1) is such that the organoleptic properties of MTBE are sufficient
> to protect against human ingestion of toxic quantities of MTBE.

Defendants sought to be free to represent that MTBE has been shown not to be a health risk

without conducting the research needed to reach such a conclusion.

123.    On the issue of the persistence of MTBE, the MTBE Committee publicly stated that "a

Japanese study ... reports that MTBE in the presence of gasoline has excellent biodegradation

characteristics."  This misrepresentation concerning the biodegradability of MTBE, which

omitted the contrary and more accurate information that MTBE was already known to be

recalcitrant to biodegradation, provides further evidence of Defendants' practice of concealing

from the State, government regulators and the public the actual risk that MTBE poses to

groundwater.

124.    On or around January 21, 1988, MTBE and/or gasoline manufacturers and distributors,

including BP Corporation (Amoco), ExxonMobil (Exxon) and Sunoco among others, signed a

Testing Consent Order with EPA.  However, a subsequent notice shows that after extensive

negotiation, the oil industry, including Defendants, convinced EPA that additional chemical fate

testing was not necessary to determine the environmental risk posed by MTBE.[6]  The oil industry, including Defendants, thus succeeded in misrepresenting that the chemical fate of MTBE was sufficiently understood to ensure that MTBE posed no undue risks to the environment and therefore that further testing was unnecessary.  Defendants knew or should have known at the time that this representation was false and misleading.

125.    The foregoing representations by the MTBE Committee are evidence of Defendants' pattern of exaggerating MTBE's environmental benefits while understating or concealing its environmental hazards, all of which Defendants knew or should have known at the time.  The comments also reveal Defendants' plans to forestall all public scrutiny of their decision to increase concentrations of MTBE in gasoline and avoid or obstruct important health and environmental safety research that would have corroborated Defendants' knowledge of MTBE's harmful effect on groundwater.  In making and supporting such representations, the Defendants demonstrated their willingness to place their economic interests above the health, property and well-being of citizens of the State, particularly, and the American public, generally.  These statements also confirm that Defendants intended to (a) continue to use MTBE without regard to its impact on the State and the environment, and (b) prevent the State from becoming aware of the potential for contamination and/or impact of contamination from MTBE.

126.    Although the MTBE Committee represented to the EPA that the Committee was going to "address environmental issues related to MTBE by a) collecting data from member companies and other sources, and b) sponsoring programs to develop data unavailable from other sources," the MTBE Committee did no such thing.  The MTBE Committee's Charter statement was

---

[6] Testing Consent Order on Methyl Tert-Butyl Ether and Response to the Interagency Testing Committee, 53 Fed. Reg. 62 (1988).

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 8:52 AM
Envelope: 1018765
Reviewer: Alexa G.

CASE 1:17-CV-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 43 of 83 PageID #: 48

intended to mislead the government and the public, including the State.  The MTBE Committee

disbanded approximately one year after achieving its goal of avoiding testing.

<strong>E.     Defendants Engaged in a Conspiracy to Protect the Use of MTBE</strong>

127.     The State realleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated in this section.

128.     At all times relevant to this lawsuit, Defendants knew or should have known of the

hazards that MTBE posed to groundwater throughout Rhode Island.  Defendants conspired

throughout the relevant time period to ensure their ability to use MTBE as an oxygenate in

gasoline.

129.     Defendants have demonstrated a pattern and practice of failing to warn the public, those

that handle gasoline containing MTBE, water providers, federal and state regulators, and federal

and state governments about MTBE and its harmful effects on human health and the environment.

130.     Indeed, the oil industry in general and these Defendants in particular, provided inaccurate

and misleading information about MTBE and its characteristics, both when they had an

affirmative duty to provide honest information without inquiry, and in response to direct inquiries

by the EPA and others for such information.

### 1.   Ad Hoc MTBE Group

131.     One of the earlier examples of a concerted effort to protect MTBE involved the Ad Hoc

MTBE Group created in 1979 whose sole purpose was to assess the health effects of MTBE and

conduct toxicological testing on MTBE.

132.     Members of the Ad Hoc MTBE Group included, among others, Defendants ARCO, Gulf,

Exxon, Phillips, Texaco, and Shell.

133.     This group supported certain limited studies on MTBE.

134.     Even though the Ad Hoc MTBE Group members specifically agreed that they had a duty

42

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 8:45:42 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 44 of 83 PageID #: 49

to make the studies public, they did not immediately publish the studies. Rather, they waited an unreasonable and unjustified period of time after completion to publish them. And when the Ad Hoc MTBE Group finally published the studies, the abstracts were misleading and did not accurately describe their results.

135.    The Ad Hoc MTBE Group routinely reported its on-going efforts to the members of the API Toxicology Committee, whose members were aware of the studies and aware that they were not being reported within a reasonable time after completion. Members of the API Toxicology Committee in that general time frame included, among others, Defendants Conoco, BP, Marathon, Texaco, Exxon, Shell, Mobil, ARCO, Sun, Phillips, Gulf, and Chevron.

136.    As a direct result of these actions, public health officials did not have the information that was available to the Defendants because it was not in the public domain. Public health officials, accordingly, could not use the information when responding to the public's health effects concerns.

137.    As a result of the Defendants' collective actions, the State, regulators and the public were kept in the dark regarding MTBE's health effects. The full understanding of MTBE's risks, which ultimately resulted in MTBE largely being removed from gasoline in the United States, was delayed for a decade or more.

**2.    OFA's MTBE Committee**

138.    On November 1, 1986, the ITC transmitted its nineteenth report to the EPA. The report included an "intent to designate" MTBE under §§ 8(a) and 8(d) of the Toxic Substances Control Act.

139.    The ITC's presentation indicates that the designation "will allow preliminary review of health and safety data which will be used by the Committee to either designate or not designate MTBE in a subsequent report to the Administrator."

43

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 45 of 83 PageID #: 50

140.    The ITC recommended that MTBE be tested for "chemical fate" including "monitoring

studies to determine typical concentrations of MTBE at representative sites where MTBE-

containing gasoline is transferred."  In addition, the Test Rules Development Branch requested

"more information on the presence and persistence of MTBE in groundwater."

141.    In response, the MTBE Committee was formed in January of 1987 under the auspices of

the OFA.  Members of MTBE Committee included, among others, Defendants Texaco, Exxon,

Citgo, Phillips, Amoco, Conoco, Valero, and Sun.

142.    One of the MTBE Committee's stated purposes, as reflected in the proposal for its

formation was to "handle the development of communication between companies and the EPA."

143.    The "rationale behind the establishment of an MTBE group" was "not only because of

the EPA action which might necessitate [study of the] toxicological and environmental effects of

MTBE," but "in order to provide an organization that would be responsive to the overall needs of

the development of MTBE itself."

144.    On February 27, 1987, the MTBE Committee presented a statement to the EPA relative

to the Federal Register announcement of the ITC's intention to designate MTBE for priority

testing.  The MTBE Committee's Statement represented to the EPA:

> There is no evidence that MTBE poses any significant risk of harm to
> health or the environment, that human exposure to MTBE and release
> of MTBE to the environment is negligible, that sufficient data exists to
> reasonably determine or predict that manufacturer, processing,
> distribution, use and disposal of MTBE will not have an adverse effect
> on health or the environment, and that testing is therefore not needed
> to develop such data.  Furthermore, issuance of a test rule requiring
> long term chronic testing will have a significant adverse environmental
> impact.

