UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                )
STATE OF RHODE ISLAND,          )
                                )
        Plaintiff,              )        C.A. No. 17-204 WES
                                )
     v.                         )
                                )
ATLANTIC RICHFIELD COMPANY et al., )
                                )
        Defendants.             )
_____)
```

**OPINION AND ORDER**

WILLIAM E. SMITH, Chief Judge.

The State of Rhode Island brings this case against various oil and chemical companies alleging that they collectively caused the widespread contamination of the State's waters by a hazardous gasoline additive — methyl tertiary butyl ether ("MTBE"). Defendants move to dismiss[1] the whole of the State's case, with limited success. (ECF No. 91).

I.  Background[2]

MTBE is a synthetic gasoline additive that acts as an oxygenate, increasing gasoline's oxygen content. (Compl. ¶¶ 34, 61.)  Oil companies began adding MTBE to gasoline in small doses

---

[1] Defendants filed an original motion to dismiss (ECF No. 89), which they later amended (ECF No. 91).  The Court addresses the amended version, and DENIES the initial one as moot.

[2] As it must, the Court tells the story as the State has it in its complaint.  Thompson v. Coca-Cola Co., 522 F.3d 168, 172 (1st Cir. 2008).

beginning in the late 1970s. (Id. ¶ 55.) These companies escalated the amount of MTBE they used in the 1990s, after Congress required an increase in the oxygen content of gasoline sold in certain markets to combat smog. (Id. ¶¶ 59–62.) One of several options, MTBE soon became the oxygenate du jour, not because it was more effective or easier on the environment, but because it was the least expensive to manufacture, and therefore helped the oil industry turn the biggest profit. (Id. ¶ 61.) Gasoline continued to be laced with a sizable volume of MTBE into the 2000s, until states began instituting bans on its use like the one the Rhode Island General Assembly enacted in 2005. (See id. ¶ 185.)

The bans materialized as evidence of MTBE's severe impact on the environment became too great to ignore. (Id. ¶¶ 178–82.) MTBE, it turns out, was the most menacing component of the gasoline to which it was added: it is more water soluble and resists biodegradation better than the conventional constituents of gasoline; it is a known animal and suspected human carcinogen; and gives water a turpentine odor and chemical taste, rendering it unfit for human consumption at concentrations as low as one part per billion. (Id. ¶¶ 37–42.) "In sum," the State alleges, "when MTBE is released into the environment, it migrates far[] and fast[] through soil and groundwater, penetrates deeply into aquifers, . . . and results in persistent contamination that is costly to address." (Id. ¶ 43.)

Worse is that the oil industry, including Defendants, knew this about MTBE early on, but instead of alerting the public or switching to a safer oxygenate, waged an obfuscation campaign, downplaying the risks it knew about and frustrating government efforts to learn more. (Id. ¶¶ 74-176.) As early as 1980, for example, certain Defendants learned of a serious incident of MTBE contamination in Rockaway, New Jersey, followed later in the decade by MTBE plumes discovered in Maryland and New York. (Id. ¶¶ 87-93.) These episodes fouled the water used by thousands, stalled residential development, and required the monitoring of regulators years after the initial contamination event. (Id. ¶¶ 87-92.) And all this before MTBE's '90s heyday. (Id.)

The science explaining the persistence of MTBE plumes was provided in a report authored in 1986 by the Maine Department of Environmental Protection. (Id. ¶¶ 94-95.) The report supplied evidence of the qualities, listed above, that make MTBE a potent environmental contaminant, and advised that MTBE be banned or that gasoline containing it be stored in double-lined tanks. (Id.) Industry considered the report's recommendations not as a way to prevent future environmental damage, but rather as a "possible grave concern to the oxygenate producers" among them. (Id. ¶ 98.) They publicly assailed the report as "reactionary, unwarranted and counter-productive," while internally recognizing the plausibility

of — and eventually replicating — its scientific conclusions. (Id. ¶¶ 99, 102.)

The federal government had suspicions of its own in the 1980s that MTBE might be a danger to the environment, and recommended further testing be done. (Id. ¶¶ 111–14.) Industry again sensed a threat, and in a concerted effort to assuage government concerns with disinformation, formed what they called the "MTBE Committee." (Id. ¶¶ 112, 115–16.) One of the Committee's first orders of business was to submit written comments regarding MTBE to the Environmental Protection Agency ("EPA"). (Id. ¶¶ 117, 120–21.) By then aware of the plumes on the East Coast and the work done by the Maine Department of Environmental Protection sounding the alarm bells about MTBE, the Committee wrote to the EPA in 1987 that "there is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, . . . and that testing is therefore not needed." (Id. ¶¶ 120–21 (alteration omitted).) In fact, wrote the Committee, "requiring long term testing of MTBE will have a significant adverse environmental and economic impact," because such testing would slow demand for what they assured the EPA was an environmentally sound product. (Id. ¶ 121.) These and other efforts by industry were effective in convincing the EPA to delay testing on the effects of MTBE, which paved the way for the ramp up in production that occurred after

amendments to the Clean Air Act passed in 1990.  (See id. ¶¶ 126, 137, 146.)

Throughout the 1990s and into the 2000s, Defendants helped sustain the bull market in MTBE by continuing to feed the EPA what they knew were half-truths about MTBE's propensity to hurt the environment.  (Id. ¶¶ 171–72.)  As late as 1994, an industry representative wrote that there was "no basis to question the continued use of MTBE."  (Id. ¶ 171.)  And when, in 1996, the efficacy of MTBE as a groundwater contaminant could no longer be denied, an oil trade association invented a clever bit of spin, writing that MTBE's special powers of adulteration allow it to "serve as an early indicator of gasoline contamination in groundwater, triggering its cleanup and remediation."  (Id. ¶¶ 173–74.)  Pollution as public service.  (See id.)

