**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF RHODE ISLAND,<br><br>                    Plaintiff,<br><br>vs.<br><br>ATLANTIC RICHFIELD COMPANY, et al.,<br><br>                    Defendants. | C.A. No.: 1:17-cv-00204-WES-PAS |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR ENTRY OF CASE MANAGEMENT ORDER

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION ................................................................................................. 1

LEGAL STANDARD............................................................................................. 5

ARGUMENT ........................................................................................................ 5

    I.    THE STATE'S CLAIM FOR "PAST COSTS" EXPENDED BY THE
           UST FINANCIAL RESPONSIBILITY FUND WAS DISMISSED AND
           CANNOT BE REVIVED AS A COMMON LAW CLAIM............................5

           A.    The Fund ................................................................................6

           B.    The Court Already Dismissed The State's Claim To Recover
                 Amounts Reimbursed From The Fund. ..................................7

           C.    The State Cannot Recover Fund Expenditures Under The
                 Common Law..........................................................................8

    II.    SITE-SPECIFIC ISSUES ARE CRITICAL TO RESOLUTION OF THE
           CLAIMS AND DEFENSES IN THIS CASE...................................11

           A.    Causation Is A Site-Specific Issue.......................................12

           B.    Other Site-Specific Issues and Defenses..............................18

    III.    THE FOCUS SITE APPROACH IS AN EFFECTIVE CASE
           MANAGEMENT TOOL BUT MAY BE UNNECESSARY. ........................22

    IV.    DEFENDANTS' CASE MANAGEMENT PROPOSAL. .............................27

CONCLUSION....................................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*Bly v. Tri-Cont'l Indus., Inc.*,
  663 A.2d 1232 (D.C. 1995) ...........................................................................16

*Clift v. Vose Hardware, Inc.*,
  848 A.2d 1130 (R.I. 2004) .............................................................................13

*Conley v. Boyle Drug Co.*,
  570 So. 2d 275 (Fla. 1990) ............................................................................16

*E.H. Ashley & Co. v. Wells Fargo Alarm Servs.*,
  907 F.2d 1274 (1st Cir. 1990) .........................................................................7

*Ferring Pharm. Inc. v. Braintree Labs., Inc.*,
  210 F. Supp. 3d 252 (D. Mass. 2016) ............................................................17

*Godding v. Pierce*,
  13 R.I. 532 (1882) ............................................................................................8

*Gorman v. Abbott Laboratories*,
  599 A.2d 1364 (R.I. 1991) .............................................................................15

*Grant v. Slater Mill & Power Co.*,
  14 R.I. 380 (1884) ............................................................................................8

*Hawkins v. Gadoury*,
  713 A.2d 799 (R.I. 1998) .................................................................................8

*Hinck v. U.S.*,
  550 U.S. 501 (2007) .........................................................................................8

*Holmes v. Secs. Investor Prot. Corp.*,
  503 U.S. 258 (1992) .......................................................................................10

*Hymowitz v. Abbott Labs.*,
  73 N.Y.2d 487 (1989) ....................................................................................16

*In re MTBE Prods. Liab. Litig.*,
  117 F. Supp. 3d 276 (S.D.N.Y. 2015) ...........................................................26

*In re MTBE Prods. Liab. Litig.*,
  2015 U.S. Dist. LEXIS 77917 (S.D.N.Y. 2015) ...........................................20

*In re MTBE Prods. Liab. Litig.*,
  379 F. Supp. 2d 348 (S.D.N.Y. 2005) ...........................................................16

*In re MTBE Prods. Liab. Litig.*,
  591 F. Supp. 2d 259 (S.D.N.Y. 2008) ......................................................16, 17

*In re MTBE Prods. Liab. Litig.*,
   67 F. Supp. 3d 619 (S.D.N.Y. 2014) ..................................................................14

*In re MTBE Prods. Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013) ..............................................................................21

*In re MTBE Prods. Liab. Litig.*,
   980 F. Supp. 2d 425 (S.D.N.Y. 2013) ..............................................14, 17, 26

*In re MTBE Prods. Liab. Litig.*,
   No. 1:00-1898, 2019 WL 117302 (S.D.N.Y. Jan. 7, 2019) ................................24

*In re MTBE Prods. Liab. Litig.*,
   No. M21-88, 2014 WL 630636 (S.D.N.Y. Feb. 18, 2014) ................................19

*In re Neurontin Mktg. & Sales Pracs. Litig.*,
   712 F.3d 21 (1st Cir. 2013) ..............................................................................17

*Lindsey v. Normet*,
   405 U.S. 56 (1972) ............................................................................................12

*Matsuyama v. Birnbaum*,
   890 N.E.2d 819 (Mass. 2008) ..........................................................................17

*Moises v. Sprague*,
   9 R.I. 541 (1870) ................................................................................................8

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ............................................................................12

*New Jersey Dep't of Envtl. Prot. v. Amerada Hess Corp.*,
   323 F.R.D. 213 (D.N.J. 2017) ..........................................................................24

*New Mexico v. General Elec. Co.*,
   467 F.3d 1223 (10th Cir. 2006) ........................................................................16

*Rhode Island Laborers' Health & Welfare Fund v. Philip Morris, Inc.*,
   99 F. Supp. 2d 174 (D.R.I. 2000) ....................................................................10

*Rhode Island v. Atl. Richfield Co.*,
   357 F. Supp. 3d 129 (D.R.I. 2018) ............................................................passim

*SEIU v. Philip Morris Inc.*,
   249 F.3d 1068 (D. C. Cir. 2001) ......................................................................16

*Silva v. Home Indem. Co.*,
   416 A.2d 664 (R.I. 1980) ................................................................................7, 8

*Sindell v. Abbott Labs.*,
   26 Cal. 3d 588 (1980) ......................................................................................16

*Smith v. Tripp,*
  14 R.I. 112 (1883) ..................................................................................................8

*State v. Lead Indus. Ass'n,*
  2001 R.I. Super. LEXIS 37 (Apr. 2, 2001), *rev'd on other grounds,* 951 A.2d 428 (R.I.
  2008) ...............................................................................................................10, 13

*Taft v. Pontarelli,*
  100 F.R.D. 19 (D.R.I. 1983) ..................................................................................5

*Tyson Foods v. Bouaphakeo,*
  136 S. Ct. 1036 (2016) ..........................................................................................16

*Wal-Mart v. Dukes,*
  564 U.S. 338 (2011) ..............................................................................................12

**Statutes**

R.I. Gen. Laws § 46-12.9-11 ......................................................................................6

R.I. Gen. Laws § 46-12.9-2 ........................................................................................6

R.I. Gen. Laws § 46-12.9-5 ..................................................................................6, 7, 9

**Other Authorities**

1 Louis R. Frumer & Melvin I. Friedman, Products Liability, § 3.04[1] (2002) ...................13

Rest. 2d Torts § 433A ................................................................................................15

Rest. Torts 2d § 433B(2) ............................................................................................15

**Rules**

Fed. R. Civ. P. 1 ........................................................................................................5

Fed. R. Civ. P. 16 ......................................................................................................5

**INTRODUCTION**

In support of its latest proposed CMO, the State for the first time specifies that the recovery it seeks in this case is limited to the following:

- "Past costs" at 616 sites where MTBE allegedly was detected at some point in time;

- Present and future investigation and cleanup costs at 93 of the 616 sites where MTBE has been detected that are alleged to be open and active remediation sites; and

- Sampling and treatment costs at 12 public and private drinking water wells where MTBE has allegedly been recently detected.

Thus, it is now clear that the State is pursuing a case that involves a defined collection of individual service stations/release sites and wells allegedly impacted by MTBE.  As the State acknowledges, this is a substantially different, smaller case than *New Hampshire*, with far fewer sites and wells, no statistical extrapolation to "unknown" sites and wells, and no statewide private well testing claim.  Pl.'s Mem. of Law in Supp. of Mot. For Entry of a Case Management Order ("State's Br.") at 10-12, 19.

Nonetheless, full discovery and trial on 616 sites and 12 wells would still be lengthy, cumbersome, and inefficient.  With this number of sites, a focus site approach is a more effective and streamlined way to proceed.  But the Court need not decide now between a focus site case and a case that addresses all sites because a threshold legal issue may resolve a large portion of the State's claims—its alleged "past cost" damages.

The State seeks what it labels as "past costs" for 616 sites where the Underground Storage Tank Financial Responsibility Fund (the "Fund") reimbursed responsible parties for performing site cleanups.  In its December 2018 decision on Defendants' Motion to Dismiss, the Court dismissed the State's statutory claim to recover these Fund reimbursements. Nevertheless, the State now asserts that it can recover these reimbursements under its common law claims.  The State is wrong.  Such reimbursements are not recoverable under the State's tort claims because the statutory remedies under the Underground Storage Tank

1

Financial Responsibility Act are comprehensive and exclusive.  In addition, because payments made to responsible parties by the Fund (which receives its money not from the State but from fees assessed on tank owners or operators) are not direct personal injury or property damage to the State, the State's common law claims are barred by the doctrine of remoteness.  Thus, the State does not have viable claims at the 523 sites where it seeks only "past costs."