145.    Despite the representation that they would collect and provide data from member

companies to the EPA and the general public, the MTBE Committee members provided a

statement that they knew, from their own experiences with MTBE contamination, was false.

44

146.    The Defendants were largely successful in their purpose of reducing testing and protecting MTBE.  Although the EPA initially expressed interest in requiring testing with respect to the environmental aspects of MTBE, the Oil Industry ultimately signed a Consent Agreement with the EPA that did not require such testing.

147.    The oil industry's response to the Garrett Report, described above, provides another example of the Defendants' coordinated effort to protect MTBE and its use as an oxygenate.

148.    The Defendants' involvements in these committees and others reflect their general participation in this conspiracy.

149.    Such activities were not limited to industry-wide organization committees.

150.    Defendant Amoco coordinated the formation of the "Consumers for Fuel Quality" lobbying association to oppose alcohol fuel blend mandates.  Companies involved with this group included Exxon, Marathon, Phillips, Unocal, Mobil and others.

151.    Had Defendants been open and honest about MTBE instead of doing their best to protect it, the publicity and interest in MTBE that began to develop a decade later would have occurred in the 1980s, not the 1990s and 2000s.

152.    As an example, all of the concerns expressed by the EPA in its March 2000 Advance Notice of Intent to Initiate Rulemaking, were known by the Defendants in the early to mid-1980s and were discussed internally and within industry meetings.  Had these concerns been disclosed in the 1980s, MTBE would likely not have been used in gasoline or would have been used in much lower amounts.

153.    The Defendants possessed information concerning MTBE's fate and transport, its low biodegradation rate, and its taste and odor thresholds at the time of the Clean Air Act Amendments and the subsequent regulatory negotiations with the EPA.

45

154.    As with the instances above, the Defendants acted with a common design to withhold information from the federal government.

155.    Defendants' representatives formed part of the group involved in assisting the federal government in drafting regulations for the enforcement and requirements under the Clean Air Act Amendments of 1990.

156.    In order to ensure that only specific MTBE-favorable information was presented to the EPA by the oil industry, Defendants' representatives frequently met to determine what information the Defendants would and would not disclose to the federal government.

157.    Defendants withheld and failed to disclose to the EPA information concerning MTBE's negligible rate of biodegradation and its probable long-term presence in groundwater.

158.    Defendants withheld and failed to disclose to the EPA information concerning MTBE's low taste and odor thresholds and, accordingly, the adverse impact that a very small release of MTBE into an aquifer could have on a potable water supply.

159.    Defendants withheld and failed to disclose to the EPA information concerning the known releases of MTBE into the environment, the characteristics of such releases, the number of these releases with the limited use of MTBE prior to 1990 and any projections of potential contamination of public water supplies from a widespread use of MTBE in gasoline.

160.    Defendants withheld and failed to disclose to the EPA information concerning the significant environmental risk that MTBE presented to groundwater, aquifers, and public and private water supplies and wells.

161.    Defendants also failed to disclose to the EPA information concerning the extent of their near-total commitment to MTBE as their oxygenate of choice to comply with the CAAA and the hundreds of millions of dollars that Defendants had already committed to producing or purchasing

MTBE before the regulatory process was even completed.

162.    Defendants also worked in concert against other retail providers of gasoline and other companies to limit or block ethanol as an alternative permitted oxygenate.

163.    As described above, Defendants knowingly and voluntarily engaged in a common plan and concerted action to commit, assist, and/or encourage a tortious act among Defendants. Specifically, certain Defendants formed joint task-forces and committees and otherwise colluded for the avowed purpose of providing information about MTBE to the public and to government agencies, but with the true, unlawful purpose of:

   a.   creating a market for MTBE with full knowledge of the hazards which MTBE poses to groundwater throughout the State of Rhode Island;

   b.   concealing the nature of MTBE and its impact on Plaintiff and the environment; and

   c.   maximizing profits in a way Defendants knew would require them to contaminate Plaintiff's water supply.

164.    These actions were not undertaken by each Defendant acting individually; rather, the Defendants in many instances joined together and made specific agreements to so act.

165.    As a direct result of these concerted actions on behalf of the oil industry and these Defendants to protect MTBE, the use of MTBE increased dramatically in the 1990s and, as a result, MTBE has contaminated the nation's groundwater in general and the State's water resources in particular.

166.    Defendants carried out their conspiracy by one or more of the following overt acts or omissions:

   a.   Intentionally representing to the EPA and the public that MTBE was safe and did not pose a risk to groundwater;

   b.   Concealing the dangers of MTBE (including MTBE's adverse fate and transport characteristics and the propensity of MTBE to contaminate groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of

47

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2017 8:62 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 49 of 83 PageID #: 54

MTBE be suppressed and not otherwise published by third parties and by
downplaying any adverse findings related to MTBE;

c.   Concealing the dangers of MTBE from downstream handlers and consumers;
and

d.   Collectively deciding to use MTBE rather than other, safer oxygenates to
satisfy the requirements of the RFG program because MTBE was the most
profitable oxygenate for Defendants to use.

167.    As a result of this continued and ongoing pattern and practice of failing to warn, failing to

provide information, and being dishonest when asked, information about MTBE's risk to human

health and the environment that was within the possession of the Defendants was unavailable to

the State, the public and governmental regulators.

168.    As a direct and proximate result of Defendants' acts and omissions as alleged in this

Complaint, the State's property and waters were and are contaminated with MTBE.  The State has

incurred, is incurring, and will incur, substantial investigation, remediation, cleanup, restoration,

removal, treatment and monitoring costs and expenses related to contamination of the State's

property, surface water, groundwater, drinking water supplies, and water wells in an amount for

which defendants are strictly, jointly, and severally liable.

**F.    Defendants Misrepresented Their Knowledge About MTBE's Risks**

169.    Defendants misrepresented MTBE's properties and withheld information even as they

were insisting that no such information existed.

170.    On April 1-2, 1987, George Dominguez of the MTBE Committee gave an oral

presentation at a Conference on Alcohols and Octane.  Mr. Dominguez represented that "MTBE

removal from groundwater is consistent with commercial experience.  MTBE gasoline spills have

been effectively dealt with."  Although the MTBE Committee was represented to have been

formed to address environmental issues and to make available to the general public information

regarding MTBE use in fuels, Mr. Dominguez did not inform the audience that MTBE is different

48

from the other components of gasoline, that it is resistant to biodegradation, that it is difficult to remediate, or that it causes a greater risk of groundwater contamination.

171.    In 1994, in response to an article that raised questions about the environmental and health benefits of MTBE, an official with the API, an agent of Defendants, wrote to rebut what he called "an inaccurate and negative view of methyl tertiary butyl ether (MTBE), one of the oxygenates that help make gasoline cleaner burning by reducing carbon monoxide emissions." The letter unambiguously represented that there was "no basis to question the continued use of MTBE." Given information known to Defendants and API at the time, this statement misrepresented to the general public the safety of gasoline with MTBE and concealed known hazards.

172.    As the reality of widespread MTBE groundwater contamination started coming to light, Defendants "greenwashed" the shameful facts. For example, in April 1996, the OFA, an agent of Defendants, published and distributed a pamphlet titled "Public Health Issues and Answers" that stated: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been attributed to leaks from nearby underground storage tanks." OFA expressed confidence that federal regulations and industry practices made such contamination largely a thing of the past. This kind of minimizing and misleading communication hid from public officials, persons and entities engaged in the storage, transport, handling, retail sale, use, and response to spills of such gasoline (referred to in this Complaint as "downstream handlers"), and the general public the dangers posed by MTBE and omitted and concealed information required to reduce and respond to such dangers.