Demand for MTBE was so great by the mid-1990s that the amount of it produced in the United States was eclipsed by only one other organic compound.  (Id. ¶ 177.)  And more than a negligible amount ended up in the country's water:  the United States Geological Survey reports that MTBE is the second-most detected chemical in groundwater, and has found MTBE-contaminated wells across the country, including in 20 percent of aquifers where MTBE was once prevalent in gasoline.  (Id. ¶¶ 178–80.)  Data such as these led to the EPA announcing that MTBE "has caused widespread and serious

contamination," representing a "threat to the nation's drinking water resources." (<u>Id.</u> ¶ 180.)

Rhode Island did not escape the scourge. (<u>See</u> <u>id.</u> ¶¶ 183–89.) By predictable leaks and spillage up and down the gasoline distribution chain, as well as inevitable mishandling by consumers, MTBE has contaminated groundwater in the state, including public and private drinking water supplies. (<u>Id.</u> ¶¶ 35–36, 183.) Despite the state-wide ban on MTBE, contamination continues to spread as MTBE slithers its way across Rhode Island's water table. (<u>Id.</u> ¶¶ 184, 186.) This suit is the State's attempt to secure compensation from those it avers are responsible for the havoc MTBE has wreaked in the state. (<u>Id.</u> ¶¶ 11, 189, 192–296.) Its hopes for doing so hang on the fate of the nine causes of action it asserts — all of which Defendants claim are wanting as a matter of law.

II. Discussion

The Court treats below the issues raised in Defendants' motion to dismiss seriatim, keeping in mind that to survive, the State's Complaint "must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true . . . .'" <u>Pérez-Acevedo v. Rivero-Cubano</u>, 520 F.3d 26, 29 (1st Cir. 2008) (quoting <u>Bell Atl. v. Twombly</u>, 550 U.S. 544, 555 (2007)).

Before doing so, though, it is worth highlighting at the outset that the Court decides this case sitting in diversity, and must therefore apply Rhode Island substantive law when such exists. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). On issues state law has yet to settle, the Court's task is to predict how the Rhode Island Supreme Court would resolve them were it asked. See Butler v. Balolia, 736 F.3d 609, 612-13 (1st Cir. 2013). Prediction of this sort requires the Court to "consult the types of sources that the [Rhode Island Supreme Court] would be apt to consult, including analogous opinions of that court, decisions of lower courts in the state, precedents and trends in other jurisdictions, learned treatises, and considerations of sound public policy." Id. at 613. Special attention may be given to "sources cited approvingly by the [Rhode Island Supreme Court] in other opinions." Id.

A.   Notice

Defendants first argument is that the State's complaint fails to meet the notice pleading standard set by Federal Rule of Civil Procedure 8, which requires complaints to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). They would have liked it if the State had provided specifics about contamination sites, such as when exactly they came to be and where they are located.

Their argument, however, assumes a pleading standard above where the law has it. "Specific facts are not necessary" to

satisfy Rule 8. <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007).

Moreover, "[d]ismissal for noncompliance with Rule 8 is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." <u>Sayied v. White</u>, 89 F. App'x 284, at **1 (1st Cir. 2004) (alteration and quotation marks omitted). The State's accusations, outlined above, are precise enough to allow Defendants to fashion a response. <u>Cf.</u> <u>Calvi v. Knox Cty.</u>, 470 F.3d 422, 431 (1st Cir. 2006) (holding that plaintiff sufficiently plead a Section 1983 excessive-force claim where she alleged that "with reckless and deliberate disregard for her rights, [defendant police officer] physically abused her and treated her cruelly and callously, using force far in excess of that necessary under the circumstances." (alteration and quotation marks omitted)). This argument fails.

B.   Standing

Defendants next say that the State has not met its burden to prove it has Article III standing to bring this suit. At the motion-to-dismiss stage, this burden requires plaintiff to plead facts which, taken as true, plausibly establish that plaintiff has suffered injury in fact, traceable to the challenged conduct, which is likely to be redressed upon winning in court. <u>Hochendoner v. Genzyme Corp.</u>, 823 F.3d 724, 731 (1st Cir. 2016). Defendants' plaint regards the first of these requirements.

To plead injury in fact, the State must demonstrate that what it has suffered is "both concrete and particularized and actual or imminent, not conjectural or hypothetical." Id. (quotation marks omitted). The State's allegation that waters in which it has an interest have been polluted by a possible human carcinogen due to Defendants activities pleads a plausible injury in fact. (Compl. ¶¶ 2–11, 48.); cf., e.g., Duke Power Co. v. Carolina Envtl. Study Grp., Inc., 438 U.S. 59, 73–74 (1978) ("Certainly the environmental and aesthetic consequences of the thermal pollution of the two lakes in the vicinity of the disputed power plants is the type of harmful effect which has been deemed adequate in prior cases to satisfy the 'injury in fact' standard.").

Parroting their notice argument, Defendants claim the State has not provided them specific information about when and where contamination occurred. Defendants again ask for too much too soon: "[a]t the pleading stage," the Supreme Court explained, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (modification and quotation marks omitted).

The State also plausibly pleads imminent future injury. Imminence is "a somewhat elastic" part of the standing doctrine

whose purpose "is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is certainly impending." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (emphasis and quotation marks omitted). The State's allegations concerning MTBE's behavior once in the ground — specifically its tendency to mix with water and its resistance to biodegradation (Compl. ¶ 52) — plausibly demonstrate that further injury from the chemical is certainly impending.