Because resolution of this issue could substantially streamline this case, Defendants request the opportunity to file a motion addressing the viability of the State's "past costs" claims.  As discussed below, a favorable ruling may make a focus site approach unnecessary because the case will include only 93 (instead of all 616) sites and 12 wells.

Regardless of the number of sites in the case, site-specific proof is necessary.  By abandoning plans to extrapolate injury to unknown sites and wells across Rhode Island, the State has addressed only one of the problems with the *New Hampshire* approach—*i.e.*, assuming that *injury* exists at sites where there is no evidence of MTBE impacts.  However, the State still incorrectly assumes that it does not need to prove other critical elements of its tort claims, including causation, on a site by site basis.

The State contends that all Defendants, as manufacturers and suppliers, are liable for MTBE damages throughout the entire state for the duration of the nearly 30 years covered by the Complaint because gasoline is fungible and commingled.  State's Br. at 1, 19.  The State thus concludes that "a site by site approach to causation does not make sense in the context of this case" and asks the Court to assume that all Defendants caused injury at each MTBE release site at every point in time.  *Id.*  This self-serving presumption has no basis in fact or law.

First, the State presupposes that every site in Rhode Island contains MTBE from each Defendant, but this is an *allegation,* not a fact, much less a finding of the Court.  Defendants

will show that not all MTBE gasoline is commingled throughout the gasoline distribution system; that the entities supplying MTBE gasoline distributed in Rhode Island changed over time; and that the entity or entities supplying each gas station in Rhode Island also changed. Contrary to the State's allegations, it is often possible to identify which entity or entities supplied the sites at issue at the relevant time before a MTBE gasoline release. Second, the State's attempt to impose an alternative liability theory finds no support in Rhode Island law, particularly where a plaintiff can proceed using traditional causation, as is the case here. Even if the burden may shift to Defendants to apportion damages with respect to each site, this does not alleviate the State's burden to prove causation in the first instance. Third, site-specific proof of causation has been the norm in most other MTBE cases, even when MDL plaintiffs have, like here, proceeded against defendants in their capacity as manufacturers and suppliers of MTBE gasoline.

The State is simply wrong to suggest that the MDL cases have gone forward against defendants solely in their capacity as "direct dischargers." The MDL cases have asserted the same product liability claims against largely the same group of refiner and supplier defendants based on the same allegations regarding the refining and supply of MTBE gasoline as Rhode Island asserts here. The fact that MDL plaintiffs have asserted manufacturer/supplier claims in the context of the focus site approach—which necessarily involves site-specific determinations—supports, rather than detracts from, the appropriateness of examining these claims on a site-specific basis.

Causation is not the only site-specific issue. Even at sites where MTBE has been present, there is still a question of whether the State has suffered any injury due to the presence of MTBE, and what part (if any) of the damages it seeks are attributable to MTBE versus other constituents of gasoline (like benzene) or other non-petroleum contaminants. Similarly, at allegedly "open" sites, the State must prove how much additional investigation

and remediation (if any) is necessary beyond what the site's "responsible party" already is conducting under State supervision.  Finally, for each site Defendants have the right to put on site-specific affirmative defenses such as comparative negligence, failure to mitigate damages, accord and satisfaction, intervening cause, lack of control, and sale to sophisticated users.

The State's suggestion that the Court adopt the trial procedures applied in *New Hampshire* and allow Defendants to develop "exemplar" defenses only with respect to a subset of the sites contradicts the State's assurances elsewhere in its submission that discovery will "proceed on all contaminated sites and wells."  State's Br. at 8.  More importantly, it conflicts with Defendants' due process right to put on individualized defenses that are unique to each site.  Regardless of how this case proceeds, Defendants are entitled to put on site-specific defenses at trial.

The State spends much of its brief trying to show that the focus site approach utilized in MDL 1358 has not been effective (even though that approach has resolved the vast majority of cases for virtually all defendants) or efficient (even where, unlike this case, the parties were remanded to and spent significant time in their original district courts, or where plaintiff's counsel refused to engage in site selection until ordered multiple times to do so by the MDL magistrate judge).  But the State cannot dispute that only a few cases remain in the MDL (or elsewhere), and many of the claims in those cases already have been resolved.  Moreover, this Court can address any issues regarding focus site procedures through active case management.

In sum, Defendants request that the Court, as set forth in the proposed CMO attached as Ex. A, (1) grant Defendants leave to file a motion addressing the Plaintiff's "past cost" claims; and (2) order discovery to continue on (a) non-site-specific issues, and (b) site-specific issues regarding all 93 "future costs" sites and 12 water supply wells, while the "past

costs" motion is pending.  Upon resolution of that motion, Defendants request that the Court re-assess the issues of case structure and pre-trial schedule.

**LEGAL STANDARD**

Courts have the discretion to implement case management orders, including "adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems."  Fed. R. Civ. P. 16(c)(2)(F).  Rule 16, like all Rules, "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.  Although each aim ("just," "speedy," and "inexpensive") is "of importance" and must "be seriously considered . . . , it is likely that just determinations are to be preferred in any system of justice to either those which are speedy or inexpensive."  *Taft v. Pontarelli*, 100 F.R.D. 19, 21 (D.R.I. 1983).

**ARGUMENT**

**I.  THE STATE'S CLAIM FOR "PAST COSTS" EXPENDED BY THE UST FINANCIAL RESPONSIBILITY FUND WAS DISMISSED AND CANNOT BE REVIVED AS A COMMON LAW CLAIM.**

The State seeks "past costs" for 616 sites, but does not describe those "past costs." Based on letters it submitted to the Court, it appears the State is still trying to recover amounts expended from the Fund to reimburse responsible parties for performing site cleanups.  State's Ltr. to Judge Smith (Nov. 1, 2019); State's Ltr. to Judge Smith, 3 (Oct. 29, 2019).  The Court already dismissed the State's recoupment claim under the Fund's authorizing statute, but nevertheless the State believes it can pursue those same Fund expenditures under its common law theories.  Not so.  The statute sets forth the criteria for recovery, and the Court has already found that the State failed to state a claim under the statute.  Fund disbursements are not recoverable under the State's tort claims, and the Court's dismissal of the State's statutory claim appears to dispose of all claims at no fewer than 523

5

of the 616 sites at which the State seeks recovery of past costs.[1]  Whether the State can recover these "past costs" should be briefed promptly, as resolution is likely to have a material effect on discovery and case structure.

### A.  The Fund

The Rhode Island Legislature established the Fund by statute, the Underground Storage Tank Financial Responsibility Act ("USTFRA"), in 1994 to comply with federal financial responsibility requirements.  *See* R.I. Gen. Laws § 46-12.9-2.  The purpose of the Fund is to reimburse eligible cleanup costs to responsible parties who remediate petroleum contamination at underground storage tank sites.  R.I. Gen. Laws § 46-12.9-5(a), (b).  Responsible parties are generally the owners or operators of the sites at which the underground storage tanks leaked, which contrary to the allegations in the State's Complaint are often not any of the Defendants in this case.

The Fund reimburses responsible parties up to $1 million for eligible cleanup expenses per petroleum release incident, and an aggregate amount of $2 million, subject to a $20,000 deductible.  R.I. Gen. Laws § 46-12.9-5(b).  As this Court noted, "[t]he [F]und was initially supplied, and is from time to time replenished, by the proceeds of a gas tax."  *Rhode Island v. Atl. Richfield Co.*, 357 F. Supp. 3d 129, 145 (D.R.I. 2018) (citing R.I. Gen. Laws § 46-12.9-11).  The tax is imposed on tank owners and operators when they buy gasoline, and is collected and remitted to the State by gasoline distributors.  R.I. Gen. Laws § 46-12.9-11.  Prior to the establishment of the Fund statute, responsible parties cleaned up petroleum releases entirely at their own expense.  Even with the enactment of the USTFRA, the

---

[1] Based on the Defendants' review of site files the State has produced, it appears that the 616 sites for which the State seeks past costs includes the 93 sites for which the State also is seeking present and future costs, leaving 523 closed sites at which the entire claim for damages consists solely of "past costs."

responsible parties—not the State—are responsible for all required cleanup costs in excess of the maximums paid out of the Fund.

### B. The Court Already Dismissed The State's Claim To Recover Amounts Reimbursed From The Fund.

As this Court determined, when enacting the USTFRA the Legislature provided "a couple ways to recoup money disbursed from the [F]und," but "[t]he facts alleged support neither" avenue of recovery here. *Atl. Richfield*, 357 F. Supp. 3d at 145. The first avenue allows the State to recoup Fund expenditures from responsible parties who fail to comply with an order from the Rhode Island Department of Environmental Management ("DEM") to undertake cleanup activities at a UST release site, thus requiring DEM to perform the cleanup itself. R.I. Gen. Laws § 46-12.9-5(b)(3). As the Court noted in dismissing the State's claim, "[b]ecause there is no allegation the State ordered Defendants to remedy leaking USTs, nor one that Defendants thereafter failed to comply, this avenue of recovery is closed." *Atl. Richfield*, 357 F. Supp. 3d at 145.