173.    In its April 1996 pamphlet, OFA also suggested that MTBE in groundwater actually provides a public and environmental health service. According to OFA's reasoning, when MTBE pollutes water it "can serve as an early indicator of gasoline contamination in groundwater,

49

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2023 8:52 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 51 of 83 PageID #: 56

triggering its cleanup and remediation, and limiting the probability of harm from the usual

constituents of gasoline."

174.      This "canary-in-the-mine" spin, repeated often by Defendants, rings false in light of the

fact that MTBE is usually not merely the first, but also the worst, and sometimes the only,

contaminant imported to groundwater by gasoline.

175.      Had Defendants warned the State, government, users, consumers, and the general public

of the known hazards MTBE presented to groundwater and drinking water supplies, they would

have sought alternatives and demanded that Defendants provide environmentally-responsible

gasoline free of MTBE.

176.      As a result of Defendants' failure to warn of the hazards posed by MTBE contamination

of groundwater, the State was deprived of facts from which its injury from MTBE contamination

could reasonably have been inferred, prevented, and/or mitigated.

      G.      **MTBE has had a Predictably Catastrophic Effect Upon Groundwater and
            Groundwater Wells**

177.      Before the 1980s, production and sales totals for MTBE were negligible, but by 1996,

MTBE ranked second among all organic chemicals produced in the United States because

Defendants were adding MTBE to gasoline in very high amounts.  As discussed above,

Defendants dramatically increased their use of MTBE in gasoline following the creation of the

RFG program.

178.      Since gasoline containing MTBE at increased levels was introduced in the early 1990s,

the United States Geological Survey ("USGS") has reported that MTBE is the second most

frequently detected chemical in groundwater in the United States.  MTBE-contaminated wells

were found from coast-to-coast with serious incidents in several states.

179.     The USGS annually tests the groundwater not near any known gasoline leaks or spills, and detected MTBE in over 20% of aquifers tested in places where high MTBE-content gasoline was used.

180.     A September 15, 1999, report by a special EPA Blue Ribbon Panel stated that MTBE is a "threat to the nation's drinking water resources"; that MTBE "has caused widespread and serious contamination"; and that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas.  As stated, the EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

181.     In its September 15, 1999, report, the EPA Blue Ribbon Panel recommended substantial reductions in the use of MTBE, and some Panel members recommended that it be eliminated entirely.  The Panel also recommended accelerating, particularly in areas where high MTBE-content gasoline was used, assessments of drinking water protection areas required under the Safe Drinking Water Act.  The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."[7]

182.     Based upon the recommendations of the Blue Ribbon Panel, the EPA initiated another Advanced Notice of Proposed Rulemaking regarding MTBE under the Toxic Substances Control Act in an effort to eliminate or limit the use of MTBE as a fuel additive in gasoline.

---

[7] "Achieving Clean Air and Clean Water: The Report of the Blue Ribbon Panel on Oxygenates in Gasoline" (Sept. 15, 1999).

**H.    Despite Rhode Island's MTBE Ban, New MTBE Contamination Continues to Be Discovered.**

183.    In Rhode Island, MTBE has contaminated public drinking water supplies, public drinking water wells, private drinking water wells, UST sites, natural resources, groundwater, and other property and waters.  This contamination damages these resources, threatens citizens' health, safety, and welfare, and interferes with the use of these precious resources.

184.    Given the nature of MTBE and its resistance to degradation, MTBE plumes from releases that occurred in the 1990s continue to travel through the environment in the groundwater and cause initial contamination in new locations, adversely impacting public and private drinking wells as well as the general condition of Rhode Island's natural resource.

185.    The Rhode Island General Assembly passed legislation banning the use of MTBE in gasoline in the state beginning on June 1, 2007.  *See* R.I. Gen. Laws § 31-37-7.1(a) ("Beginning June 1, 2007, no person shall sell, deliver for sale, import, or cause to be imported into the state for sale any gasoline containing methyl tertiary-butyl ether (MTBE) or other ether oxygenates in quantities greater than one-half of one percent (0.5%) by volume.").

186.    Despite the ban on MTBE, new MTBE contamination continues to be found at new locations in the State's environment.  Over the past five years, testing at numerous sites and monitoring or production wells across the State has revealed for the first time newly discovered MTBE in groundwater.

187.    In some instances, the State has traced these initial detections to leaks or other failures of USTs or their supporting valves or pumps.  In other instances, previous releases from USTs into the environment were unknown and undetected until the property owner removed the USTs from the property and soil testing indicated past releases.  In other instances, the removal of USTs did not result in the identification of petroleum releases into the environment and only the subsequent

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2023 8:52 AM
Envelope: 1018765
Reviewer: Alexa G.
CASE 1:17-CV-00204-WES-PAS    Document 1-1    Filed 05/11/17    Page 54 of 83 PageID #: 59

appearance of MTBE within a well or the detection of a petroleum odor enabled individuals to

locate and identify an underlying contaminant plume, containing MTBE, within the aquifer.

188.    Other test results from wells within the State indicate a series of releases from past sites

with the later releases only just now reaching test and production wells.

189.    Upon information and belief, MTBE's presence and migration in Rhode Island's

groundwater, absent large-scale remediation, shall continue for a number of decades and will

continue to present an ongoing threat to public and private wells throughout that period.

## I.    Collective Liability and Indivisible Injuries; Punitive Damages

190.    As discussed above, it is impossible, based upon physical characteristics, to identify the

manufacturer or refiner of any given quantity of gasoline that was the source of MTBE found in

surface water, groundwater, or water wells.  The State must therefore pursue all Defendants,

jointly and severally, for those injuries that Defendants have collectively visited upon the State.

Defendants are collectively liable under traditional causation theories as well as theories of

market share liability, alternative liability, concert of action liability, commingled product

liability, and/or enterprise liability for injuries caused by Defendants.

191.    Defendants knew that it was substantially certain that their acts and omissions described

above would threaten public health and result in extensive contamination of the State's property

and waters, and public and private drinking water supplies.  Defendants' conduct was

outrageously reprehensible and malicious.  Defendants acted and/or failed to act with conscious

and deliberate disregard for a known, substantial, and intolerable risk of harm, with the

knowledge that their acts or omissions were substantially certain to result in the threatened harm,

and/or as a matter of free and intentional business choices.  Such conduct was not the result of a

mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

## VII.    FIRST CAUSE OF ACTION

### Strict Liability for Design Defect and/or Defective Product

192.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

193.    Defendants during the relevant time period were designers, manufacturers, refiners, formulators, sellers, marketers, and suppliers of petroleum products, including gasoline containing MTBE.

194.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers, and marketers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to all persons whom Defendants' petroleum products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

195.    Defendants represented, asserted, claimed, and warranted that gasoline containing MTBE could be used in the same manner as gasoline not containing MTBE, or otherwise did not require any different or special handling or precautions.