C.   Causation

Moving to the substance of the State's claims, Defendants argue the first six — all sounding in common-law tort — should be dismissed for failure to plead causation. Indeed, their charge is not only that the State has failed to plead causation, but that it has pleaded proof of causation in this case is a physical impossibility. The Court holds that although the State's facts as to causation are peculiar, they are nevertheless ones the Rhode Island Supreme Court would find, if asked, support a favorable ruling for the State on that element.

The pertinent facts are these: MTBE is fungible. (Id. ¶ 44-45.) Any particular molecule of the substance is indistinguishable from any other. (Id.) The same is true of MTBE-tainted gasoline. (Id.) Therefore, when some volume of MTBE is found in the environment, chemical tests attempting to trace it back to its source always will be in vain. (Id. ¶ 47.) Moreover, because of

the way Defendants set up their supply chain, MTBE-tainted gasoline
was untraceable even before it crossed state lines: the various
gasoline producers do not keep separate their respective products
from one end of the supply chain to the other.  (Id. ¶ 46.)
Instead, once refined, gasoline from multiple producers is blended
en route to the pump.  (Id.)  So even taking a step further up the
chain of causation — from running chemical tests on MTBE molecules
found contaminating the environment to identifying a particular
leak from which the MTBE sprang — would do the State no good in
identifying the responsible party.  (Id. ¶¶ 46-47.)  Turtles all
the way up, as far as the State can tell.  (See id.)

       Which creates an ostensible problem for the State's case.
The Rhode Island Supreme Court has held that, generally, a
successful tort plaintiff must establish that the alleged
tortfeasor caused the harm suffered.  See State of R.I. v. Lead
Indus. Ass'n, 951 A.2d 428, 450-51 (R.I. 2008).  This requires
proof that "the harm would not have occurred but for the act and
that the harm was a natural and probable consequence of the act."
Almonte v. Kurl, 46 A.3d 1, 18 (R.I. 2012) (quotation marks
omitted).  Implicit in this requirement is that when there are
multiple defendants and multiple harms, the plaintiff must plead
and eventually prove by a preponderance facts matching harms to
defendants.  See Clift v. Vose Hardware, Inc., 848 A.2d 1130, 1132
(R.I. 2004) ("The identification element of causation-in-fact

requires the plaintiff to establish a sufficient connection between the product and its alleged manufacturer or supplier." (quotation marks omitted)).

Sometimes this requirement is discussed in terms of "apportion[ing] . . . harm to causes," as in the Restatement (Second) of Torts: "[d]amages for harm are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm." Restatement (Second) of Torts § 433A (Am. Law Inst. 1965). As a constituent of legal cause, the burden to apportion the harm is usually plaintiff's. Id. § 433B(1). And although "circumstantial evidence may be used to establish the identity of the manufacturer or the seller of a defective product, such evidence must establish that it is reasonably probable, not merely possible, that the defendant was the source of the offending product." Clift, 848 A.2d at 1132–33 (quotation marks omitted) (affirming summary judgment for defendants where "there was no competent evidence connecting defendants to the bungee cord that injured [plaintiff]"). "Mere speculation, guess, or conjecture is insufficient to establish identification." Id. at 1132; see also Martinelli v. Hopkins, 787 A.2d 1158, 1169 (R.I. 2001) ("[T]he causal connection between negligence and a plaintiff's injury must be established by competent evidence and may not be based on conjecture or speculation . . . ." (quotation marks omitted)).

Defendants are right that application of these precedents with blinders on would have the State pleading itself out of court on its tort claims. And all for owning up to the fact that MTBE contamination is — on account of its chemical makeup and the way Defendants have designed the relevant supply chain — virtually untraceable, and the harm it has allegedly caused unapportionable. Facing this same conundrum over a decade ago, Judge Shira Scheindlin found it "contrary to New York's law and public policy that the defendants would be able to escape <u>all</u> liability by the expedient of contaminating New York's environment in an undifferentiated mass." <u>In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.</u>, 980 F. Supp. 2d 425, 456 (S.D.N.Y. 2013) (describing her ruling in <u>In re Methyl Butyl Ether ("MTBE") Prods. Liab. Litig.</u>, 591 F. Supp. 2d 259 (S.D.N.Y. 2008)). This Court finds similarly with respect to Rhode Island: the relevant holdings of the state's supreme court suggest that to shield tortfeasors from liability because they had the foresight (or luck) to pollute without demarcation would be contrary to Rhode Island law and policy.

The Restatement (Second) of Torts — on which the Rhode Island Supreme Court often relies — makes two exceptions to the general rule stated above that it is the tort plaintiff's burden to apportion harm. <u>See</u> Restatement (Second) of Torts § 433B(2)-(3) (Am. Law Inst. 1965). One of these is where the actions of

13

multiple defendants have combined to harm the plaintiff in such a way that fairness dictates the job of apportionment should fall to the defendants. Id. at § 433B(2). The paradigmatic case for the exception is "the pollution of a stream by a number of factories which discharge impurities into it": the Restatement authors illustrate the point with a hypothetical where A, B, and C negligently allow water to escape their land and flood D's farm; "[i]n D's action against A, B, and C, or any of them, each defendant," the authors articulate, employing the exception, "has the burden of proving the extent to which his negligence contributed to the damage caused by the flood, and if he does not do so is subject to liability for the entire damage to the farm." Id. cmt. c–d, illus. 7.