The second avenue is for the State to assert a claim in subrogation against a responsible third party who is not the owner or operator of a site: "[t]he State can collect by asserting the subrogated rights of owners[ ] and operators[ ] who, paid by the fund to cover the cost of their remediation efforts, have claims against these non-owner/operator third parties." *Id.* (citing R.I. Gen. Laws § 46-12.9-5(b)(4)). But as the Court already held, the State's claim failed: "the State asserts in this case exclusively its own rights, not the ones of its de facto insureds, and thus there can be no subrogation." *Atl. Richfield*, 357 F. Supp. 3d at 145. Thus, the Court dismissed in its entirety the State's claim to recover Fund payments under the USTFRA.[2]

---

[2] If the State had proceeded as a subrogee, it would have "step[ped] into the shoes of the insured and could only recover if the insured could have recovered. The subrogee has no greater rights against a third party by virtue of its status as the insurer." *E.H. Ashley & Co. v. Wells Fargo Alarm Servs.*, 907 F.2d 1274 (1st Cir. 1990) (citing *Silva v. Home Indem. Co.*, 416 A.2d 664, 666 (R.I. 1980)). This means the State would take these subrogated claims subject to any defenses Defendants could raise

**C.  The State Cannot Recover Fund Expenditures Under The Common Law.**

Confronted with this dismissal, the State now appears to be taking a different tack—contending that it can resurrect its claim to recoup Fund reimbursements under the guise of damages for its common law claims.  State's Ltr. to Judge Smith (Nov. 1, 2019).  The State is wrong for several reasons.

<u>First</u>, the Legislature provided only two avenues of recovery under USTFRA, which the Court has already held are both closed to the State.  *Atl. Richfield*, 357 F. Supp. 3d at 145–46.  Black-letter Rhode Island law provides that "where a new right is created or a new duty imposed by statute, … if a remedy be given by the same statute for its violation or nonfulfillment, the remedy given is exclusive."  *Grant v. Slater Mill & Power Co.*, 14 R.I. 380, 383 (1884); *see also Godding v. Pierce*, 13 R.I. 532, 533-34 (1882) ("The general statement of the rule is, that where a statute creates a right or liability and gives a remedy, the remedy given is exclusive") (citing *Moises v. Sprague*, 9 R.I. 541, 543-44 (1870); *Smith v. Tripp*, 14 R.I. 112, 114 (1883) ("when a statute creates a new right or liability and gives a specific remedy, the remedy given is exclusive")).  These legal principles have withstood the test of time and are consistent with recent Supreme Court jurisprudence.  *Hinck v. U.S.*, 550 U.S. 501, 506 (2007) ("Our analysis is governed by the well-established principle that, in most contexts, "'a precisely drawn, detailed statute pre-empts more general remedies.'") (citations omitted).

---

against the owners and operators who were reimbursed by the Fund, such as the statute of limitations, comparative negligence, assumption of the risk, lack of causation, and a slew of other claim-specific and site-specific defenses.  *Silva*, 416 A.2d at 666 ("An insurer's claim by subrogation is derivative from that of the insured, and it is subject to the same statute of limitation as though the action were sued upon by the insured."); *Hawkins v. Gadoury*, 713 A.2d 799, 805 (R.I. 1998).  The State also could not bring subrogation claims against Defendants who were reimbursed from the Fund, as it would amount to the State asserting claims *on behalf of* a Defendant *against* that Defendant—a logical absurdity.

8

When the Legislature created the Fund, it created new duties and new rights.  It required gasoline distributors to collect a tax from the owners and operators of USTs; created a right for responsible parties to obtain reimbursement for approved amounts they spent addressing petroleum releases; obligated the Fund to pay those amounts; and defined how and when the Fund could seek recoupment.  This comprehensive statutory scheme is self-contained and does not contemplate the State seeking to recoup such reimbursements by other means.[3]

The State's attempt to recover Fund expenditures under its "common law" claims is not only inconsistent with the statute—it is an attempted end-run *around* the statute.  The recoupment provision of the USTFRA explicitly precludes the State from recovering Fund payments from tank owners/operators.  R.I. Gen. Laws § 46-12.9-5(b)(4).[4]  Yet the State's common-law claims are asserted indiscriminately against all Defendants, including those who own and/or operate underground tanks.  Allowing recoupment claims against those Defendants would violate the statute and render the Fund's coverage wholly illusory.  It would amount to little more than giving with the right hand and taking with the left.

Second, even if the statutory remedy provided by the Legislature were not the exclusive means of recouping Fund expenditures, the State's efforts to recover Fund payments under common-law theories are barred by the doctrine of remoteness.  The purely financial loss the State claims to have incurred by reimbursing money out of the Fund to eligible claimants is simply not recoverable in tort.

---

[3] This limitation is critical to ensure fulfillment of the statutory objective.  For example, if the parties can ignore the statutory scheme Defendants could implead every site owner who failed to maintain its USTs and force them to pay for these past costs—undoing the basic statutory purpose of funding UST cleanups through the gas tax.

[4] R.I. Gen. Laws § 46-12.9-5(b)(4) states, "Nothing contained in this chapter shall be construed to prevent subrogation by the state of Rhode Island against any responsible party, other than the owner and/or operator, for all sums of money that the fund shall be obligated to pay hereunder . . ."

Payments made to responsible parties by the Fund do not represent damages for direct injury to the State.  Rather, those payments represent reimbursement of amounts that responsible parties spent under Rhode Island statutes and regulations to clean up petroleum spills.  They are financial payments from the Fund to responsible parties entitled to reimbursement under a statutory scheme set up by the Legislature for that very purpose— equivalent to an insurer's payment under an insurance policy—and nothing more.  The payment to the owners is the result of a statutory mandate, not a common law tort against the State that compelled payment.  There is therefore no tort claim in this causal chain.

Nor can the State recover these reimbursement amounts on a theory that it has been indirectly harmed by Defendants' allegedly tortious conduct.  "The doctrine of remoteness bars recovery in tort for indirect harm suffered as a result of injuries directly sustained by another person."  *State v. Lead Indus. Ass'n*, 2001 R.I. Super. LEXIS 37 (Apr. 2, 2001), *rev'd on other grounds,* 951 A.2d 428 (R.I. 2008).  Remoteness is related to proximate cause which, as the U.S. Supreme Court has observed, generally requires "some direct relation between the injury asserted and the injurious conduct alleged."  *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).  "Therefore, 'a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover.'"  *Lead Industries*, 2001 R.I. Super. LEXIS 37 at *44 (citing *Holmes*, 503 U.S. at 268-69); *see also Rhode Island Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 99 F. Supp. 2d 174 (D.R.I. 2000) (dismissing health plan's claims against tobacco companies for excess health care costs incurred related to plan members' smoking-related illnesses on remoteness grounds, due to lack of direct injury).

That is precisely the case here.  Direct harm is entirely absent from the State's "past cost" claims.  The alleged misfortune caused by Defendants' purported conduct is that the

10

cleanups responsible parties had to perform cost more due to the presence of MTBE in the released gasoline and the Fund was obligated by statute to reimburse those higher amounts. Like an action by an insurer seeking to recover payments to a policyholder for an injury caused by an alleged third-party tortfeasor, this is a quintessential subrogation claim, not a direct injury.  And if the State wants to seek reimbursement of these incremental monies to the Fund, it must proceed in subrogation, which is precisely why the USTFRA provides the State with *subrogation* rights.  *Atl. Richfield*, 357 F. Supp. 3d at 145 ("The State can collect by asserting the subrogated rights of owners[ ] and operators[ ] who, paid by the fund to cover the cost of their remediation efforts, have claims against these non-owner/operator third parties.").[5]

If, as Defendants contend, the State's effort to recover Fund expenditures under its common law claims is foreclosed, the scope of this case becomes significantly smaller, which will impact case structure and management going forward.  Thus, Defendants request leave to file a motion to address the viability of Plaintiff's "past costs" claims within 21 days of the date of the Court's Order.

## II.   SITE-SPECIFIC ISSUES ARE CRITICAL TO RESOLUTION OF THE CLAIMS AND DEFENSES IN THIS CASE.

Elements of the State's claims (such as causation and damages) and the Defendants' defenses (such as intervening cause and failure to mitigate) can only be proven through site-specific evidence that addresses what occurred at specific release sites.  This is true regardless of whether the case involves 616 sites, 93 sites, or just one site.  The State carries the burden of proving each element of its claims, *Atl. Richfield*, 357 F. Supp. 3d at 141, and

---

[5] In its brief, the State suggests that "defendants raised a potential defense that the State has no damages at all because the defendants have been contributing to the State's leaking underground storage tank cleanup fund," and that the New Hampshire court held that the "collateral source rule" foreclosed that defense.  State's Br. at 20.  As detailed above, that is not Defendants' argument here and the collateral source rule does not apply.