196.    When Defendants placed gasoline containing MTBE into the stream of commerce, it was defective, unreasonably dangerous, and not reasonably suited for its intended, foreseeable and ordinary transportation, storage, handling, and uses for the following reasons:

   a.    Unintended discharges of gasoline are commonplace;

   b.    When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

   c.    MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

54

d.  When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

e.  Very low concentrations of MTBE will ruin the taste and smell of water;

f.  MTBE is a known animal carcinogen and a possible human carcinogen and otherwise unhealthy to ingest;

g.  Defendants with knowledge of the risks failed to use reasonable care in the design of gasoline containing MTBE;

h.  Gasoline containing MTBE poses greater dangers to groundwater than would be expected by ordinary persons such as Plaintiff, downstream handlers, and the general public exercising reasonable care;

i.  The risks which gasoline containing MTBE poses to groundwater outweigh MTBE's utility in boosting the octane level of gasoline and/or supposedly reducing air pollution by increasing the oxygen content of gasoline; and

j.  Safer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline.  Such sensible alternatives to MTBE include, but are not limited to, ethanol and other "oxygenates" and "octane enhancers."

197.   The above-described defects exceeded the knowledge of the ordinary person and by the exercise of reasonable care Plaintiff would not be able to avoid the harm caused by gasoline with MTBE.

198.   Gasoline containing MTBE was distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

199.   Gasoline containing MTBE reached the consumer and the environment in a condition substantially unchanged from that in which it left Defendants' control.

200.   Gasoline containing MTBE failed to perform as safely as an ordinary consumer would expect when used in its intended and reasonably foreseeable manner.

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 3:46:47 AM
Envelope: 1018765
Reviewer: Alexa G.

201.     As a direct and proximate result of Defendants' acts and omissions as alleged in this

Complaint, Plaintiff's property and waters were and are contaminated with MTBE.  Plaintiff has

incurred, is incurring, and will incur, substantial investigation, remediation, cleanup, restoration,

removal, treatment, and monitoring costs and expenses related to contamination of Plaintiff's

property, surface water, groundwater, drinking water supplies, and water wells in an amount

within the jurisdictional limits of this Court, for which defendants are strictly, jointly, and

severally liable.

202.     As a further direct and proximate result of the acts and omissions of the Defendants

alleged in this Complaint, Plaintiff has sustained and will sustain other substantial expenses and

damages, in an amount within the jurisdictional limits of this Court, for which defendants are

strictly, jointly, and severally liable.

203.     The injuries to the property and waters of the State caused and/or imminently threatened

by Defendants' acts and omissions as alleged in this Complaint are indivisible because, *inter alia*,

MTBE and MTBE gasoline are fungible products which defendants commingled throughout the

distribution system from refinery to retail gasoline station.

204.     Further, as discussed above, it is impossible, based upon physical characteristics, to

identify the manufacturer or refiner of any given quantity of gasoline that was the source of

MTBE found in surface water, groundwater, or water wells.  Plaintiff must therefore pursue all

Defendants, jointly and severally, for those injuries that Defendants have collectively visited upon

Plaintiff.  Defendants are collectively liable under traditional causation theories as well as theories

of market share liability, alternative liability, concert of action liability, and/or enterprise liability

for injuries caused by Defendants.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 58 of 83 PageID #: 63

205.    Defendants handled, stored, treated, transported, disposed, manufactured, promoted, marketed, distributed, refined, supplied, and/or sold MTBE and MTBE-containing gasoline willfully, recklessly, or wickedly with disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the State of Rhode Island.  Therefore, the State requests an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

## VIII.   SECOND CAUSE OF ACTION

## <u>Strict Liability for Failure to Warn</u>

206.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

207.    As manufacturers, distributors, suppliers, sellers, and marketers of gasoline containing MTBE, Defendants had a duty to issue warnings to Plaintiff, the public, consumers, public officials and downstream handlers of the risk posed by MTBE.

208.    Defendants knew that gasoline mixed with MTBE would be purchased, transported, stored, handled, and used without notice of the hazards which MTBE poses to groundwater and wells.

209.    Defendants' failure to warn of these hazards made gasoline containing MTBE unreasonably dangerous.

210.    At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered MTBE hazardous to groundwater and production wells:

      a.   Unintended discharges of gasoline are commonplace;

CASE 1:17-CV-00204-WES-PAS    Document 1-1    Filed 05/11/17    Page 59 of 83 PageID #: 64

    b. When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

    c. MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

    d. When gasoline containing MTBE is released into the environment, MTBE persists much longer than the other organic (BTEX) components of gasoline, because MTBE is recalcitrant to biodegradation and bioremediation;

    e. At extremely low concentrations, MTBE can have a distressing and objectionable taste and odor that renders water unusable;

    f. MTBE is a known animal carcinogen and a possible human carcinogen and is otherwise unhealthy when ingested;

    g. MTBE greatly increases the importance of preventing leaks of gasoline, and for the first time makes it necessary to prevent very small quantities of gasoline from escaping containment to avoid groundwater contamination;

    h. MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

    i. MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE; and

    j. MTBE creates the need for more regular testing and monitoring of wells for early detection of MTBE.

211. The foregoing facts relating to the hazards that MTBE poses to groundwater are not the sort of facts that Plaintiff, downstream handlers, consumers, and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

212. Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged here to Plaintiff, public officials, downstream handlers, consumers, and/or the general public.

213. Defendants' failure to warn as alleged herein proximately caused reasonably foreseeable injuries to Plaintiff because Plaintiff and others would have heeded legally adequate warnings. If defendants had provided legally adequate warnings, for example, MTBE would not have gained

58

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 8:46:42 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 60 of 83 PageID #: 65

approval in the marketplace for use in gasoline and/or gasoline containing MTBE would have been treated differently in terms of procedures for handling, storage, emergency response and/or environmental clean-up. Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate cause of all such contamination.

214.    As a direct and proximate result of Defendants' acts and omissions as alleged in this Complaint, Plaintiff's property and waters were and are contaminated with MTBE. Plaintiff has incurred, is incurring, and will incur, substantial investigation, remediation, cleanup, restoration, removal, treatment, and monitoring costs and expenses related to contamination of Plaintiff's property, surface water, groundwater, drinking water supplies, and water wells in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly, and severally liable.

215.    As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiff has sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are strictly, jointly, and severally liable.

216.    The injuries to the property and waters of the State caused and/or imminently threatened by Defendants' acts and omissions as alleged in this Complaint are indivisible because, *inter alia*, MTBE and MTBE gasoline are fungible products which defendants commingled throughout the distribution system from refinery to retail gasoline station.

217.    Further, as discussed above, it is impossible, based on physical characteristics, to identify the manufacturer or refiner of any given quantity of gasoline that was the source of MTBE found in surface water, groundwater, or water wells. Plaintiff must therefore pursue all Defendants, jointly and severally, for those injuries that Defendants have collectively visited upon Plaintiff.

Defendants are collectively liable under traditional causation theories as well as theories of market share liability, alternative liability, concert of action liability, and/or enterprise liability for injuries caused by Defendants.

218.     Defendants handled, stored, treated, transported, disposed, manufactured, promoted, marketed, distributed, refined, supplied, and/or sold MTBE and MTBE-containing gasoline willfully, recklessly, or wickedly with disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the State of Rhode Island.  Therefore, the State requests an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

## IX.     THIRD CAUSE OF ACTION

### Negligence

219.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

220.     As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and handlers of petroleum products, including gasoline containing MTBE, Defendants owed a duty to Plaintiff as well as to all persons whom Defendants' petroleum products might foreseeably harm to exercise due care in the supply of, handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of gasoline containing MTBE.

221.     Defendants had a duty and the financial and technical means to test MTBE and gasoline containing MTBE, and to warn the State, public officials, downstream handlers, and the general public of the hazardous characteristics of MTBE.