The Restatement explains that "[t]he reason for the exceptional rule placing the burden of proof as to apportionment upon the defendant or defendants is the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability." Id. cmt. d. And this "merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before it can be apportioned." Id. The authors conclude, "As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff,

any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former." Id.

This sentiment is echoed by a second source in this area — another the Rhode Island Supreme Court regularly consults, and indeed recognizes as a "venerable" and "leading treatise" — Prosser and Keeton on Torts. Almonte, 46 A.3d at 21; Lead Indus., 951 A.2d at 451. Applying an exception to the identification requirement "seems a very desirable solution," the authors there write, "where negligence on the part of . . . defendants is clear, and it is only the issue of causation which is in doubt, so that the choice must be made between letting loss due to failure of proof fall upon the innocent plaintiff or the culpable defendants." W. Page Keeton et al., Prosser & Keeton on Torts 271 (5th ed. 1984); see also id. at 350 ("The courts quite reasonably have been very liberal in permitting the jury to award damages where the uncertainty as to their extent arises from the nature of the wrong itself, for which the defendant, and not the plaintiff, is responsible."). And yet another whisperer of Rhode Island law, Professor John Henry Wigmore, see, e.g., State v. von Bulow, 475 A.2d 995, 1004 (R.I. 1984), has noted "the unfairness of putting on the injured party the impossible burden of proving the specific shares of harm done by each" in such a situation. John Henry Wigmore, Joint Tortfeasors and Severance of Damages, 17 Ill. L. Rev. 458, 458 (1923).

The exception and its justification are not strangers to Rhode Island, either. This Court adopted it applying state law in D'Ambra v. United States, 396 F. Supp. 1180, 1185-86 (D.R.I. 1973). There, plaintiff mother sued the federal government to recover for injuries sustained after witnessing her four-year-old son run over by a United States mail truck. Id. at 1180–81. The Court found the driver negligent, but that no evidence had been produced as to how much of the mother's subsequent "psychoneurosis" had been caused by witnessing the incident (for which the law recognized a cause of action) as opposed to how much had been caused by the death of her child (for which the law provided no relief). Id. at 1181, 1186. Predicting Rhode Island law would adopt the exception to apportionment contemplated here, the Court held that "the burden of proof of allocation of injury should clearly be on [the defendant driver] and not the innocent plaintiff," and because the defendant had provided no evidence for apportionment, that "the defendant [was] liable for the entire psychoneurosis." Id. at 1186.

Defendants here point out, and it is true, that the Rhode Island Supreme Court has on occasion declined to shift the apportionment burden. See, e.g., Almonte, 46 A.3d at 23–28; Gorman v. Abbott Labs., 599 A.2d 1364, 1364 (1991). But these cases are readily distinguishable. In Almonte, for example, the court refused to shift the burden of proving causation in a wrongful

16

death case involving medical malpractice — failure to civilly commit — that resulted in suicide. Almonte, 46 A.3d at 23-28. It did so for two reasons, neither of which is present in this case: first, the court felt that granting plaintiff a presumption on causation would undo the balance the General Assembly had struck in the commitment statute between "the constitutional rights of individual patients and the state's interest in committing patients should it be necessary." Id. at 26. Second, it held — after surveying other states to find that plaintiffs in several had "succeeded in establishing evidence of causation . . . in a case involving the eventual suicide of a physician's patient" — that "the traditional negligence causation standard does not represent an insurmountable barrier to recovery" in these cases. Id. at 27 & n.25. The State's case here is different — and importantly so — in that the facts as pleaded do plainly erect a barrier of this sort.

The State is also in a position distinct from that of the plaintiff in Gorman, who was injured by the drug diethylstilbestrol ("DES"). See 599 A.2d at 1364. The Gorman court declined to ease the causation standard as the California Supreme Court had done in its landmark DES case, Sindell v. Abbott Labs., 26 Cal.3d 588, 610-13 (1980). Id. The typical DES complaint was against defendants who sold DES to plaintiff's mother as an antidote to miscarriage, but whose only effect was to cause plaintiff terrible

disease later in life.  See, e.g., Sindell, 26 Cal.3d at 593–95.
Because of the considerable time that had elapsed between when the
mother ingested DES and when the signs of illness manifest,
plaintiff could not identify the manufacturer of the pills her
mother had taken.  Id. at 600–01.  The court in Sindell —
recognizing that "advances in science and technology create
fungible goods which may harm consumers and which cannot be traced
to any specific producer" — shifted the burden of identification
onto the defendants, who, if plaintiff could prove the rest of her
case, would be liable for any judgment against them according to
their share of the DES market at the time of injury.  Id. at 610–
13.

     The respective positions of DES plaintiffs and the State in
this case are distinct:  the former were allegedly injured by one,
and only one, DES dealer, but could not determine by which; the
latter was allegedly injured by each of the MTBE dealers, but
cannot determine by how much.  As the court said in Sindell, "There
may be a substantial likelihood that none of the five defendants
joined in the action made the DES which caused the injury, and
that the offending producer not named would escape liability
altogether."  Id. at 603.  That is not the situation here.  Sindell
would be inapt precedent even had Gorman come out the other way.

     Not only do these cases not squarely address the issue
presented here, the trend in those that do is overwhelmingly to

allow plaintiffs to prove causation using an alternative approach.
See, e.g., State of New Hampshire v. Exxon Mobil Corp., 126 A.3d
266, 297–98 (N.H. 2015); In re: Methyl Tertiary Butyl Ether
("MTBE") Prods. Liab. Litig., 379 F. Supp. 2d 348, 379–441
(S.D.N.Y. 2005). Judge Scheindlin, for instance, who presided
over multi-district MTBE litigation for more than a decade, was
set the daunting task of predicting whether the law in each of 15
states would countenance modification to the standard causation
requirement. In re: Methyl Tertiary Butyl Ether ("MTBE") Prods.