Defendants must have the opportunity to rebut the State's evidence and present their affirmative defenses. "Due process requires that there be an opportunity to present every available defense." *Lindsey v. Normet*, 405 U.S. 56, 66 (1972); *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669 (7th Cir. 2015) ("[A] defendant has a due process right not to pay in excess of its liability and to present individualized defenses if those defenses affect its liability."). The right to present available defenses is not contingent on the form in which the case is brought. *See, e.g., Wal-Mart v. Dukes*, 564 U.S. 338, 341 (2011) ("[A] class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims."). The State's attempt to gloss over essential site-specific elements of this case by offering a generalized (and unsupportable) "one size fits all" approach should be rejected.

## A. Causation Is A Site-Specific Issue.

The State attempts to avoid one of the most critical site-specific issues—causation—by theorizing that "*all* the defendants are liable for contamination at *each* MTBE site throughout the entire state because their MTBE gasoline is fungible and commingled such that every site contains MTBE gasoline from each defendant." State's Br. at 1. The State posits that because "all defendants are responsible for the MTBE contamination (injury) at each known site and well . . ., a site-by-site approach to causation does not make sense." *Id.* at 1, 19. But this allegation is just that—a conclusory allegation that is supported by neither the facts nor the law and is a transparent attempt to bypass the State's obligation to prove liability.

Rhode Island law requires the State to present evidence sufficient to demonstrate which Defendants—if any—caused its alleged MTBE injuries and damages at each of the sites in this case. Rhode Island courts require "'a plaintiff in a products liability case [to] bear[] the burden of proving by a preponderance of evidence that the defendant caused the

12

harm that is the subject of the litigation.  The identification element of causation-in-fact requires the plaintiff to establish a sufficient connection between the product and its alleged manufacturer or supplier.'"  *Clift v. Vose Hardware, Inc.*, 848 A.2d 1130, 1132 (R.I. 2004) (quoting 1 Louis R. Frumer & Melvin I. Friedman, Products Liability, § 3.04[1] at 3-46 to 3-48 (2002)); *Lead Indus. Ass'n*, 951 A.2d at 451 ("[B]asic fairness dictates that a defendant must have caused the interference to be held liable for its abatement.").

The State defines its alleged injury, or "harm" to be the release of MTBE gasoline at 616 specific sites and 12 specific wells.  State's Br. at 1, 10-12.  Nonetheless, the State seeks to sidestep its fundamental obligation to establish causation in accordance with Rhode Island law by suggesting that the scope of the case it elected to bring makes site-specific evidence of causation challenging and, therefore, unnecessary.  This ignores the fact that parties have filed and prosecuted environmental contamination claims in Rhode Island for decades where, in each instance, the plaintiff is required to prove that specific culpable conduct by each defendant caused harm and damages at that particular site.  Simply because the State chose to cobble together many disparate claims into one large case should not relieve its burden.

Contrary to the State's representations, *e.g.*, State's Br. at 1, the MDL cases, like this case, have proceeded against Defendants in their capacity as suppliers and manufacturers of an allegedly defective product, with plaintiffs asserting common law claims such as nuisance, trespass, negligence, design defect, and failure to warn, as well as certain statutory claims. With respect to proof of causation—notwithstanding Judge Scheindlin's prediction that some jurisdictions might be open to market-share or other forms of alternative liability—most of the MTBE cases in fact have proceeded under traditional causation theories.  Plaintiffs in the MDL cases have identified through discovery which defendant or subset of defendants supplied (as well as owned, operated, or branded) the specific sites at issue during the relevant time period.  *See infra* at 26.

13

In many cases, this has led to the dismissal of claims for inability to establish the causal connection between certain defendants and MTBE releases at specific sites. For example, in the *Orange County Water District* case, the MDL court granted defendants' motion for summary judgment with regard to certain sites where the plaintiff could not "adequately place [defendants'] gasoline at those stations, which it must do to prove causation for each of its claims against them." *In re MTBE Prods. Liab. Litig.*, 67 F. Supp. 3d 619, 631 (S.D.N.Y. 2014). In the *City of Fresno* case, the MDL court rejected the City's reliance on the commingled product theory and instead required plaintiff to provide traditional proof of causation. The court ultimately granted summary judgment at specific sites where the City could point to no direct evidence that defendants' gasoline was present during the relevant timeframe. *In re MTBE Prods. Liab. Litig.*, 980 F. Supp. 2d 425, 458–49 (S.D.N.Y. 2013).

This Court's 2018 decision on the motion to dismiss does not allow the State to avoid its obligation to prove causation on a site-by-site basis. That decision held only that Defendants had the burden to apportion damages assuming "the State does its part," *Atl. Richfield*, 357 F. Supp. 3d at 135, which involves, among other things, providing sufficient evidence of causation in the first instance. *See also id.* at 141 ("The rule then, for this case . . . is as follows: the State is to be held to the traditional burdens on every element of its tort claim except for apportioning harm."). That decision also "assum[ed] that all the allegations in the complaint are true," *id.*, including the State's conclusory assertion that the MTBE gasoline of all Defendants is present at all sites in Rhode Island at all times, which Defendants vigorously contest. In reaching the conclusion regarding apportionment, the Court relied, in part, on the rule that, "where the actions of multiple defendants have combined to harm the plaintiff in such a way that fairness dictates the job of apportionment should fall to the defendants." *Id.* at 138 (citing Rest. 2d Torts § 433B(2)). Section 433B(2),

14

however, only shifts the burden of proof on *apportioning proved damages*.  Section 433B(2) does not shift the burden of proving (or disproving) *causation* to defendants; it only applies once the plaintiff has already proved that "multiple defendants" caused an identifiable harm. Rest. Torts 2d § 433B(2).[6]  The burden of showing which Defendants if any caused the harm at a particular site in the first place remains with the State.

The State has indicated it intends to adopt the *New Hampshire* approach, State's Br. at 4, which was entirely dependent on the adoption of market-share liability—something Rhode Island has refused to do.  In the only Rhode Island Supreme Court case to fully consider it, *Gorman v. Abbott Laboratories*, the Court said:  "We are not willing to adopt the market-share doctrine which has been accepted in the State of California in *Sindell v. Abbott Laboratories, Inc*., 26 Cal.3d 588, 163 Cal. Rptr. 132, 607 P.2d 924 (1980)."  599 A.2d 1364, 1364 (R.I. 1991).  The Court emphasized: "We are of the opinion that the establishment of liability requires the identification of the specific defendant responsible for the injury."  *Id*. On the State's motion to dismiss, this Court accepted the State's effort to distinguish *Gorman* through its allegations that every defendant's gasoline was present in every release at every site.  *Atl. Richfield*, 357 F. Supp. 3d at 140.  But as discussed above, and as Defendants will demonstrate, that allegation is false.  Without that essential foundational predicate, the State's

---

[6] The reason for the exceptional rule placing the burden of proof as to apportionment on defendants is the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm that he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before it can be apportioned. *See id.*, cmt. d.  As the comment further explains, shifting the burden of apportionment is fair because it has already been proved that the defendant harmed the plaintiff.  *Id*. ("As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former.").  Similarly, the comment's example of multiple companies discharging into a single stream, which the court embraced, *Atl. Richfield*, 357 F. Supp. 3d at 138, is the same:  It does not allow liability without proof that each company was, in fact, discharging into the stream.  Finally, Restatement § 433A confirms that where two defendants' actions cause "distinct harms," the damages are always apportioned.  Rest. 2d Torts § 433A.  Similarly, here the State must first prove which Defendants, if any, "contributed" gasoline to each site before employing the rule.

attempt to avoid its obligation to prove that each Defendant caused its injuries on a site-specific basis collapses.

Even if market-share liability was cognizable under Rhode Island law, the State has not even attempted to demonstrate how market-share would be warranted on the facts of this case.  Nor could it.  Traditional methods of proving causation are available.  As will be shown, this is not a situation where the plaintiff has no remedy, or where alleged tortfeasors would be unfairly shielded from liability. [7] [8]

*Tyson Foods* and the other cases discussed by the State at pages 25–26 of its brief have nothing at all to do with the State's theory that all defendants are responsible for MTBE injuries at all sites because of the fungibility and alleged commingling of all MTBE gasoline.[9]  They do not address market-share liability or any other form of alternative liability that would be necessary for the State to proceed on its theory of causation.  These cases merely stand for the general proposition that statistical evidence is sometimes admissible.[10]

---

[7] Even where accepted, market-share liability is a "theory of last resort."  *Conley v. Boyle Drug Co.*, 570 So. 2d 275, 285 (Fla. 1990); *Bly v. Tri-Cont'l Indus., Inc.*, 663 A.2d 1232, 1243 (D.C. 1995).  It generally has only been applied where the plaintiff has suffered serious personal injury.  *Sindell v. Abbott Labs*., 26 Cal. 3d 588 (1980); *Hymowitz v. Abbott Labs*., 73 N.Y.2d 487 (1989).