222.     Defendants had a duty not to contaminate the environment with MTBE.

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 6:42 AM
Envelope: 1018765
Reviewer: Alexa G.
CASE 1:17-CV-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 62 of 83 PageID #: 67

223.    At all times relevant to this litigation, Defendants knew or should have known that:

   a.   Unintended discharges of gasoline are commonplace;

   b.   When gasoline containing MTBE is released into the environment, MTBE has a tendency to mix with groundwater and migrate great distances;

   c.   MTBE is highly soluble in water and many times more soluble in water than the other organic (BTEX) components of gasoline;

   d.   When gasoline containing MTBE is released into the environment, MTBE persists over long periods of time because MTBE is recalcitrant to biodegradation and bioremediation;

   e.   Very low concentrations of MTBE can ruin the taste and smell of water;

   f.   MTBE is a known animal carcinogen and a possible human carcinogen;

   g.   MTBE greatly increases the importance of preventing leaks of gasoline;

   h.   MTBE increases the need to maintain underground storage tanks, prevent overfills, and respond immediately to the loss of any gasoline containing MTBE;

   i.   MTBE creates the need to issue warnings to all groundwater users in the area of any spill of gasoline containing MTBE; and

   j.   MTBE creates a need for more regular testing and monitoring of wells for early detection of MTBE.

224.    The foregoing facts relating to the hazards which MTBE poses to groundwater are not the

sort of facts which Plaintiff, downstream handlers, and the general public could ordinarily

discover or protect themselves against in the absence of sufficient warnings.

225.    Defendants have negligently breached their duties of due care to Plaintiff, downstream

handlers, and the general public by, among other things:

   a.   failing to adequately test, identify and remediate wells that are contaminated with MTBE;

   b.   forming joint committees and task-forces to promote and defend MTBE while concealing the threat which MTBE poses to groundwater;

61

CASE 1:17-CV-00204-WES-PAS    Document 1-1    Filed 05/11/17    Page 63 of 83 PageID #: 68

  c. voluntarily undertaking to conduct and report research related to the environmental hazards and purported benefits of gasoline containing MTBE and not conducting and reporting that research in a reasonably truthful manner;

  d. marketing, touting, and otherwise promoting the benefits of gasoline mixed with MTBE without disclosing the truth about the environmental and potential health hazards posed by MTBE;

  e. failing to eliminate or minimize the harmful impacts and risks posed by gasoline containing MTBE;

  f. failing to curtail or reduce MTBE's distribution;

  g. failing to instruct downstream handlers and the general public about the safe handling and use of gasoline containing MTBE;

  h. failing to inspect, test and take the necessary steps to prevent their gasoline distribution and storage system from releasing MTBE in the general public's water or threatening such release;

  i. negligently releasing MTBE into the environment;

  j. failing to remediate MTBE released into the environment; and

  k. failing to warn and instruct downstream handlers and the general public about the risks to groundwater posed by gasoline containing MTBE, about the necessary precautions and steps to prevent or minimize spills and leaks of MTBE gasoline in distribution, storage and use, and about how to remediate such spills and leaks promptly.

226. As a direct and proximate result of Defendants' acts and omissions as alleged in this Complaint, Plaintiff's property and waters were and are contaminated with MTBE. Plaintiff has incurred, is incurring, and will incur, substantial investigation, remediation, cleanup, restoration, removal, treatment, and monitoring costs and expenses related to contamination of Plaintiff's property, surface water, groundwater, drinking water supplies, and water wells in an amount within the jurisdictional limits of this Court, for which defendants are jointly and severally liable.

227. As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiff has sustained and will sustain other substantial expenses and

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 8:52 AM
Envelope: 1018765
Reviewer: Alexa G.

CASE 1:17-CV-00204-WES-PAS    Document 1-1    Filed 05/11/17    Page 64 of 83 PageID #: 69

damages, in an amount within the jurisdictional limits of this Court, for which defendants are

jointly and severally liable.

228.     The injuries to the property and waters of the State caused and/or imminently threatened

by Defendants' acts and omissions as alleged in this Complaint are indivisible because, *inter alia*,

MTBE and MTBE gasoline are fungible products which defendants commingled throughout the

distribution system from refinery to retail gasoline station.

229.     Further, as discussed above, it is impossible, based on physical characteristics, to identify

the manufacturer or refiner of any given quantity of gasoline that was the source of MTBE found

in surface water, groundwater, or water wells.  Plaintiff must therefore pursue all Defendants,

jointly and severally, for those injuries that Defendants have collectively visited upon Plaintiff.

Defendants are collectively liable under traditional causation theories as well as theories of

market share liability, alternative liability, concert of action liability, and/or enterprise liability for

injuries caused by Defendants.

230.     Defendants handled, stored, treated, transported, disposed, manufactured, promoted,

marketed, distributed, refined, supplied, and/or sold MTBE and MTBE-containing gasoline

willfully, recklessly, or wickedly with disregard of the probable dangerous consequences of that

conduct and its foreseeable impact upon the State of Rhode Island.  Therefore, the State requests

an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these

Defendants for the good of society and deter Defendants from ever committing the same or

similar acts.

# X. FOURTH CAUSE OF ACTION

## Public Nuisance

231.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

232.     In Rhode Island, the public is entitled, by right, to the protection, preservation, and enhancement of the waters of the state, including groundwater.

233.     In Rhode Island, there is a public right to clean, safe and drinkable groundwater.

234.     Defendants have manufactured, distributed, marketed, promoted, handled, stored, treated, transported, supplied or disposed of MTBE and MTBE gasoline in a manner that created or contributed to creating a public nuisance that unreasonably interferes with the public right to unpolluted, safe, and clean natural resources, groundwater, and environment and to safe, healthy, and uncontaminated drinking water.  Specifically, the presence of MTBE unreasonably endangers or injures the property, health, safety and welfare of the general public and the State of Rhode Island, interfering with the comfort and convenience of communities state-wide and the general public.

235.     Defendants, by their acts and omissions set forth above, have, among other things, knowingly unleashed massive, long-lasting, spreading, and continuously migrating contamination into groundwater and drinking water wells, while concealing the threat from all, thereby causing MTBE contamination of the State's property and groundwater and contamination and imminent threat of contamination of wells within the State.

236.     The public nuisance caused, contributed to, maintained, and/or participated in by Defendants, individually and collectively, has substantially and unreasonably interfered with, obstructed and/or threatened, among other things, the rights of the people of the State to enjoy a

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2023 9:36:52 AM
Envelope: 1018765
Reviewer: Alexa G.
CASE 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 66 of 83 PageID #: 71

water supply free from unacceptable health risk, taste, odor, pollution, and contamination as well as the State's *parens patriae* ability to protect, conserve, and manage the waters of the State, which are by law precious and invaluable public resources.