Liab. Litig., 379 F. Supp. 2d at 362–63. And in each she found
the state's highest court would do so. Id. at 379–441. One of
these states was New Hampshire whose supreme court — after the
attorney general successfully moved to remand, State of New
Hampshire v. Hess Corp., 20 A.3d 212, 214 (N.H. 2011) — had the
opportunity to check Judge Scheindlin's homework, Exxon Mobil, 126
A.3d at 297–98. She passed:  the New Hampshire Supreme Court
agreed that using an expanded causation theory was appropriate in
the case of MTBE contamination, where plaintiffs would otherwise
"be left without recourse due to impossible burdens of proof."
Exxon Mobil, 126 A.3d at 297.

Echoing Justice Cardozo, ever a trusted adviser to the state's
jurists, see, e.g., Air Distrib. Corp. v. Airpro Mech. Co., 973
A.2d 537, 541 n.6 (R.I. 2009); Presley v. Newport Hosp., 365 A.2d
748, 755 (R.I. 1976), the Rhode Island Supreme Court observed that

19

"[f]ew rules in our time are so well established that they may not be called upon any day to justify their existence as means adapted to an end." Silva v. Silva, 446 A.2d 1013, 1016 (R.I. 1982) (quoting Benjamin N. Cardozo, The Nature of the Judicial Process 98 (1921)). The court in that case abrogated a decades-old rule that immunized immediate family members from tort suits against one another, remarking that "the principles underlying the doctrine no longer have any validity." Silva, 446 A.2d 1015–17. What this Court predicts of the Rhode Island Supreme Court here is something much more conservative: not an abrogation of a time-honored principle, but simply the adaptation of one to suit the extraordinary circumstances of this case. As Justice Cardozo wrote, "Every new case is an experiment; and if the accepted rule which seems applicable yields a result which is felt to be unjust, the rule is reconsidered." Cardozo, supra, at 22.

The rule, then, for this case — portended by "the types of sources that the [Rhode Island Supreme Court] would be apt to consult," Butler, 736 F.3d at 613 — is as follows: the State is to be held to the traditional burdens on every element of its tort claims except for that of apportioning harm. The latter will be Defendants' to bear, if the State does its part. The Court leaves for another day a decision on what happens if Defendants are unable to find a reasonable basis upon which to divvy damages. The Restatement's position is that this would mean Defendants are

20

jointly and severally liable for the whole of them. Restatement (Second) of Torts § 433B cmt. d. Those authors, however, speculated that where there are myriad alleged polluters "hold[ing] each of them liable for the entire damage because he cannot show the amount of his contribution may perhaps be unjust." Id. cmt. e.

To be clear, the Court does not endeavor to substitute one injustice for another. Each Defendant will have an opportunity to exculpate itself by showing that any MTBE found polluting Rhode Island could not have been its responsibility — either because the Defendant was not connected to the MTBE that entered Rhode Island, or was but not during the relevant time period, or for some other reason. In due course, the Court will have an opportunity to consider potential comparators, including the apportionment scheme blessed by the New Hampshire Supreme Court in Exxon Mobil, 126 A.3d at 291-99, and those applied by Judge Scheindlin in In re: Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 591 F. Supp. 2d at 265-69, and In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 980 F. Supp. 2d 425, 456-58 (S.D.N.Y. 2013).

The Defendants broadside against the State's common-law tort claims fails for the reasons cited.

D.   Strict Liability for Failure to Warn

The State alleges the Defendants breached their duty to warn about the dangers of MTBE. Rhode Island law provides that a

product seller must warn consumers of the reasonably foreseeable dangers associated with the use of its product. See Thomas v. Amway Corp., 488 A.2d 716, 722 (R.I. 1985). Defendants quibble that though they may have had a duty to warn private citizens who used their product, there is no similar duty running to the State and its employees. The Court, though, finds no support for Defendants' proposed distinction between private persons and public entities. Insofar as the State used or consumed gasoline containing MTBE, it has the same right as a private party to be warned by sellers of their products' reasonably foreseeable dangers. See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 725 F.3d 65, 123 (2d Cir. 2013) ("We reject Exxon's suggestion that, as a categorical matter, neither the City nor the public are reasonably foreseeable users of gasoline containing MTBE, and therefore that Exxon owed the City and the gasoline-using public no duty to advise them of the hazards of use."). In other words, the fact that Defendants may also have had a duty to warn others does not vitiate its duty to warn the State to the extent it was a consumer. For now, as pleaded, this count stands.

    E.    Nuisance

    Defendants target next the State's public and private nuisance claims. Their contention is that these claims must be dismissed pursuant to the Rhode Island Supreme Court's decision in State v. Lead Indus. Ass'n, 951 A.2d 428 (R.I. 2008). In that

case, the State's attorney general brought suit against the manufacturers of lead pigment used in paint that had allegedly caused widespread injury to children in Rhode Island. Id. at 437-38, 440. On appeal, the court reversed a verdict for the State on its public-nuisance theory. Id. at 435.

Lead Industries contains considerable discussion of the history and present-day application of public nuisance. Id. at 443–53. That discussion makes abundantly clear that public nuisance has old roots that are still alive and well. Id. This Court need not retrace them to state the basics: the attorney general has authority to bring a public-nuisance claim, which is one against "behavior that unreasonably interferes with the health, safety, peace, comfort or convenience of the general community," whose elements are "(1) an unreasonable interference; (2) with a right common to the general public; (3) by a person or people with control over the instrumentality alleged to have created the nuisance when the damage occurred; and (4) causation." Id. at 445–46, 452–53.