[8] Although the MDL Court initially held that a number of states might recognize market-share or other alternative liability theories, *In re MTBE Prods. Liab. Litig.*, 379 F. Supp. 2d 348 (S.D.N.Y. 2005), it eventually created a "commingled product theory" that was different from market-share and that required plaintiffs to connect defendants to particular releases.  *See In re MTBE Prods. Liab. Litig.*, 591 F. Supp. 2d 259, 275 (S.D.N.Y. 2008) ("The [commingled product] theory is different from market-share liability").  In particular, under the commingled product theory, the plaintiff must still prove the presence of each defendant's gasoline "in the capture zone of each well" and at "the time that the risk of harm . . . occurred."  *Id*.  Only then is causation against the defendant established, subject to its ability to exculpate.

[9] Nor do *Missouri v. Illinois* and the other *parens patriae* cases referenced briefly by the State on page 26 of its brief support the State's causation theory.  Those cases generally provide that a state has standing in certain circumstances to bring a case on behalf of its citizens when a quasi-sovereign interest is at stake.  *Parens patriae* does not alter substantive requirements:  "The doctrine of *parens patriae* is a standing concept rather than one of substantive recovery."  *New Mexico v. General Elec. Co.*, 467 F.3d 1223, 1243 n.30 (10th Cir. 2006); *see also SEIU v. Philip Morris Inc*., 249 F.3d 1068, 1073 (D. C. Cir. 2001) ("the doctrine of *parens patriae* is merely a species of prudential standing and does not create a boundless opportunity for governments to seek recovery for alleged wrongs against them or their residents").

[10] *See Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016) (stating that the "permissibility" of "representative or statistical" evidence "turns not on the form a proceeding takes—be it a class or an

Regardless of how the State is allowed to proceed on its proof of causation, Defendants are entitled to present site-specific causation defenses to exculpate themselves. Indeed, this Court has recognized that "[e]ach Defendant will have an opportunity to exculpate itself by showing that any MTBE found polluting Rhode Island could not have been its responsibility." *Atl. Richfield*, 357 F. Supp. 3d at 141. Judge Scheindlin, too, acknowledged the importance of Defendants' right to exculpate themselves and specified that application of her commingled product theory would involve exculpation on a site-specific basis. Thus, if the State's claimed injury arose from a release that occurred before or after a particular defendant became associated with a site or entered/exited the Rhode Island market, that defendant would be allowed to defend on that basis. Similarly, Defendants must be able to present evidence that they never delivered MTBE gasoline to a particular release site. *See*, *e.g.*, *In re MTBE Prods. Liab. Litig.*, 980 F. Supp. 2d 425, 452 (S.D.N.Y. 2013) (noting in *Fresno* that under commingled product theory, each defendant may exculpate itself by proving that its product was not present at the relevant time or at the relevant sites); *In re MTBE Prods. Liab. Litig.*, 591 F. Supp. 2d 259, 279 (S.D.N.Y. 2008) (stating in *Suffolk County* that if contamination of a well occurred prior to the time a defendant entered the market, defendant may not be liable as a matter of law, but if contamination occurred after a defendant entered the market, defendant's liability is a factual question to be determined on a well-by-well basis).

---

individual action—but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action."); *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 30 (1st Cir. 2013) (holding that statistical data may be used to prove causation where such evidence meets the same standards of admissibility as any other type of expert evidence); *Ferring Pharm. Inc. v. Braintree Labs., Inc.*, 210 F. Supp. 3d 252, 255 (D. Mass. 2016) (stating that a plaintiff asserting a false advertising claim could present expert statistical evidence regarding its economic damages); *Matsuyama v. Birnbaum*, 890 N.E.2d 819, 834, 841 (Mass. 2008) (holding that under Massachusetts law, there is no presumption against the admissibility of statistical evidence but still requiring a careful evaluation of whether it is appropriate to prove a particular claim).

Therefore, the State's contention that it is proceeding against Defendants only as manufacturers and suppliers of MTBE gasoline into Rhode Island neither distinguishes this case from the MDL cases nor provides a reason why it, unlike so many MTBE plaintiffs before it, cannot prove causation on a site-specific basis.  And even if the Court were to permit the State to proceed on an alternative theory such as market-share—an issue that at the very least would require additional factual and legal development and that the Court specifically reserved in its prior decision, *Atl. Richfield*, 357 F. Supp.3d at 141—Defendants are entitled to exculpate themselves and otherwise defend against the State's causation claims on a site-by-site basis.

### B.    Other Site-Specific Issues and Defenses.

The State should not be allowed to circumscribe Defendants' ability to present their site-specific defenses by requiring them to limit their evidence to "exemplars."  State's Br. at 19-20 (stating that "any issues that defendants believe are unique to specific sites can be addressed in the same manner as in New Hampshire," where "defendants were not prevented from putting on their defense and evidence of exemplar sites.").  Limiting Defendants to only "exemplar" sites does not protect Defendants' due process right to present all available defenses.  The following are just a few examples of additional fundamental issues that will require site-specific discovery, motion practice, and evidence at trial in order for Defendants to appropriately defend themselves against the State's allegations, regardless of the number of sites at issue in the case.

As an initial matter, the State must establish at each site that it has suffered an injury that would not have occurred if gasoline that did not contain MTBE had leaked.  In other words, the State is required to link its site-specific injuries to MTBE as opposed to gasoline in general. The State must be able to demonstrate, among other things, that the presence of MTBE at each site caused the State itself to incur damages due to a more expensive

18

remediation process than would be necessary had gasoline that did not contain MTBE leaked, that the State would not have been injured had a warning about MTBE been directed at a specific user or consumer of the MTBE gasoline that was released at the sites, and that the release of gasoline containing MTBE at each site was controlled by a defendant.

Even a cursory review of the 93 sites and 12 wells for which the State seeks present and future damages reveals that the State's claimed injuries are hardly a foregone conclusion. For example, the State seeks current and future treatment damages at two wells where the last MTBE detections were more than eight years ago and each less than 1 ppb—a fraction of the State's 40 ppb action level.  That these wells have had no MTBE testing since those detections suggests that the State already has determined that the low levels previously detected would not pose any threat to human health or safety, and that the State has not been injured at those wells.[11]  At one site for which the State alleges there will be future costs for investigation or remediation, MTBE has been below the applicable groundwater standards since 2011, and the only constituent above those standards, and therefore driving any costs, is benzene.[12]  Indeed, based on the State's own documents, it appears that several of the 93 "open" sites for which present and future costs are sought are actually "closed" pursuant to the State's supervision and regulatory scheme.  In *State of New Jersey*, the MDL Court dismissed site-specific claims against a defendant "where there is no evidence that restorative measures are necessary or will even be implemented."  *In re MTBE Prods. Liab. Litig.*, No. M21-88, 2014 WL 630636, *3 (S.D.N.Y. Feb. 18, 2014).  And New Jersey also voluntarily dismissed sites where the MTBE impacts and damages were so small that they did not merit

---

[11] These wells are located at 21 Danielson Pike, North Scituate, and 419 Albion Road, Lincoln.  RI-SITEREM-0000001.

[12] This site is located at 43 W. Main St., Kingston, Rhode Island.  RI-SITEREM-0000001.  At other sites, questions remain about whether the investigation- and remediation-based damages the State seeks are due to MTBE or to other constituents and why the State is not already requiring responsible parties to undertake additional remediation and investigation if the State truly believes such additional work is necessary.

the expense of pursuing those sites past the point of fact discovery.  Stipulated Order of

Dismissal, *New Jersey Dep't of Envtl. Prot. v. Amerada Hess Corp.*, No. 15-cv-6468 (FLW)

(LHG) (D.N.J. Aug. 15, 2016, attached as Ex. B.[13]

Similarly, site-specific evidence is relevant to disproving a Defendant's alleged

liability under the State's failure to warn theory, where the Defendant itself was the station

owner or operator.  That is because a defendant cannot be held liable for failing to warn itself.

*In re MTBE Prods. Liab. Litig.*, 2015 U.S. Dist. LEXIS 77917, *21 (S.D.N.Y. 2015)

(dismissing failure to warn claim against refiner defendant that also owned station,

"[b]ecause there can be no duty to warn oneself").  Also, site-specific evidence is necessary

to demonstrate intervening causes, for example, where a retailer, distributor or other third

party may have negligently caused a spill or underground storage tank owners negligently

failed to maintain their tanks as required under applicable laws and regulations.  Discovery in

other cases has demonstrated that station owners' negligence (*e.g.*, failing to correctly take

inventory or maintain USTs), contractor negligence (*e.g.*, accidently puncturing product lines

when performing work at a station or improperly installing tanks), and delivery driver

negligence (*e.g.*, overfilling a UST or delivering to the wrong UST), among other things,

often are the cause-in-fact of gasoline releases, including MTBE gasoline releases.  These

negligent actions, rather than any allegedly defective "design" of MTBE gasoline or failure to

warn in connection with the MTBE gasoline itself, can only be explored in discovery and

established at trial on a site-by-site basis.