237.     Each Defendant has, at all times relevant to this action, caused, contributed to, maintained, participated in and/or assisted in the creation of such public nuisance.  Among other things, each Defendant is a substantial contributor to such public nuisance as follows:

a.  At all times, Defendants controlled the handling, storage, treatment, transportation, supply, disposal, manufacture, promotion, distribution, and sale of MTBE-containing gasoline that has contaminated the waters of Rhode Island. Defendants chose to add MTBE to gasoline, chose to market it for sale without warning of its dangerous properties, transported and supplied it via pipelines, barges, and trucks without taking precautions against its release, delivered it into aboveground storage terminal tanks and into underground storage tanks at service station sites without issuing warnings or taking precautions against its release, and sold it without issuing warnings or providing instruction to consumers;

b.  Defendants controlled the handling, storage, and transportation of MTBE-containing gasoline that released MTBE into the environment.  Defendants could have prevented these releases or abated the resulting pollution but failed to fully remediate known spills and failed to prevent migration of MTBE into drinking water supplies;

c.  Defendants controlled MTBE gasoline at every step of the supply chain. Defendants intentionally created a fungible and commingled product in order to be able to utilize a common distribution system that moved MTBE gasoline from

refineries to pipelines to terminals (large storage tanks) to retail stations. The
defendants created this distribution system because it was more efficient and cost
effective for them to do so. From the refineries, Defendants supplied MTBE
gasoline into pipelines; Defendants then removed MTBE gasoline from pipelines
at certain storage facilities or placed MTBE gasoline into trucks for transport to
retail sites. At retail sites, Defendants stored MTBE gasoline in underground
storage tanks. Multiple opportunities for leaks and releases were present at every
step of Defendants' distribution of MTBE gasoline;

d.   Thus, through their handling, storage, transportation, supply and/or sale of MTBE
gasoline in the State, Defendants controlled MTBE gasoline at the time of damage
because defendants knew that once they supplied MTBE gasoline into the State, it
was inevitable and substantially certain that it would be released, leaked, spilled,
or otherwise find its way into the natural environment, soil, groundwater, and/or
drinking water. Defendants also controlled MTBE gasoline at the time of damage
because they failed to warn customers, retailers, regulators, public officials, or the
State, and failed to take any other precautionary measures to prevent or mitigate
such contamination. Defendants were in the best position to prevent the nuisance
but failed to do so;

e.   Defendants handled, stored, treated, transported, disposed, manufactured,
promoted, marketed, distributed, refined, supplied, sold, and/or otherwise placed
into the stream of commerce MTBE and/or gasoline containing MTBE when they
knew, or reasonably should have known, that gasoline containing MTBE would
then be placed into leaking gasoline delivery systems, including those in the State;

66

f.   Defendants handled, stored, treated, transported, disposed, manufactured, promoted, marketed, distributed, refined, supplied, sold, and/or otherwise placed into the stream of commerce MTBE and/or gasoline containing MTBE that was delivered into the State (and areas affecting the property and waters of the State), when they knew, or reasonably should have known, that MTBE would be released even more readily than the constituents of conventional gasoline from gasoline delivery systems; and when released, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate soils, groundwater, and surface water, including drinking water supplies, and, ultimately, be difficult and costly to remove; and

g.   Defendants handled, stored, treated, transported, disposed, manufactured, promoted, marketed, distributed, refined, supplied, sold, and/or otherwise placed into the stream of commerce MTBE and/or gasoline containing MTBE that was delivered into the State (and areas affecting the property and waters of the State), when they knew, or reasonably should have known, that MTBE would be released into the environment from commercial and consumer uses and sources in the State and would contaminate the property and waters of the State.

Thus, defendants engaged in a variety of tortious conduct beyond simply marketing and using MTBE.

238.   Defendants also had first-hand knowledge and experience regarding leaking gasoline delivery systems and releases of MTBE to groundwater from those systems.  These defendants obtained such first-hand knowledge and experience because each of them owned, operated, and/or controlled individual gasoline stations and/or were aware of leaks at terminals and refineries.

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 8:42 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 69 of 83 PageID #: 74

239.    Despite their knowledge that contamination of the property and waters of the State with MTBE was the inevitable consequence of their conduct as alleged in this Complaint, Defendants failed to provide any warnings or special instructions, failed to take any other precautionary measures to prevent or mitigate such contamination, and/or affirmatively misrepresented the hazards of MTBE in their product information and/or instructions for use.

240.    Indeed, through their Material Safety Data Sheets, Defendants represented that gasoline containing MTBE could be handled in the same fashion as conventional gasoline, and required no special measures to protect against, respond to, or mitigate suspected releases to the subsurface.

241.    Defendants engaged in separate and joint activities to suppress, conceal, and/or minimize information regarding the hazards of MTBE in order to mislead government agencies, including the State, and the public regarding the hazards of MTBE.

242.    Defendants knew, or in the exercise of reasonable care should have known, that the introduction and use of MTBE in gasoline would and has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment of property and vital water resources relied upon by the State.

243.    The public nuisance caused, contributed to, maintained, and/or participated in by Defendants has caused and/or imminently threatens to cause substantial injury to the property and waters of the State, in which the public has interests represented by and protected by the State in its *parens patriae* capacity.  The public nuisance has also caused and/or imminently threatens to cause substantial injury to property directly owned by the State.

244.    The contamination of the property and waters of the State with MTBE alleged in this Complaint has varied over time and is ongoing.  MTBE continues to imminently threaten, migrate

into, and enter the property and waters of the State.  Gasoline and MTBE contamination, both real

and immediate, constitute a current existing and continuing public nuisance.

245.     As a direct and proximate result of Defendants' acts and omissions as alleged in this

Complaint, Plaintiff's property and waters were and are contaminated with MTBE.  Plaintiff has

incurred, is incurring, and will incur, substantial investigation, remediation, cleanup, restoration,

removal, treatment, and monitoring costs and expenses related to contamination of Plaintiff's

property, surface water, groundwater, drinking water supplies, and water wells in an amount

within the jurisdictional limits of this Court, for which defendants are strictly, jointly, and

severally liable.

246.     As a further direct and proximate result of the acts and omissions of the Defendants

alleged in this Complaint, Plaintiff has sustained and will sustain other substantial expenses and

damages, in an amount within the jurisdictional limits of this Court, for which defendants are

jointly and severally liable.

247.     The injuries to the property and waters of the State caused and/or imminently threatened

by Defendants' acts and omissions as alleged in this Complaint are indivisible because, *inter alia*,

MTBE and MTBE gasoline are fungible products which defendants commingled throughout the

distribution system from refinery to retail gasoline station.

248.     Further, as discussed above, it is impossible, based upon physical characteristics, to

identify the manufacturer or refiner of any given quantity of gasoline that was the source of

MTBE found in surface water, groundwater, or water wells.  Plaintiff must therefore pursue all

Defendants, jointly and severally, for those injuries that Defendants have collectively visited upon

Plaintiff.  Defendants are collectively liable under traditional causation theories as well as theories

of market share liability, alternative liability, concert of action liability, and/or enterprise liability

for injuries caused by Defendants.

249.     Defendants handled, stored, treated, transported, disposed, manufactured, promoted,

marketed, distributed, refined, supplied, and/or sold MTBE and MTBE-containing gasoline

willfully, recklessly, or wickedly with disregard of the probable dangerous consequences of that

conduct and its foreseeable impact upon the State of Rhode Island.  Therefore, the State requests

an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these

Defendants for the good of society and deter Defendants from ever committing the same or

similar acts.

## XI.     FIFTH CAUSE OF ACTION

### Private Nuisance

250.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated in this section.

251.     The State's property and waters including surface water, groundwater, drinking water

supplies, and water wells within the State, have been contaminated by MTBE as a direct and

proximate result of the intentional and unreasonable, negligent and reckless conduct of

Defendants, all as alleged in this Complaint.

252.     As a direct and proximate result of Defendants' acts and omissions creating the above-

described nuisance, the State has suffered injuries from contamination of State-owned property,

water, and wells.  Defendants' acts and omissions have substantially, intentionally, and

unreasonably interfered with, obstructed, violated, and/or imminently threatened, among other

things, the State's interests in its property, water, and wells.  This harm far outweighs any utility

or benefit derived from this intentional conduct.