The court's inquiry in Lead Industries into what constitutes interference with a public right leaves no doubt that the State's complaint here identifies one. Widespread water pollution is indeed a quintessential public nuisance. See id. at 444 ("By the fourteenth century, courts began to apply public nuisance principles to protect rights common to the public, including

23

roadway safety, air and water pollution, disorderly conduct, and public health." (alteration and quotation marks omitted)). The State has also alleged the requisite control, unlike in <u>Lead Industries</u>, where the court wrote that "[f]or the alleged public nuisance to be actionable, the state would have had to assert that defendants not only manufactured the lead pigment but also controlled that pigment at the time it caused injury to children in Rhode Island." <u>Id.</u> at 455; <u>see also</u> <u>id.</u> at 449 ("The party in control of the instrumentality causing the alleged nuisance is best positioned to abate it, and, therefore, is legally responsible.").

Contrary to Defendants' argument, the State's nuisance case here does not suffer this same infirmity. The Defendants are alleged to have controlled the "nuisance-causing instrumentality" — the MTBE-tainted gasoline — "at every step of the supply chain." (Compl. ¶ 237.) They moved MTBE-tainted gasoline "from refineries to pipelines to terminals . . . to retail stations," which they owned and where they "stored MTBE gasoline in underground storage tanks." (<u>Id.</u>) The complaint contends that a common manner in which MTBE made its way into the environment was through foreseeable "releases, leaks, overfills, and spills" along this Defendant-controlled supply chain. (<u>Id.</u> ¶ 35.) So whereas lead-pigment manufacturers escaped nuisance liability for having passed control of their product to landlords before it could do any

24

damage, <u>Lead Indus.</u>, 951 A.2d at 457, Defendants here controlled their product right up until it seeped into the state's water table.[3] That is the contention, anyway, and what separates this from the State's case in <u>Lead Industries</u>.  The nuisance claims stay.

    F.   Trespass

Rhode Island recognizes a cause of action for trespass, which imposes liability for intentionally entering the property of another.  <u>Newstone Dev., LLC v. E. Pac., LLC</u>, 140 A.3d 100, 106 (R.I. 2016); Restatement (Second) of Torts § 158 (Am. Law Inst. 1965).  The State's trespass claim attempts to hold Defendants responsible for the MTBE that has allegedly entered waters and property statewide.  (Compl. ¶¶ 5, 260–61.)  Defendants have several objections to this.  Some the Court has already rejected — that the State's notice was inadequate under Federal Rule of Civil Procedure 8, that the Defendants failed to exercise control over the MTBE when it allegedly harmed the State's legally protected interests — for reasons that need not be repeated.

Defendants only original objection is that the State lacks the possessory interest required to complain of a trespass to polluted land and water it does not own.  <u>See</u> Restatement (Second)

---

[3] Whether the State will be able through discovery to develop facts supporting the allegations that Defendants were in control of the MTBE-tainted gasoline at the time of the harm is a question for later.

of Torts § 157 (Am. Law Inst. 1965) (defining "possession" for purposes of trespass liability).  And indeed the State is seeking damages not only for the harm done to property it owns — which Defendants admit is not vulnerable to the present criticism — but for that to private property as well.  (Compl. ¶ 11.)  At first blush, the State's bid to base liability here on property it does not possess seems to buck black-letter trespass law.  The State outmaneuvers this potential obstacle by bringing its case as <u>parens patriae</u>.  (<u>Id.</u> ¶¶ 2, 14, 260.)

A state may proceed <u>parens patriae</u> to protect its "quasi-sovereign" interests, which are the "set of interests that the State has in the well-being of its populace."  <u>Alfred L. Snapp & Son, Inc. v. P.R. ex rel. Barez</u>, 458 U.S. 592, 602 (1982).  These interests include one in the integrity of a state's natural resources.  <u>See Snapp</u> 458 U.S. at 604–05.  As <u>parens patriae</u>, the Supreme Court has said, "the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain."  <u>Georgia v. Tenn. Copper Co.</u>, 206 U.S. 230, 237 (1907).  "It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air."  <u>Id.</u>  In <u>Tennessee Copper Company</u>, for example, the Court held that Georgia could maintain an action against copper companies whose operations polluted the state's air, despite the fact that Georgia owned "very little of the territory alleged to

be affected" and "elements that would be relied upon in a suit between fellow-citizens as a ground for equitable relief [were] wanting." Id. at 237–39.

Likewise in Missouri v. Illinois, where the Court allowed Missouri to sue Illinois for leaving sewage to flow down the Mississippi River, thereby "poison[ing] the water supply of the inhabitants of Missouri." 180 U.S. 208, 243, 248 (1901). "[I]f the health and comfort of the inhabitants of a state are threatened," the Court wrote, "the state is the proper party to represent and defend them." Id. at 241. Closer in time and place, the Rhode Island Superior Court found that the State had parens patriae standing to pursue the lead-pigment manufacturers in tort to avenge damage inflicted by them on the state's children. See State v. Lead Indus. Ass'n, No. 99-5226, 2001 WL 345830, at *3–4 (R.I. Super. Ct. Apr. 2, 2001) (Silverstein, J.), rev'd on other grounds, 951 A.2d at 435. And even more recently, the New Hampshire Supreme Court held that its state had "parens patriae standing to bring contamination suits," including for trespass, "against the MTBE defendants on behalf of the residents of New Hampshire." New Hampshire v. City of Dover, 891 A.2d 524, 527, 530 (N.H. 2006). And for that reason, the court allowed the state to recover damages for harm done by MTBE to privately owned wells. New Hampshire v. Hess Corp., 20 A.3d 212, 215–16 (N.H. 2011).