Calculating damages, if any, will also necessarily be a site-specific issue.  As an

initial matter, it will be the rare site, if any, where the State will be able to show that it will

---

[13] In *State of New Jersey*, the plaintiff's expert declined to "present damages estimates for [these] sites" because "the likely damages would be modest relative to the cost of completing site-specific assessments."  Expert Report of Robert E. Unsworth, *New Jersey Dep't of Envtl. Prot.*, No. 08-CIV-00312, 42 (Nov. 8, 2012), attached hereto as Ex. C.

incur any future remediation costs at all, as the responsible parties—not the State—are required by statute to pay for the investigation and remediation of the sites until the State regulators have determined that the sites have been cleaned up.  Moreover, investigation and remediation costs vary dramatically depending on the condition of the site.  MTBE is not uniformly dispersed across sites; some sites will have higher levels of MTBE than others.  Sites may have had small or large amounts of gasoline released and may also contain little MTBE but high levels of other petroleum compounds or other chemicals such as perchloroethylene (a dry-cleaning solvent that renders drinking water non-potable), a fact that resulted in a $70 million reduction in the damages awarded in the *City of New York* case.  *In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 126-127 (2d Cir. 2013) (affirming trial court's decision to instruct the jury to reduce the City's damage award for treating MTBE by the cost of treating other contaminants).[14]  Varying geological conditions impact whether basic or complex remedial measures are necessary.  MTBE remediation varies in technical difficulty, cost, and duration.  Remediation may have just begun at one site, while another open site may be fully remediated and awaiting approval from the DEM to close.

The State anticipates that its "experts will develop matrices to apply well-established and known costs for common activities across known and identified MTBE-contaminated sites and wells."  State's Br. at 10.  But for all of the reasons stated above, a generalized approach to calculating damages divorced from the specific and unique facts of each site is inappropriate and objectionable.  Defendants must be able to investigate the conditions of each site to rebut the State's proposed generic assumptions and estimations (if the State

---

[14] In the *City of New York* case, the jury's $70 million reduction of the City's damages had no impact on the City's ability to build the treatment facility it claimed to need, because it never built the facility.  Shortly after the U.S. Supreme Court denied certiorari in the matter, the City, after pocketing well over $100 million from the trial verdict (and considerable additional funds by way of settlements), announced that it did not need to use the wells after all and, therefore, was indefinitely suspending its plans to construct the treatment facility.  *Queens Groundwater Rehabilitation*, NYC Water for the Future Envtl. Prot. (March 20, 2017), attached as Ex. D.

chooses and is allowed to proceed in such a manner).  At a minimum, Defendants need this

site-specific evidence both to challenge the reliability of the expert testimony under Federal

Rule of Civil Procedure 702 and, should the testimony be admitted, to rebut the State's expert

witnesses' damages calculations at trial. [15]

Finally, Defendants likely have viable comparative negligence defenses where a State

agency owned the UST that allegedly leaked, failed to properly maintain the tank, or

otherwise caused the release of gasoline.  Accord and satisfaction or other contractual

defenses may be available at sites where the record shows the State entered into a settlement

agreement with a Defendant with respect to a site or sites that included a release and

covenant not to sue and that covered the cost of the completed remediation.  Identifying the

owner and operator of each site is necessary to show that Defendants lacked control at

particular sites.

These are just a few examples of how the facts and circumstances of each site and

each MTBE release are different.  Due process and fundamental fairness require that these

differences are afforded individualized treatment.

### III.    THE FOCUS SITE APPROACH IS AN EFFECTIVE CASE MANAGEMENT TOOL BUT MAY BE UNNECESSARY.

As described above, the State's case is more limited than it suggests because its

alleged "past cost" claims are not viable.  If, however, the State were to have claims at more

than 600 sites, the focus site approach would be the most efficient method of proceeding that

also protects Defendants' constitutional right to put on a defense.  Should focus sites become

necessary, Defendants are willing to discuss specifics of selection with the State and the

---

[15] The State incorrectly states that Defendants did not challenge the evidence New Hampshire submitted to prove damages at known sites and wells.  State's Br. at 7.  But Defendants in New Hampshire did challenge this evidence, not in the "relevancy" briefing, but in the very *Daubert* motion that the State itself references, *id.* at 7 n.2, and Defendants reserve the right to do the same in this matter.

22

Court, including the number of sites that would allow the parties to fully litigate site-specific issues while ensuring that the trial remains manageable.  Although there are a variety of methods that could be used to select the focus sites, a straightforward process involving some aspect of random selection would proceed quickly and prevent parties from choosing only "extreme" sites with very high or very low concentrations of MTBE.  State's Br. at 23.  The resulting focus site trial would encourage the efficient resolution of claims related to any remaining sites because it would allow the parties to develop a better understanding of the merits of those claims.

The State's protestations that the focus site approach would not resolve the entire case, would create satellite litigation over focus site selection, and would unduly prolong the litigation ignores both the history of the MDL litigation (described at pages 4-6 of Defendants' May 20 submission) and this Court's active and close management of this case. As an initial matter, simple arithmetic demonstrates the success of the focus site approach. At one time, more than 150 MTBE cases were pending in MDL 1358.  Only five remain, in large part due to the use of focus sites that allowed the parties to narrow both the scope of the cases and the issues, and negotiate settlements sooner rather than later.  The State complains that these five cases are not completely resolved, but they are well on their way to resolution. For example, the Orange County Water District has settled its claims with all but a few minor defendants.  And in *New Jersey*, where the State initially claimed that more than 6,000 sites were at issue, the focus site approach has led to resolution of claims at all sites with almost all of the 49 defendants, resulting in substantial recoveries to the State without it having to conduct a single trial.[16]

---

[16] The State claims that Judge Scheindlin "lost faith" in the focus site process, but she never veered from her view that Defendants' constitutional due process rights had to be honored, as the State acknowledges.  State's Br. at 22.  Of course, "Phase I" in New Jersey (i.e., the first set of focus sites) has already resolved almost the entire case, even before a Phase I trial.  And neither the current MDL judge nor the *New Jersey* judge have indicated they would require a "single Phase II trial."  Judge Broderick, who now oversees MDL 1358, has discussed with approval the focus site selection and

The State's claim that focus site selection will inevitably lead to satellite litigation also is baseless. In none of the MDL cases has "parallel litigation" over focus site selection ever occurred. Nor does the focus site selection process have to be protracted. In *Commonwealth of Pennsylvania*, the most recent case adopting the focus site approach, the State's representation that it took three years to select focus sites is wrong. Focus site selection in that case was substantially complete within two months of Magistrate Judge Freeman's order directing the parties to do so.[17] As for the State's claim about the time it is taking to resolve the other state cases, that is a function of both the plaintiffs' lack of diligence in pressing their claims and the remanded courts' busy calendars. In any event, the State's criticism of the handling of other cases is irrelevant to what happens here. Defendants have no doubt that the Court would exercise a fair but tight rein over both the focus site selection process and the timeframe for focus site discovery and motion practice.

Likewise, although the State portends that a focus site approach will result in seriatim trials *ad nauseum*, that has never happened.[18] To the extent that a focus trial takes place and does not lead to a global settlement of all claims, there are likely certain issues that would be

---

site-specific discovery procedures, *In re MTBE Prods. Liab. Litig.*, No. 1:00-1898, 2019 WL 117302 (S.D.N.Y. Jan. 7, 2019), and Judge Wolfson, who will be trying the New Jersey focus site case, also has recognized the importance of "site-specific realities and circumstances." *New Jersey Dep't of Envtl. Prot. v. Amerada Hess Corp.*, 323 F.R.D. 213, 222 (D.N.J. 2017).

[17] The State calculates the time period for selection of focus sites in Pennsylvania based on Judge Scheindlin's order dated April 29, 2016, which first mentioned focus site selection. State's Br. at 16 (citing State's Ex. D). But following entry of that Order, Judge Scheindlin retired and the State resisted efforts to implement the focus site approach for nearly three years. It was not until Magistrate Judge Freeman was assigned to the matter and ordered the parties to select focus sites on January 11, 2019 that the process of focus site selection began. That process was substantially complete within two months and fully completed within five months.

[18] The State laments the fact that the City of New York had to dismiss its claims for other wells in order to get a final judgment on the wells it took to trial. State's Br. at 24. Those claims were dismissed *without prejudice* more than a decade ago. Not surprisingly, after pocketing well over $100 million and never treating or replacing a single well, the City never refiled claims for its other wells.

24

resolved in the initial trial that would be applicable to subsequent trials, which would

significantly reduce the universe of evidence to be presented and the issues to be decided.

      Finally, as noted above, the State's attempt to distinguish this case from

*Pennsylvania*, *New Jersey*, and *Puerto Rico* by characterizing them as "direct discharger"

cases is simply wrong.  The complaints in those cases allege the same product liability and

other common law theories of liability against MTBE manufacturers and suppliers as are at

issue here.  For example:

*Commonwealth of Pennsylvania*:
- Plaintiff alleged strict product liability based on defective design, strict liability for failure to warn, negligence, public nuisance, trespass, unjust enrichment, and state statutory claims.  *Commonwealth of Pennsylvania v. Exxon Mobil Corp., et al.*, No. 1:14-cv-06228, Second Amended Compl., attached as Ex. E.
- Plaintiff identified defendants as either (1) "MTBE Defendants" who were "MTBE manufacturers and MTBE refiners" as well as "major-brand gasoline marketers and distributors" or; (2) "Insurance Defendants" who owned and/or operated USTs.  *Id.* at ¶¶ 14, 15, 21.
- Plaintiff alleged: "MTBE Defendants designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, stored, marketed and/or otherwise supplied (directly or indirectly) MTBE and MTBE gasoline that was delivered, stored and sold in Pennsylvania (or to areas outside Pennsylvania affecting the waters of the Commonwealth) resulting in contamination of the waters of the Commonwealth."  *Id.* at ¶ 14.