70

253.     As a direct and proximate result of Defendants' acts and omissions as alleged in this

Complaint, Plaintiff's property and waters were and are contaminated with MTBE.  Plaintiff has

incurred, is incurring, and will incur, substantial investigation, remediation, cleanup, restoration,

removal, treatment, and monitoring costs and expenses related to contamination of Plaintiff's

property, surface water, groundwater, drinking water supplies, and water wells in an amount

within the jurisdictional limits of this Court, for which defendants are strictly, jointly, and

severally liable.

254.     As a further direct and proximate result of the acts and omissions of the Defendants

alleged in this Complaint, Plaintiff has sustained and will sustain other substantial expenses and

damages, in an amount within the jurisdictional limits of this Court, for which defendants are

jointly and severally liable.

255.     The injuries to the property and waters of the State caused and/or imminently threatened

by Defendants' acts and omissions as alleged in this Complaint are indivisible because, *inter alia*,

MTBE and MTBE gasoline are fungible products which defendants commingled throughout the

distribution system from refinery to retail gasoline station.

256.     Further, as discussed above, it is impossible, based upon physical characteristics, to

identify the manufacturer or refiner of any given quantity of gasoline that was the source of

MTBE found in surface water, groundwater, or water wells.  Plaintiff must therefore pursue all

Defendants, jointly and severally, for those injuries that Defendants have collectively visited upon

Plaintiff.  Defendants are collectively liable under traditional causation theories as well as theories

of market share liability, alternative liability, concert of action liability, and/or enterprise liability

for injuries caused by Defendants.

257.     Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of drinking water supplies for the public.  Defendants committed each of the above described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness.  Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

258.     Defendants handled, stored, treated, transported, disposed, manufactured, promoted, marketed, distributed, refined, supplied, and/or sold MTBE and MTBE-containing gasoline willfully, recklessly, or wickedly with disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the State of Rhode Island.  Therefore, the State requests an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

## XII.     SIXTH CAUSE OF ACTION

### Trespass

259.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

260.     The State has significant property interests in the property and waters of the State.  These property rights and interests include, but are not limited to, its quasi-sovereign *parens patriae* interest and authority in protecting the quality of such waters and property from contamination and pollution.

261.     In addition, the State holds an exclusive possessory right to certain property within the State, including lands, water supplies, and water wells.

262.    The State did not consent, in any way, to the presence of MTBE on State lands, water supplies, water wells, or waters of the State.

263.    Defendants voluntarily and intentionally supplied gasoline containing MTBE to locations throughout the State where it was stored in aboveground storage terminal tanks and USTs.

264.    Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, that MTBE is extremely hazardous to groundwater, surface water, and public water systems, including the property and interests of the State.

265.    Defendants so negligently, recklessly and/or intentionally transported, supplied, released, spilled, and/or failed to properly control, handle, store, contain, and use gasoline containing MTBE, and/or clean-up spills and leaks of MTBE, that they directly and proximately caused and continue to cause MTBE to intrude onto State property, contaminate water systems, surface water, groundwater systems, and zones of influence of the areas that supply production wells within the State.

266.    As a direct and proximate result of the trespass, the State has been damaged and is entitled to compensatory damages for the costs of investigation, remediation, and treatment, damages for loss of use and enjoyment, and/or other relief the State may seek at trial.

267.    As a direct and proximate result of Defendants' acts and omissions as alleged in this Complaint, Plaintiff's property and waters were and are contaminated with MTBE.  Plaintiff has incurred, is incurring, and will incur, substantial investigation, remediation, cleanup, restoration, removal, treatment, and monitoring costs and expenses related to contamination of Plaintiff's property, surface water, groundwater, drinking water supplies, and water wells in an amount within the jurisdictional limits of this Court, for which defendants are jointly and severally liable.

268.    As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiff has sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which defendants are jointly and severally liable.

269.    The injuries to the property and waters of the State caused and/or imminently threatened by Defendants' acts and omissions as alleged in this Complaint are indivisible because, *inter alia*, MTBE and MTBE gasoline are fungible products which defendants commingled throughout the distribution system from refinery to retail gasoline station.

270.    Further, as discussed above, it is impossible, based upon physical characteristics, to identify the manufacturer or refiner of any given quantity of gasoline that was the source of MTBE found in surface water, groundwater, or water wells.  Plaintiff must therefore pursue all Defendants, jointly and severally, for those injuries that Defendants have collectively visited upon Plaintiff.  Defendants are collectively liable under traditional causation theories as well as theories of market share liability, alternative liability, concert of action liability, and/or enterprise liability for injuries caused by Defendants.

271.    Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of drinking water supplies for the public.  Defendants committed each of the above described acts and omissions maliciously, fraudulently, willfully and/or wantonly, with conscious disregard for probable injury, or with gross negligence or oppressiveness.  Such conduct was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

272.    Defendants handled, stored, treated, transported, disposed, manufactured, promoted, marketed, distributed, refined, supplied, and/or sold MTBE and MTBE-containing gasoline

willfully, recklessly, or wickedly with disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the State of Rhode Island. Therefore, the State requests an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

## XIII.   SEVENTH CAUSE OF ACTION

### Impairment of Public Trust Natural Resources

273.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

274.    The Rhode Island Constitution provides for the broad protection of the State's natural resources, and guarantees that its citizens "shall be secure in their rights to the use and enjoyment of the natural resources of the state with due regard for the preservation of their values." R.I. Const. art. I, §17.

275.    The Rhode Island Constitution provides that the "powers of the state" to "regulate and control the use of land and waters in the furtherance of the preservation, regeneration, and restoration of the natural environment . . . as those rights and duties are set forth in Section 17, shall be an exercise of the police powers of the state, [and] shall be liberally construed." R.I. Const. art. I, §16.

276.    Groundwater in Rhode Island is a critical public trust resource which is held in trust by the State to ensure the availability of safe and potable drinking water for the people of Rhode Island. *See* R.I. Gen. Laws § 46-13.1-2(2-3).

277.    As alleged above, Defendants' activities in manufacturing, distributing, marketing, promoting, handling, storing, treating, transporting, supplying, handling, and storing MTBE

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 8:36:52 AM
Envelope: 1018765
Reviewer: Alexa G.

CASE 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 77 of 83 PageID #: 82

caused widespread MTBE contamination of the State's groundwater, rendering such waters

unsafe for human consumption.

278.    By engaging in the acts and omissions alleged in this Complaint, Defendants have altered

the character and/or quality of the groundwater of the State of Rhode Island and unreasonably

interfered with the use and enjoyment of public trust resources by causing statewide

contamination of groundwater, including drinking water supplies, public drinking water supply

wells, private drinking water wells, and other waters and property of the State.

279.    As a direct and proximate result of Defendants' acts and omissions as alleged in this

Complaint, Plaintiff's public trust resources are contaminated with MTBE.  Plaintiff has incurred,

is incurring, and will incur, substantial investigation, remediation, cleanup, restoration, removal,

treatment and monitoring costs and expenses related to contamination of Plaintiff's public trust

resources in an amount within the jurisdictional limits of this Court, for which defendants are

jointly and severally liable.

280.    As a further direct and proximate result of the acts and omissions of the Defendants

alleged in this Complaint, Plaintiff has sustained and will sustain other substantial expenses and

damages, in an amount within the jurisdictional limits of this Court, for which defendants are

jointly and severally liable.