Here, the State — properly proceeding as parens patriae — may also protect its pseudo-sovereign interest in the welfare of its citizens and integrity of its natural resources. See Lead Indus. Ass'n, 2001 WL 345830, at *4 ("[Q]uasi-sovereign interests include a state's interests in its citizens' health, safety, and welfare as well as in a healthful environment."). One way it may do so is seeking relief for the invasion of its citizens' possessory interests by MTBE in an action for trespass. See New Mexico v. Gen. Elec. Co., 467 F.3d 1223, 1243 n.30 (10th Cir. 2006) (noting that the parens patriae doctrine provides "a state with standing to sue for damages to a broader range of natural resources because it does not require state ownership of such resources"). While possessory interests are usually for individual owners themselves to protect, when the harm to such interests is as widespread as alleged in the State's complaint, it counts as injury not just to the affected individuals, but to the state as a whole. See Missouri, 180 U.S. at 241 ("[S]ubstantial impairment of the health and prosperity of the towns and cities of the state situated on the Mississippi river, including its commercial metropolis, would injuriously affect the entire state."); see also Massachusetts v. Bull HN Info. Sys., Inc., 16 F. Supp. 2d 90, 102 (D. Mass. 1998) (allowing state to bring parens patriae suit where it had "alleged conduct that has potentially wide-spread impacts . . . that [were]

unlikely to be addressed fully if the controversy [was] cabined in the realm of private litigation").

G.    Impairment of the Public Trust

Defendants have a stronger argument when it comes to the State's cause of action brought pursuant to the public-trust doctrine.    The State's claim is that it can sue as trustee to protect the corpus of a public trust that includes groundwater. This claim fails:    the State's portfolio of trust assets it administers for public benefit does not, as yet, include groundwater.    Rhode Island law is that the public-trust doctrine stops at granting the State legal title to tidal lands below the high-water mark.    Champlin's Realty Assocs. v. Tillson, 823 A.2d 1162, 1165-67 (R.I. 2003).    Whatever the merits of extending the doctrine,[4] Rhode Island — either through legislation or decisional law — has yet to do so.    Cf., e.g., Vt. Stat. Ann. tit. 10, § 1390 (2008); In re Water Use Permit Applications, 9 P.3d 409, 447 (Haw. 2000); Hess Corp., 20 A.3d at 217.

H.    Underground Storage Tank Financial Responsibility Act

The State brings a claim under the Underground Storage Tank Financial Responsibility Act ("USTFRA").    1956 R.I. Gen. Laws §§

---

[4] See, e.g., Joseph L. Sax, Liberating the Public Trust Doctrine from Its Historical Shackles, 14 U.C. Davis L. Rev. 185, 188-89 (1980); Jack Tuholske, Trusting the Public Trust: Application of the Public Trust Doctrine to Groundwater Resources, 9 Vt. J. Envtl. L. 189, 226-31 (2008).

46-12.9-1 to -12.  The Act created a fund to reimburse owners and operators of underground tanks storing petroleum products ("USTs") for their efforts remediating leaks.  Id. §§ 46-12.9-4 to -5.  The fund was initially supplied, and is from time to time replenished, by the proceeds of a gas tax.  Id. § 46-12.9-11.  The USTFRA also provides the State a couple ways to recoup money disbursed from the fund.  Id. §§ 46-12.9-5(b)(3)-(4).

The State here pursues both, seeking to restore the fund at Defendants expense with money it says has been disbursed to investigate and remedy USTs that leaked MTBE.  The facts alleged support neither.  The first, established by section 46-12.9-5(b)(3), allows the State to redeem fund money it spends cleaning up UST leaks from a party who "fail[ed] to comply with an order of the department to undertake such activities."  Because there is no allegation the State ordered Defendants to remedy leaking USTs, nor one that Defendants thereafter failed to comply, this avenue of recovery is closed.

The State runs into a different problem down the second avenue.  Section 46-12.9-5(b)(4) creates a subrogation right for the State to pursue "any responsible party, other than the owner and/or operator, for all sums of money that the fund shall be obligated to pay hereunder, plus reasonable attorneys' fees and costs of litigation."  By "responsible party," the Act means "the person or persons liable for release of petroleum or the

30

remediation of a release." Id. § 46-12.9-3(11). An "operator" is "any person in control of, or having the responsibility for, the daily operation of an underground storage-tank system." Id. § 46-12.9-3(7). And an "owner" is one who "holds exclusive or joint title to, or lawful possession of, a facility or part of a facility" storing petroleum products in USTs. Id. § 46-12.9-3(8).

A plain-language reding of this section of the statute, then, is that if any non-owner/operators end up liable for the release or remediation of MTBE-tainted gasoline leaked from USTs, they can be on the hook for fund money spent cleaning it up. See State v. Santos, 870 A.2d 1029, 1032 (R.I. 2005) ("The plain statutory language is the best indicator of legislative intent.") The State can collect by asserting the subrogated rights of owners' and operators' who, paid by the fund to cover the cost of their remediation efforts, have claims against these non-owner/operator third parties. See U.S. Inv. & Dev. Corp. v. R.I. Dep't of Human Servs., 606 A.2d 1314, 1317 (1992) ("Subrogation is the substitution of one person in the place of another with reference to a lawful claim or right . . . ." (quotation marks omitted)).