*New Jersey Department of Environmental Protection*:
- Plaintiff alleged strict product liability based on defective design, negligence, public nuisance, trespass, and state statutory claims.  *New Jersey Dept. of Envtl. Prot. v. Atlantic Richfield Co., et al.*, No. 08-cv-00312, Fourth Amended Compl., attached as Ex. F.
- Plaintiff alleged: "The Defendants in this action are major oil and chemical companies that designed and/or manufactured MTBE and/or supplied gasoline containing MTBE within the State, and/or affecting waters of the State. The Defendants include MTBE manufacturers and refiners and major-brand marketers of gasoline containing MTBE." *Id.* at ¶ 5.
- Plaintiff alleged that Defendants "designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed and/or otherwise suppled (directly or indirectly) gasoline containing MTBE that was delivered into the State." *Id.* at ¶ 9(a).

*Commonwealth of Puerto Rico II*:
- Plaintiff alleged strict products liability for defective design and failure to warn, negligence, public nuisance, trespass, and state and federal statutory claims.  *Commonwealth of Puerto Rico v. Shell Oil Co., et al.*, No. 13-cv-01678, Second Amended Compl., attached as Ex. G.

- Plaintiffs categorized defendants into three distinct groups: refiners/suppliers, manufacturers/suppliers, and owners/operators.  *Id.* at ¶¶ 21–59.
- Plaintiff alleged claims against Defendants as manufacturers and suppliers of MTBE gasoline: "As described below, Defendants include refiners of gasoline containing MTBE that contaminates waters of the Commonwealth; manufacturers and promoters of MTBE; suppliers of gasoline containing MTBE that contaminates waters of the Commonwealth; and owners and/or operators of gasoline facilities that have released MTBE that contaminates waters of the Commonwealth."  *Id.* at ¶ 17.

Also, the plaintiffs in these other cases have taken discovery focused on the

defendants' supply of MTBE gasoline into the relevant jurisdictions and have identified

specific defendants who they claim have supplied gasoline to individual service station

release sites.  *See, e.g.*, *In re MTBE Prods. Liab. Litig.,* CMO 119 ¶¶ III.B. (1-4, 7), E., Ex. A,

attached as Ex. H (in *Commonwealth of Pennsylvania* case, outlining extensive discovery

focused on defendants' supply of MTBE gasoline into Pennsylvania); *In re MTBE Prods.*

*Liab. Litig.*, 117 F. Supp. 3d 276, 295–96 (S.D.N.Y. 2015) (holding that suppliers could not

be held liable when they only "supplied and distributed gasoline with *de minimis* levels of

MTBE"); *In re MTBE Prods. Liab. Litig.*, (Jun. 10, 2014) CMO at 2, attached as Ex. I (listing

defendants' ownership, operation *and supply* relationships with specific release sites in

*OCWD* case); *In re MTBE Prods. Liab. Litig.*, 980 F. Supp. 2d at 445–47, 452, 457 (noting

that City of Fresno's claims against certain defendants are based on their manufacture, supply

and marketing gasoline with MTBE that was delivered to stations in Fresno).  Thus, other

MTBE plaintiffs have made it clear through the course of litigation that they are pursuing

defendants as manufacturers and suppliers of MTBE gasoline (in addition to pursuing certain

defendants as owners and operators of gas station release sites).

However relevant the MDL 1358 focus site approach may be in a case involving

hundreds or thousands of sites, it may not be necessary here if the State has no valid claims

for past costs such that only 93 sites and 12 wells remain at issue.  Although these are not

small numbers, they certainly are not unprecedented.  In *Commonwealth of Pennsylvania*, the

parties recently selected and are taking discovery on 75 focus sites.  In *City of Fresno*, the

MDL Court did not adopt the focus site process because there were only about 60 sites at issue, so discovery and motion practice was conducted as to all sites.  That case was resolved without a need for a trial primarily through summary judgment and other dismissals. In any event, the Court need not decide now whether and how focus sites would be chosen or utilized in this case.

**IV.   DEFENDANTS' CASE MANAGEMENT PROPOSAL.**

First, Defendants request that the Court exercise its discretion under Rule 16 and establish a briefing schedule for Defendants' motion directed at the State's "past cost" sites:

- Defendants' Motion:  21 days from date of Court's order;

- Plaintiff's Response:  21 days from date of Defendants' motion;

- Defendants' Reply:    14 days from date of Plaintiff's response;

- Oral argument on a date set by the Court.

Second, and in parallel with this motion, Defendants propose that non-site-specific discovery continue and site-specific discovery go forward as to the 93 purported "future cost" sites and 12 wells that are not the subject of Defendants' anticipated motion.  Plaintiff's statements about the status of its responses on non-site-specific discovery are misleading. Contrary to the State's representations that it has produced "substantial amounts of documents" that are not site specific, State's Br. at 9, the State in fact has produced very little in response to Defendants' requests and has yet to produce any emails or other electronically stored information.

In June of 2020, the State began producing documents that were purportedly responsive to the November 2019 requests.  In fact, most of the documents produced to date appear to be *site-specific* documents, such as quarterly monitoring reports, requests for remediation permits, and site investigation report addendums, or are entirely non-responsive. Even assuming as true the State's representations that it may have destroyed many of the

27

responsive documents under its document retention policies (an issue for another day), there is still much progress to be made on the State's non-site-specific document production.

Defendants, on the other hand, have already produced most of their non-site-specific materials in prior MTBE litigation (which the State's outside counsel has had access to for many years), as well as in a series of Rhode Island-specific productions that Defendants have made over the last six months. As previously reported to the Court, Defendants are prepared to submit an agreed order specifically governing the use of prior MTBE discovery in this case and sent a second draft of that order to the State on November 1, 2019 and on May 19, 2020. Although the State has attached a draft order to its submission, the State's draft wholly ignores the concerns Defendants raised in their November 1 and May 19 draft and thus the parties have yet to reach any agreement on this order.

Ignoring the snail's pace of its own non-site-specific document production and the amount of time necessary to take site-specific discovery, the State continues to offer the same unrealistic schedule that it has all along, with all fact discovery closing in a year and trial commencing in just under two years. Given that it took the State nearly seven months to make its first, and wholly inadequate, production in response to Defendants' non-site-specific document requests, it is unreasonable to expect that *all* fact discovery covering both non-site-specific and site-specific document productions and depositions can close by next July, even if less than 616 are at issue. The State also has admitted that due to the global pandemic, it currently is unable to access and review potentially relevant hard-copy materials, making its projected time frame all the more unrealistic.

Further, for the same reasons Defendants have previously explained, the State's proposal with respect to a simultaneous exchange of expert reports and the submission of dispositive motions and *Daubert* challenges on the same date is unworkable in a case of this size and complexity. *See* Defs' Mar. 11, 2019 Proposed CMO Submission at 9–10. Until the

28

State identifies its experts and general subject matter of their testimony, Defendants cannot know which or how many experts they will need and the simultaneous exchange of expert reports will undoubtedly lead to requests for additional time to address unexpected issues or experts.  There is simply no reason to depart from the standard procedure of plaintiffs making their expert disclosures first, followed by the defendants.  Summary judgment motions are likely to rely in large part on expert opinions and accordingly, expert discovery, including *Daubert* challenges, should conclude before summary judgment motions are due.

Defendants' proposal to continue to address this case in stages—with the next stage consisting of motion practice to address the viability of the State's "past costs" claims and continuing with both non-site-specific discovery and site-specific discovery on the 105 "future cost" sites and wells—and reconvening in the near future to set the next schedule, is the most realistic and efficient approach to managing this litigation.

## CONCLUSION

Defendants respectfully request that the Court permit Defendants to proceed with a motion to address the State's alleged "past costs" claims and enter the proposed Case Management Order attached as Ex. A.