281.    The injuries to the public trust resources of the State caused and/or imminently threatened

by Defendants' acts and omissions as alleged in this Complaint are indivisible because, *inter alia*,

MTBE and MTBE gasoline are fungible products which defendants commingled throughout the

distribution system from refinery to retail gasoline station.

282.    Further, as discussed above, it is impossible, based on physical characteristics, to identify

the manufacturer or refiner of any given quantity of gasoline that was the source of MTBE found

in surface water, groundwater, or water wells.  Plaintiff must therefore pursue all Defendants, jointly and severally, for those injuries that Defendants have collectively visited upon Plaintiff. Defendants are collectively liable under traditional causation theories as well as theories of market share liability, alternative liability, concert of action liability, and/or enterprise liability for injuries caused by Defendants.

283.    Defendants handled, stored, treated, transported, disposed, manufactured, promoted, marketed, distributed, refined, supplied, and/or sold MTBE and MTBE-containing gasoline willfully, recklessly, or wickedly with disregard of the probable dangerous consequences of that conduct and its foreseeable impact upon the State of Rhode Island.  Therefore, the State requests an award of punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants for the good of society and deter Defendants from ever committing the same or similar acts.

## XIV.   EIGHTH CAUSE OF ACTION

### Underground Storage Tank Financial Responsibility Act

284.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

285.    Defendants installed, operated, and/or closed USTs without taking all practicable measures to control releases or spills and/or failed to remediate contamination caused by such releases or spills.

286.    The State has spent funds from its Underground Storage Tank Financial Responsibility Program, *see* R.I. Gen Laws § 46-12.9-1 *et seq.*, for the investigation, remediation, and closure of leaking underground storage tank ("LUST") sites that released gasoline and MTBE into the environment.

287.     Rhode Island's Underground Storage Tank Financial Responsibility Act allows the State

to recover from the responsible party "any amount expended from the fund by the department,"

and creates a right of subrogation "against any responsible party other than the owner and/or

operator for all sums of money [paid from the State fund] plus reasonable attorneys' fees and

costs of litigation."  R.I. Gen. Laws, § 46-12.9-5 (3), (4).

288.     As provided by the Act, the State seeks reimbursement of all monies that the State

expended for investigation, remediation, and closure activities at LUST sites, attorneys' fees, and

costs of litigation.

## XV.    NINTH CAUSE OF ACTION

### Civil Action for Damages Per R.I. Gen. Laws Section 46-12-1, *et seq.*,

### the Water Pollution Act

289.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding

paragraphs as if fully restated in this section.

290.     Defendants are persons within the meaning of R.I. Gen. Laws, § 46-12-1(13).

291.     MTBE is a pollutant within the meaning of R.I. Gen. Laws, § 46-12-1(15).

292.     Each defendant violated R.I. Gen. Laws, § 46-12-5(a) which provides that it is "unlawful

for any person to place any pollutant in a location where it is likely to enter the waters."

Defendants, *inter alia*, manufactured, marketed, distributed and/or supplied MTBE and MTBE

gasoline into the State of Rhode Island when they knew, or should have known, that it was likely

to enter the waters of the State through reasonably foreseeable leaks and releases from USTs and

other sources.

293.    As alleged above, there were and are, within the meaning of R.I. Gen. Laws, § 46-12-1, discharges and releases of pollutants into the waters of the State at multiple sites throughout the State.

294.    Each Defendant violated R.I. Gen. Laws, § 46-12-5(b), which prohibits discharges of pollutants into the waters of the State.

295.    Each Defendant is liable under R.I. Gen. Laws, § 46-12-21, which provides that any person who negligently or intentionally pollutes groundwater shall be liable to any other person who is damaged by that pollution.  Defendants, *inter alia*, manufactured, marketed, distributed and/or supplied MTBE and MTBE gasoline into the State of Rhode Island when they knew, or should have known, that it was likely to enter the waters of the State through reasonably foreseeable leaks and releases from USTs and other sources.

296.    The State has a legally recognized right to protect the waters of the State, including, for example, as provided by R.I. Gen. Laws, § 46-12-28.


## PRAYER FOR RELIEF

The Plaintiff, **STATE OF RHODE ISLAND**, seeks judgment against these Defendants for:

1.    Compensatory damages arising from MTBE contamination of natural resources, public trust resources, groundwater, release sites, public drinking water supply wells, private drinking water supply wells, and other State and public properties and waters, according to proof, including, but not limited to:

(i)      costs of investigation;

(ii)     costs of testing and monitoring;

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2018 8:36:52 AM
Envelope: 1018765
Reviewer: Alexa G.

CASE 8:36:52 AM-CV-00204-WES-PAS    Document 1-1    Filed 05/11/17    Page 81 of 83 PageID #: 86

       (iii)    costs of providing water from an alternate source;

       (iv)    costs of installing and maintaining wellhead treatment;

       (v)    costs of installing and maintaining a wellhead protection program;

       (vi)    costs of installing and maintaining an early warning system to detect MTBE and /or TBA before it reaches a well;

       (vii)    costs of remediating MTBE and/or TBA from natural resources including groundwater;

       (viii)    costs of remediating MTBE and/or TBA from public trust resources including groundwater;

       (ix)    damages to reimburse the State for the costs of remediating MTBE and/or TBA contamination at release sites;

       (x)    damages to reimburse the State for any other response costs or other expenditures incurred to address MTBE and/or TBA contamination; and

       (xi)    interest on the damages according to law;

2.     Injunctive and equitable relief to abate the continuing nuisance and trespass by removing MTBE and TBA from soil and groundwater;

3.     Punitive damages;

4.     Costs (including reasonable attorneys' fees, court costs, and other expenses of litigation);

5.     Prejudgment interest; and

6.     Any other and further relief as the Court deems just, proper and equitable.

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2017 8:52 AM
Envelope: 1018765
Reviewer: Alexa G.

Case 1:17-cv-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 82 of 83 PageID #: 87

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all causes of action for which a jury is available under the law.

Case Number: PC-2017-1879
Filed in Providence/Bristol County Superior Court
Submitted: 4/26/2017 8:52 AM
Envelope: 1018765
Reviewer: Alexa G.

CASE 1:17-CV-00204-WES-PAS   Document 1-1   Filed 05/11/17   Page 83 of 83 PageID #: 88

Dated:  April 26, 2017

STATE OF RHODE ISLAND
PETER F. KILMARTIN, ATTORNEY GENERAL
By his Attorneys,

_/s/ Rebecca Partington_____

Rebecca Partington, Assistant Attorney General and
Chief of the Civil Division (Bar No. 3890)
DEPARTMENT OF THE ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903
Tel. (401) 274-4400 ext. 2303
rpartington@riag.ri.gov

_/s/ Neil F.X. Kelly_____
Neil F.X. Kelly, Assistant Attorney General and
Deputy Chief of the Civil Division (Bar No. 4515)
DEPARTMENT OF THE ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903
Tel. (401) 274-4400 ext. 2284
nkelly@riag.ri.gov

_/s/ Michael Rubin_____
Michael Rubin, Assistant Attorney General and
Environmental Advocate (Bar No. 3656)
DEPARTMENT OF THE ATTORNEY GENERAL
150 South Main Street
Providence, RI 02903
Tel. (401) 274-4400 ext. 2116
mrubin@riag.ri.gov