This avenue, too, is closed though: the State asserts in this case exclusively its own rights, not the ones of its de facto insureds, and thus there can be no subrogation. See Hawkins v. Gadoury, 713 A.2d 799, 805 (R.I. 1998) ("An insurer's claim by

subrogation is derivative from that of the insured . . . ."
(quotation marks omitted)).

I.   Water Pollution Act

The State's final claim is one under the Water Pollution Act
("WPA").   1956 R.I. Gen. Laws §§ 46-12-1 to -41.   This Act
asseverates that "[a]ny person who shall negligently or
intentionally pollute groundwater shall be liable to any other
person who is damaged by that pollution."   Id. § 46-12-21.   The
Defendants and the governmental subdivisions for whose benefit the
State brings this suit are persons under the WPA.   Id. § 46-12-
1(13).   The State has alleged that Defendants polluted waters in
the state.   See id. § 46-12-1(16)-(17) (defining "[p]olluting" as
"the causing of pollution" and "[p]ollution" as "the man made or
man induced alteration of the chemical, physical, biological, and
radiological integrity of water").   And did so negligently and
intentionally.   See Restatement (Second) of Torts § 8A cmt. b (Am.
Law Inst. 1965) ("Intent is not . . . limited to consequences which
are desired.   If the actor knows that the consequences are certain,
or substantially certain, to result from his act, and still goes
ahead, he is treated by the law as if he had in fact desired to
produce the result.").   If the State can prove these allegations
— something it now has the chance to do — the Defendants will be
exposed to liability under the WPA.

J.  Personal Jurisdiction

There is a final piece of business:  Total Petrochemicals & Refining USA, Inc., ("TPRI") has moved (unsuccessfully) to dismiss for lack of personal jurisdiction (ECF No. 88).  The Fourteenth Amendment's Due Process Clause defines the outer limit of jurisdiction in this case, see 1956 R.I. Gen. Laws § 9-5-33, and it "requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice," Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quotation marks omitted).

The State alleges that TPRI introduced MTBE into the sequence of pipelines and storage tanks dedicated to the delivery of gasoline to Rhode Island (see, e.g., Aff. of Bruce F. Burke ¶¶ 23-27, ECF No. 94-1), and that this MTBE contributed to that polluting the state, (see, e.g., Compl. ¶¶ 8-9).  These contacts not only relate to the claims the State has against TPRI, they also "represent a purposeful availment of the privilege of conducting activities in [Rhode Island]."  Bluetarp Fin., Inc. v. Matrix Constr. Co., 709 F.3d 72, 80-82 (1st Cir. 2013) (quotation marks omitted).  In other words, the introduction of TPRI's product to the state was not "merely random, isolated, or fortuitous." Hannon

v. Beard, 524 F.3d 275, 284 (1st Cir. 2008) (quotation marks omitted).

This is not a case where a defendant placed its product in "the stream of commerce" by selling it to a retailer who acted unilaterally to sell it to the injured plaintiff. J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 887–89 (2011) (Breyer, J., concurring) (concluding there was no jurisdiction over foreign manufacturer whose product reached New Jersey plaintiff through sale from an independent distributor); see also Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 679, 681–83 (1st Cir. 1992) (same regarding domestic company whose product reached Maine plaintiff through sale from national retailer). The stream TPRI allegedly utilized was one whose distributaries led straight to Rhode Island. Cf. Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102, 112 (1987) (O'Connor, J., plurality opinion)

Placing its product in that particular stream "indicate[d] an intent or purpose" on the part of TPRI to serve the Rhode Island market. Id.; cf. J. McIntyre Mach., 564 U.S. at 889 ("[Plaintiff] . . . has shown no specific effort by [defendant] to sell in [forum state]"); Boit, 967 F.2d at 683 ("There is no evidence in the record that [defendant] intended to serve the market in [forum state]"). TPRI voluntarily directed its allegedly hazardous product at Rhode Island, making it foreseeable that it would have to defend litigation there if and when the harms risked by its

34

conduct befell the State. See Hannon, 524 F.3d at 284 ("The purposeful availment requirement . . . is based upon the cornerstones of voluntariness and foreseeability." (quotation marks omitted)); J. McIntyre Mach., 564 U.S. at 889 ("'[T]he volume, the value, and the hazardous character' of a good may affect the jurisdictional inquiry . . . ." (quoting Asahi Metal Indus., 480 U.S. at 122 (Stevens, J., concurring)).

Furthermore, jurisdiction over TPRI in Rhode Island is eminently reasonable: TPRI has not shown that litigating in Rhode Island would be unusually burdensome; Rhode Island has a special interest in pursuing relief in courts conveniently located in the state; and trying its case against TPRI with other parties the State alleges have similarly harmed it seems a most economical use of judicial resources. See Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 209-11 (1st Cir. 1994) (noting that these considerations are relevant to analysis of whether exercise of jurisdiction is reasonable, that "[t]he forum state has a demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders," and that "an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness."); see also Wash., Dep't of Revenue v. WWW.Dirtcheapcig.com, Inc., 260 F. Supp. 2d 1048, 1053 (W.D. Wash. 2003) (finding in a suit by Washington's Department of

Revenue against out-of-state defendant that the "State has a high level of interest in adjudicating this dispute.").

III. Conclusion

Defendants' Motion to Dismiss (ECF No. 91) is GRANTED IN PART AND DENIED IN PART: the State may proceed to discovery on all its claims except for those arising under the public-trust doctrine and the USTFRA. This includes those against TPRI, whose Motion to Dismiss (ECF No. 88) is DENIED.

IT IS SO ORDERED.

William E. Smith
Chief Judge
Date: December 11, 2018