EXXON MOBIL CORPORATION,
EXXONMOBIL OIL CORPORATION,
and MOBIL CORPORATION
By their attorneys,

/s/ Matthew T. Oliverio
Matthew T. Oliverio (#3372)
OLIVERIO & MARCACCIO LLP
55 Dorrance Street, Suite 400
Providence, RI 02903
(401) 861-2900
mto@om-rilaw.com

Deborah E. Barnard (*pro hac vice*)
Michael T. Maroney (*pro hac vice*)
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA 02116
(617) 619-9240
deborah.barnard@hklaw.com
michael.maroney@hklaw.com

David J. Lender (*pro hac vice*)
Jessica L. Falk (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8511
david.lender@weil.com
jessica.falk@weil.com

James A. Pardo (*pro hac vice*)
Lisa Gerson (*pro hac vice*)
MCDERMOTT WILL & EMERY
340  Madison  Avenue
New  York,  NY  10173
(212) 547-5353
jpardo@mwe.com
lgerson@mwe.com

ATLANTIC RICHFIELD
COMPANY and BP PRODUCTS
NORTH AMERICA INC.
By their attorneys,

/s/ John A. Tarantino
John A. Tarantino (#2586)
Nicole J. Benjamin
Patricia K. Rocha
Kyle M. Zambarano
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
401-274-7200
jtarantino@apslaw.com
nbenjamin@apslaw.com
procha@apslaw.com
kzambarano@apslaw.com

J. Andrew Langan (*pro hac vice*)
Andrew R. Running (*pro hac vice*)
Amanda Jacobowski (*pro hac vice*)
Benjamin O'Connor (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
312-862-2412
alangan@kirkland.com
arunning@kirkland.com
amanda.jacobowski@kirkland.com
benjamin.oconnor@kirkland.com

CHEVRON U.S.A. INC. and TRMI-H LLC
By its attorneys,

*/s/ Charles C. Correll, Jr.*
Charles C. Correll, Jr. (*pro hac vice*)
Jeremiah J. Anderson (*pro hac vice*)
James J. Maher (*pro hac vice*)
KING & SPALDING LLP
1100 Louisiana
Suite 4000
Houston, TX 77002
(713) 751-3200
CCorrell@kslaw.com
jjanderson@kslaw.com
jmaher@kslaw.com

Stacey P. Nakasian (#5069)
Robert M. Duffy (#4428)
DUFFY & SWEENEY, LTD.
321 South Main Street
4th Floor
Providence, RI 02903
(401) 455-0700
snakasian@duffysweeney.com
rduffy@duffysweeney.com

CITGO PETROLEUM CORPORATION,
CITGO REFINING AND CHEMICALS
COMPANY, L.P., and PDV MIDWEST
REFINING, L.L.C.
By their attorneys,

*/s/ John E. Bulman*
John E. Bulman (#3147)
Stephen J. MacGillivray (#5416)
PIERCE ATWOOD LLP
72 Pine Street 5th
Floor
Providence, RI 02903
401-490-3435
jbulman@pierceatwood.com
smacgillivray@pierceatwood.com

Nathan P. Eimer (*pro hac vice*)
Pamela R. Hanebutt (*pro hac vice*)
Lisa S. Meyer (*pro hac vice*)
Susan M. Razzano (*pro hac vice*)
EIMER STAHL LLP
224 S. Michigan Avenue Suite
1100
Chicago, IL  60604
312-660-7600
neimer@eimerstahl.com
phanebutt@eimerstahl.com
lmeyer@eimerstahl.com
srazzano@eimerstahl.com

31

COASTAL EAGLE POINT OIL
COMPANY, EL PASO MERCHANT
ENERGY-PETROLEUM COMPANY
By its attorneys,


/s/ Mark P. Dolan
Mark P. Dolan (#3280)
RICE DOLAN AND KERSHAW
72 Pine Street, Suite 300
Providence, RI 02903
401-272-8800
mdolan@ricedolan.com


James L. Messenger (*pro hac vice
pending*)
Brian J. Wall (*pro hac vice*)
GORDON & REES SCULLY
MANSUKHANI
21 Custom House Street, 5th
Floor Boston, Massachusetts
02110
617-902-0098
jmessenger@gordonrees.com
bwall@grsm.com

CONOCO PHILLIPS COMPANY
By its attorneys,


/s/ Robert G. Flanders, Jr.
Robert G. Flanders, Jr. (#1785)
Timothy K. Baldwin (#7889)
WHELAN, CORRENTE, FLANDERS,
KINDER
& SIKET LLP
100 Westminster Street, Suite 710
Providence, RI 02903
401-270-0154
rflanders@whelancorrente.com
tbaldwin@whelancorrente.com


Jessica Farley (*pro hac vice*)
Stephen Dillard (*pro hac vice*)
NORTON ROSE FULBRIGHT US LP
1301 McKinney
Suite 5100
Houston, TX 77010
(713) 651-5246
jessica.farley@nortonrosefulbright.com
steve.dillard@nortonrosefulbright.com

32

EQUILON ENTERPRISES LLC,
MOTIVA ENTERPRISES LLC,
SHELL OIL COMPANY, SHELL
OIL PRODUCTS COMPANY LLC,
SHELL PETROLEUM INC., SHELL
TRADING (US) COMPANY and
TMR COMPANY
By their attorneys,

/s/ Matthew J. McBurney
Matthew J. McBurney
Richard E. Wallace (*pro hac vice*)
Peter Condron (*pro hac vice*)
Harmon (Monty) L. Cooper (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Ave. NW
Washington, DC 20004
(202) 624-2500
mmcburney@crowell.com
RWallace@crowell.com
pcondron@crowell.com
MCooper@crowell.com

HESS CORPORATION, MARATHON OIL
COMPANY, MARATHON PETROLEUM
COMPANY LP,
By its attorneys,

/s/ Robert Fine
Douglas J. Emanuel (#5176)
Robert D. Fine (#2447)
CHACE, RUTTENBERG & FREEDMAN,
LLP
One Park Row
Suite 300
Providence, RI 02093
(401) 453-6400
demanuel@crfllp.com
rfine@crfllp.com

Christopher Danley (*pro hac vice*)
Joshua B. Frank (*pro hac vice*)
BAKER BOTTS LLP
1299 Pennsylvania Ave. NW
Washington, DC 20004
(202) 639-7842
christopher.danley@bakerbotts.com
joshua.frank@bakerbotts.com

33

HIGHLANDS FUEL DELIVERY, LLC,
IRVING OIL LIMITED
By its attorneys,

*/s/ Glenn J. Pogust*
Glenn J. Pogust (*pro hac vice*)
James D. Herschlein (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019
(212) 836-8655
glenn.pogust@apks.com
james.herschlein@apks.com

Sina Mansouri (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 942-5833
sina.mansouri@arnoldporter.com

Gerald J. Petros (#2931)
Ryan M. Gainor (#9353)
HINCKLEY, ALLEN & SNYDER LLP
100 Westminster Street
Suite 1500
Providence, RI 02903
(401) 457-5324
gpetros@hinckleyallen.com
rgainor@hinckleyallen.com

PAULSBORO REFINING COMPANY,
LLC, THE PREMCOR REFINING GROUP
INC., ULTRAMAR ENERGY, INC.,
VALERO ENERGY CORPORATION,
VALERO MARKETING AND SUPPLY
COMPANY, VALERO REFINING-
TEXAS, L.P.
By its attorneys,

*/s/ Erika M. Anderson*
Erika M. Anderson (*pro hac vice*)
James F. Bennett LLP (*pro hac vice*)
Kelly J.H. Murrie
DOWD BENNETT LLP
7733 Forsyth Blvd.
Suite 1900
St. Louis, MO 63105
(314) 889-7300
eanderson@dowdbennett.com
jbennett@dowdbennett.com
kmurrie@dowdbennett.com

Richard Lumley (#9665)
BURNS & LEVINSON LLP
One Citizens Plaza
Suite 1100
Providence, RI 02902
(401) 831-8330
rlumley@burnslev.com

34

SUNOCO, INC. (R&M)
By its attorneys,

*/s/ Daniel M. Krainin*
Daniel M. Krainin (*pro hac vice*)
Paula J. Schauwecker (*pro hac vice*)
BEVERIDGE & DIAMOND, P.C.
477 Madison Avenue, 15th Floor
New York, NY
(212) 702-5417
dkrainin@bdlaw.com
pschauwecker@bdlaw.com

John S. Guttmann (*pro hac vice*)
Nessa Horewirch Coppinger (*pro hac vice*)
BEVERIDGE & DIAMOND, P.C.
Suite 700
1350 I St., NW
Washington, DC 20005
(202) 789-6020
jguttmann@bdlaw.com
ncoppinger@bdlaw.com

Douglas J. Emanuel (#5176)
Robert D. Fine (#2447)
CHACE, RUTTENBERG & FREEDMAN,
LLP
One Park Row, Suite 300
Providence, RI 02093
(401) 453-6400
demanuel@crfllp.com
rfine@crfllp.com

TOTAL PETROCHEMICALS &
REFINING USA, INC.
By its attorneys,

*/s/ Christopher H. Domingo*
Christopher H. Domingo (*pro hac vice*)
Diane L. Myers (*pro hac vice*)
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
(832) 239-3827
chdomingo@jonesday.com
dmyers@jonesday.com

Traci L. Lovitt (*pro hac vice*)
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-7830
tlovitt@jonesday.com

Jeffrey M. Padwa (#5130)
PADWA LAW LLC
One Park Row, 5th Floor
Providence, RI 02903
(401) 935-8571
jpadwa@padwalaw.com

35

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on this 24th day of July, 2020, a copy of the foregoing was filed electronically and service of this filing will be sent by operation of the  United States District Court for the District of Rhode Island's electronic filing system to ECF registered counsel for plaintiff and defendants.

*/s/ Stephen J. MacGillivray*
Stephen J. MacGillivray